THE UNITED STATES DISTRICT COURT FOR DISTRICT OF COLUMBIA **FILED**

Case No.

**JAN - 2 2008**

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

DOROTHY DIER
Incapacitated
Summit Park Holding Facility
1502 Frederick Rd. Catonsville, MD 21228
JERRY L. DIER, her son and next friend
11448 Rowley Rd. Clarksville, MD 21029
(202)276-8716

Plaintiffs

vs.

PHYLLIS MADACHY, DIRECTOR
OFFICE OF AGING,
HOWARD COUNTY, MARYLAND
Court Appointed Guardian of the Person
DOROTHY DIER held incapacitated
Designated agents, Peggy Rightenauer, Opheila Ross
6751 Gateway Drive, Columbia, MD 21046  and
JUDGE DENNIS SWEENEY,
State of Maryland, Howard County Circuit Court,
Howard County, Maryland
8360 Court Avenue, Ellicott City, MD 21043
Summit Park Health and Rehabilitation Center
Court Ordered Holding Facility
Director, Jacqueline. Hardy and designee Lottie Dorsey
And Doctors Bernhard, Baskeran and Tansandra and
Unit manager, Kim Williams and
Charge nurse, Richards, amongst others
1502 Old Frederick Rd.
Catonsville, MD  21228

Defendants

Petition for a Writ of
Habeas Corpus for a
Person found Incapacitated

In State Custody

In The
Howard County
Circuit Court
Case No: 13-C-0563324

AND

Case No. 13-C06-65465

Case: 1:08-cv-00002
Assigned To : Collyer, Rosemary M.
Assign. Date : 1/2/2008
Description: Habeas Corpus-2255

**PETITION PURSUANT TO 28 U.S.C. SECT. 2254, FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY-PLAINTIFF'S SEEKS HABEAS CORPUS RELIEF, RELEASE FROM STATE CUSTODY, UNDER THE UNITED STATES CONSTITUTION FOR VIOLATION OF PLAINTIFF'S FOURTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS, NAMELY RIGHT TO PRIVACY, RIGHT TO COUNSEL, RIGHT TO A FAIR TRIAL, RIGHT TO BE PRESENT, RIGHT TO A JURY TRIAL, RIGHT TO DUE PROCESS OF LAW**

*INTRODUCTORY STATEMENT*

PLEASE BE ADVISED, that the State of Maryland Howard County Circuit Court with at the very least the concurrence of the Court of Special Appeals for Maryland have issued a series of holdings contrary to the Rule of Law which have deprived DOROTHY DIER of her rights both guaranteed and protected by the United States Constitution, so as to significantly impact her life and liberty interests by Maryland State Court conduct in Case Nos. 13-C05-63324(guardian of person, Court order dated March 7, 2006, App. 1, grounded soley on activities taking place in the District of Columbia, when DOROTHY DIER was a patient at the Washington Hospital Center, <u>in the District of Columbia</u> and being treated by medical staff working for said Hospital-said activities were <u>directed</u> wholly by the State of Maryland Howard County Circuit Court and/or its agents, the State of Maryland Howard County Department of Social Services and Office of Aging) and 13-CO6-65465(guardian of property action) in the Howard County Circuit Court-said conduct, unsupportable by fact or in law were affirmed by the Court of Special Appeals for Maryland in Case Nos. 295, September 2006 Term and 1595, September 2006 Term, respectively. The thrust of both actions in the State Circuit Court and the State Appellate Court was the lack of fairness and impartiality in both court systems, most recently manifesting itself most recently when the State of Maryland Appellate Court affirmed the Howard County Circuit Court action as regards a request for recusal of the Howard County Circuit Court Judge in the guardian of property action which was grounded on the conduct of the Howard County Circuit Court in the guardian of person action depriving DOROTHY DIER of her life and

liberty interests guaranteed and protected under the United States Constitution making necessary this request for habeas relief pursuant to 28 U.S.C. 2254. (See App. 2, State Appellate decision in guardian of property action pertaining to conduct of State Court in guardian of person action, and request for reconsideration and denial.

The record was clear, there was no question as to misjudgment; a signal pattern with marker after marker made it remarkably obvious that what had taken place at the Howard County Circuit Court level was that a State Court had refused to recognize the Rule of Law, so as to conduct itself and issue holdings that that were rooted in its own particular notions of right and wrong, Whereby the Rule of Law was nowhere to be found as the rule of man triumphed in a most deplorable fashion. The reach of the Howard County Circuit Court is not to be underestimated, as the State Appellate Court System bent over backwards breaking all the rules as regards addressing issues placed before it for resolution in order protect the Howard County Circuit Court Judge.

DOROTHY DIER, an innocent, has been victimized by the State of Maryland Howard County Circuit Court. Judge Dennis M. Sweeney's holdings throughout the proceedings before him which have been grounded on his
individual notions of right and wrong, Thereby violating his oath and the trust placed in him by the community in which he serves, allowing the rule of man to triumph over the Rule of Law. By extra-legal means, such as, 1- by appointing an attorney to represent DOROTHY DIER who would serve only to mirror his beliefs, 2- by appointing as guardian of person an entity, Howard County Office of

3

Aging, a complicit appendage which was insulated from scrutiny by Judge

Sweeney, 3- by appointing the same court appointed counsel in the subsequent

guardian of property action brought by its agent Summit Park, so as to further

protect its position, and 4-then by appointing as guardian of property, a person

who under any definition can only be described as having a direct interest in the

Howard County Circuit Court, Thomas Meachum(campaign treasurer in 2006

election of 2 of 5 Howard County Circuit Judges), setting forth a pattern of conduct

Whereby DOROTHY DIER has been deprived of her rights guaranteed and

protected by the United States Constitution by a State of Maryland Howard County

Circuit Court Judge who has acted as if granted immunity from wrongdoing by the

State Court Appellate System, which for all practical purposes is exactly what has

taken place.

   A most recent event clearly but shamefully pictures how State of Maryland

Court Action has deprived DOROTHY DIER of her human dignity and life and

liberty interests. On Monday, December 24, 2007, at approximately 1 p.m. I found

my mother with the door wide open to her room lying in a position that can only be

described by closing one's eyes and reflecting back to what we have all seen during

our lifetimes, still pictures and video depictions of man's inhumanity to men and

women in the Nazi concentration camps, deprived, mangled, starved and tortured

bodies. MY MOTHER, DOROTHY DIER was turned on her right hip with her

neck bent and head extended and turned toward her body with sheet-blanket

covering her face up to her nose. Although I could not see specific outline of her

arms, hands, legs and feet, she appeared to be rolled up like a ball. I immediately

summoned help, and a nurse Tyla came into the room. She removed the covers from MY MOTHERS body and I could then see, MY MOTHERS legs, her left knee extended into the air close to her face, her right leg mangled under body, her right arm barely visible squeezed under her body with her right hand under her body hidden from view Moreover, MY MOTHERS right arm as best as I could see was covered with sores as was her back area with blood staining sheeting adjacent these areas. Mangled, distorted and bent so as to take on  positions unimaginable is the only way I can describe MY MOTHERS appearance-similar to the mangled, contorted bodies seen by American soldiers during their liberation of Auschwitz. And other Nazi concentration camps. The second World War was followed by war crimes tribunals, crimes against humanity-what of justice for an innocent, tortured on American soil at the behest of a State Court System, where does that person turn for relief. The State of Maryland Howard County Circuit Court, Judge Dennis M. Sweeney is directly responsible, having been told(transcript, App. 4) on October 3, 2007, in open court with the representative of Howard County Office Aging, Peggy Rightenauer seated beside her legal representative, the Howard County Office of Law, Beverly Heydon, of the horrific, inhumane and barbaric acts inflicted up MY MOTHER DOROTHY DIER through his agent the State of Maryland Howard County Office of Aging and its designee, Summit Park Holding Facility and taking no corrective and/or curative action, a fact acknowledged by Judge Sweeney by his silence when asked about what he had done if anything as regards the specific information presented to him without denial on October 3rd. Judge Sweeney surprisingly retired on November 2, 2007, but still shamefully is granted permission

by the State of Maryland Court System to sit on certain cases, including matters pertaining to MY MOTHER DOROTHY DIER.

Jerry L. Dier, in behalf of his Mother, DOROTHY DIER is petitioning this Court to issue a writ of habeas corpus based in law on the following jurisdictional arguments as regards DOROTHY DIER. The Howard County Department of Social Services filed a petition for guardian of person, DOROTHY DIER in Howard County Circuit Court on September 28, 2005. On January 4, 2006, at Howard County General Hospital, the medical staff performed an unconsented surgical debridment on DOROTHY DIER, removing a golf ball size of flesh on her right hip. Moreover, the medical staff stated that they were considering further radical surgery. Jerry L. Dier removed and had his mother transferred to Washington Hospital Center in the District of Columbia on January 8, 2006. The State of Maryland petitioners in the guardian of person action requested that the doctors at Washington Hospital Center conduct examinations and make evaluations consistent with the requirements of Maryland law in guardian of person actions.

The Howard County Circuit Court had earlier stated, at a December 7, 2005, that it believed that at least one of the two physician certificates required by law to be attached to the petition were defective and apparently in response to said instructive directive by the Court, the Howard County Office of Aging through its representative went to Howard County General on or about December 30, 2005, in the early morning hours and attempted to have a further physician certificate filled out under the false claim that it had a court order for the same. A diligent nurse asked to see such a court order and the representative said she did not have it with

6

her and left. In response, Mr. Dier filed a request for a protective order with the

Howard County Circuit Court. In spite of the fact that the request for a protective

order had been filed and the Office of Aging had been found out at Howard County

General, Aging further requested the doctors at Washington Hospital Center to fill

out two physician certicates consistent with Maryland law while the request for a

protective order was pending before the Howard County Circuit Court.

When this matter was discovered and brought to the attention of the Howard

County Circuit Court, the court's astonishing response was since it had been done,

it was moot. Throughout DOROTHY DIER'S stay at the Washington Hospital

Center, January 8 through January 31, 2006, representatives from the Howard

County Department of Social Services and Office of Aging directed the medical staff

at the Washington Hospital Center. In the end of January 2006, DOROTHY DIER

was removed from the Washington Hospital Center and transferred to Summit

Park Nursing and Rehabilitation Facility by the order of the State of Maryland

Howard County Circuit Court; the Howard County Circuit Court Judge

acknowledged that he had previously been in Summit Park and that Summit Park

was three houses from where his sister lived.. The Howard County Circuit

Court both directly and indirectly through its agents, the petitioner, Howard

County Department of Social Services and the Howard County Office of Aging

both directed and received input that they believed necessary to meet the demands

of the State of Maryland Court as regards the law in the State of Maryland

concerning guardian actions. In addition and finally, at the Court hearing in the

Howard County Circuit Court on March 7, 2006, the evidence received by the

Howard County Circuit Court was entirely that of the medical staff of the

Washington Hospital Center, who either in response to subpoena or direction

appeared before the Howard County Circuit Court and gave testimony and

documentation as regards their observations, examinations and analysis so as to

make a presentation consistent with the requirements of Maryland law of

DOROTHY DIER all while she was a patient at the Washington Hospital Center in

the District of Columbia.

Thereby, under the well recognized doctrine of minimum contacts

incorporating elemental fairness and justice as set forth by the Untied States

Supreme Court in *International Shoe Co. v. Washington*, 328 U.S. 310(1945)

the Howard County Circuit Court has submitted to the jurisdiction of the Court.

Clearly through the enunciated signal pattern of conduct and the markers set

forth herein, Whereby due process considerations were satisfied.

The Howard County Circuit Court having gone into the District of Columbia either

directly or indirectly(through agents) can not now claim ignorance of the law, when

the nature of the existence of the Howard County Circuit Court is both to know and

interpret the laws of the State of Maryland and the United States and the United

States Constitution.

Your Petitioner submits that jurisdiction is acquired through applicable

traditional jurisdiction and venue considerations framed in the knowledge that the

State of Maryland Howard County Circuit Judge Dennis M. Sweeney individually

and by and through his agent State of Maryland Howard County Office of Aging

and Department of Social Services micromanaged a process which took place in the

District of Columbia which gave rise to DOROTHY DIER'S claim, her present

Predicament-the result of what took place in the Howard County Circuit

Court, the appointment of a guardian of person which only was able to go forward

due to the testimony and documentation offered from doctors from the Washington

Hospital Center treating DOROTHY DIER while a patient in the District of

Columbia hospital, grounded solely on examination, diagnosis and prognosis of

DOROTHY DIER directed to meet the specific requirements of Maryland law in

guardianship actions; said offering was directed and managed by a consistent and

systematic pattern of conduct directed, either directly or indirectly in significant

part by the Howard County Circuit Court and/or its agents the Howard County

Office of Aging and Howard County Department of Social Services, so as to satisfy

the "minimum contacts" standard required to give to this Court personal

jurisdiction as fairness and justice demands in a case of this nature.

## THE FACTS: PERTAINING TO THE LEGAL ISSUES OF JURISDICTION AND VENUE

**Background**

   Traditional "core" habeas corpus challenges and guardianship relief actions

    Traditional "core" habeas corpus challenges presented the courts with

issues as regards immediate physical custody. The response of the courts was to sue

the jailer. In *Braden v. 30th Judicial Circuit Court of Kentucky*, 410 U.S. 484 (1973)

Mr. Justice Brennan stated that the Court when faced with an expanded requests

for habeas relief, it would no longer adopt inflexible jurisdictional rules as in "core" habeas challenges and would utilize an expansive standard where traditional venue principles and the consideration of useful purpose would play a significant part. at 499-500.

The Court under *Braden*, in *Rumsfeld v. Padilla*, 124 S. Ct. 2711 (2004), stated at 2720, that a petitioner who challenges a form of custody other than present physical confinement may name as respondent the entity or person who exercise legal control with respect to the challenged custody. In the case at bar, the entity is the State of Maryland, Howard County Circuit Court. Furthermore, in *Rumsfeld*, Justice Kennedy with Justice O'Connor, concurring in a 5-4 decision got to the crux of the matter as to *Braden, and* its impact on *Rumsfeld*, which directly bears on the case bar,

> Only in an exception case may a court deviate from those
> Basic rules to hear a habeas petition filed against some
> Person other than the immediate custodian of the prisoner,
> Or some court other than the one in whose territory the
> Custodian can be found.

> The Court has made exceptions in the cases of nonphysical custody.
> at 2729.

It is not in dispute that nonphysical custody is the circumstance that DOROTHY DIER has been placed in by the State of Maryland, Howard County Circuit Court.


Therefore, when considering traditional venue factors as well as those in determining useful purpose it is most appropriate to carefully analyze the factors that impact on the issue of contacts and prudently evaluate the question of substantial events giving rise to the claim having occurred within jurisdiction of the

district court, so as to determine if the facts necessary to support the constitutional

standard of elemental fairness as regards State of Maryland Howard County

Circuit Court are present.

## DIRECTION BY STATE OF MARYLAND HOWARD COUNTY DEPARTMENT OF SOCIAL SERVICES AND OFFICE OF AGING

1- In September 2005, prior to the filing of any papers for guardianship in the Howard County Circuit Court, the Howard County Department of Social Services through its agent, Janice DiSibio and/or the Office of Aging, Howard County <u>directed</u> the medical staff at <u>Sibley Hospital in Washington, D.C.</u>, NAMELY, Dr. Peter Hamm and an associate, to conduct an <u>examination</u> of DOROTHY DIER consistent with the Social Services belief of what was necessary to complete a filing for guardianship in Howard County Circuit Court, physicians certificates. <u>Physicians certificates</u> were completed by Dr. Hamm and an associate based on observations, examination and analysis *solely* taking grounded in Washington, D.C., so as in the belief of the Representatives from Aging and/or Social Services to be in compliance with Maryland law. Both physician certificates were filed as mandated as part of a petition for guardianship in the Howard County Circuit Court on September 28, 2005.

## DIRECTION BY STATE OF MARYLAND HOWARD CIRCUIT COURT AND HOWARD COUNTY OFFICE OF LAW AND IMPACTS ON THEIR AGENTS, STATE OF MARYLAND HOWARD COUNTY DEPARTMENT OF SOCIAL SERVICES AND OFFICE OF AGING

2- On or about December 7, 2005, during a status hearing before Judge Sweeney, Judge Sweeney stated that he believed that one of the filed physician certificates was defective. Under Maryland law, Maryland Rule 10-201(10) and 10-202(a)(1) and Maryland Code, Estates and Trusts, 13-705 (b) (2) and (3) the petitioner in a guardian of the person action MUST file two attached physician certificates for there to be a prima facie complete filing. Interested Person Jerry L. Dier amongst other filings immediately, prior To the initial hearing on October 14, 2004, filing a motion to dismiss The petition based on the insufficiency under law of the filed physician certificates. Judge Dennis M. Sweeney, States of Maryland Howard County Circuit Court *instead* of addressing the concerns raised as well as his concerns As regards the sufficiency of the filed physician certificates Judge Sweeney implicitly gave instructions to his agents, the Department of Social Services andthe Office of Aging through

their legal representative the
Howard County Office of Law, Beverly Heydon, as follows

> So, I'll point out to the Department, I think you know
> The certificates here are, - - maybe I'm being too picky
> On these, but I've looked at them and I don't know
> If we need more than the certificates at this point.

As a result of a conversation between Beverly Heydon and Ophelia Ross-
Ophelia Ross,

The appointed representative of Judge Dennis M. Sweeney, concerning the
status of DOROTHY DIER,
pursuant to Court Order, had a conversation with the legal representative
of the
Howard County Department of Social Services and Aging,
Beverly Heydon,
Howard County Office of Law as regards
Judge Sweeney's comments in open court concerning the apparent
Deficiency in one of the filed physician certificates.
Ms. Ross knew exactly what Judge Sweeney meant, as evidenced by this
Question and Answer,


MR. DIER: Would it be a fair statement that it was of some concern
To you -  not to anyone else, but to you, that the second physician
Assessment be corrected according to what the Court had noted on
December 7th? This was of some concern on December 12th and 13th.

MS. ROSS:  Of concern because Judge Sweeney brought it to
the attention.(emphasis added).


Following the apparent direction, either implied or direct
of Beverly Heydon so as to meet
Judge Sweeney's demands and instructions, to wit, get it done,
Another physician certificate,
Ophelia Ross went to see DOROTHY DIER
AT
Howard County General.
On December 30, 2005, Jerry L. Dier arrived at Howard County
General between 8-8:30 a,m. and was told by the nurse for his mother
that a lady unknown
to her appeared at approximately 7 a.m. and
Requested information concerning DOROTHY DIER.
As well as requested that a Mental Competency Examination be
Conducted by a doctor at Howard County General.
The nurse described this person in detail and it was without doubt
Opheilia Ross.

The unknown person responded that she had a court order, giving her
The authority to request that a mental competency examination
be conducted. The nurse was suspicious due to the early hour and
she did not know this person. The nurse asked to see the court order.
This person had no such order, and said she did not have it with her
and abruptly left.
Jerry L. Dier immediately brought this matter
To the attention of senior staff members at the hospital and then to the
Hospital's legal department.
Jerry L. Dier was told that both Janice DiSibio(Department of
Social Services), and Ophelia Ross
Had *now* faxed a copy of a Court order, an order providing Ophelia Ross
the ability to review DOROTHY DIER'S medical records, but not to
to create a new medical record, to the hospital after the unknown
person believed to be Opheilia Ross, and later at a hearing confirmed to
be Opheilia Ross by her own admission, had abruptly left the hospital.
Seemingly, Ms. Ross had contacted Ms. DiSibio and in a futile attempt
To cover up this most inappropriate action, misrepresenting the substance
Of a Court order so as to gain a tactical advantage in ongoing litigation.
Judge Sweeney made himself part of this conduct when he brushed this
Information of wrongdoing aside when brought to his attention.
Said order
in pertinent part gave Ms. Ross the ability to gain access to certain
medical records, but
in NO WAY, MANNER OR FASHION gave Ms. Ross
the authority and/or right to
Create Medical Records.
The legal Department at Howard County General AGREED and
Promised Mr. Dier that NO MENTAL COMPETENCY examination and/or
Competency Certificate would be generated by the Hospital staff.


The initial trial date was January 4, 2006; it was changed upon a filing
of a request for continuance by Interested Person Jerry L. Dier, due
to DOROTHY DIER'S hospitalization.

4-  Ophelia Ross stated at a January 4, 2006, hearing before
    Judge Sweeney that DOROTHY DIER could be transferred back to
    Assisted Living Residence in Howard County as soon as she
    Was able to take in sufficient food in by mouth then she can return back to
    the assisted living facility.

            She stabilized and as of yesterday she was in a
            Regular room and a nasogastric tube, which had
            Been feeding her, was removed. She was able
            To take in about 25 percent of her breakfast and

100 percent of, like, a supplement shake.
She seemed to be stable. Not very alert. Not very
Verbally communicative, but other than that, stable.


5-  On January 4, 2006,  after Jerry L. Dier had attended the converted trial to
status hearing conference, he immediately went to see his mother. Soon after he
left, in the mid to late afternoon, Without either Notice or Consent
Medical staff at Howard County General performed a surgical debridement
Of a bedsore area on DOROTHY DIER'S right hip, creating a very large
crater, down to the bone, in that   area. Apparently, no one on Mrs. Dier's floor
knew what had happened; when
Jerry L. Dier arrived early the following morning he saw a large bandage on
His mother's right hip and asked the nurse why was this area had been
bandaged.
She did not know, and slowly removed the bandaging. To everyone's Shock
there was a large crater that looked like the size of a golf ball over two inches
across and right down to the bone. Jerry L. Dier complained, wanting to know
how this could have taken place. The doctor on the floor, told him that he could
not talk about it without his lawyer being present-like a criminal caught in the
act, this doctor chose to lawyer up--here in a medical hospital, where
DOROTHY DIER had been taken against the advice of Jerry L. Dier, who had
summoned an ambulance service to take his mother from the Howard County
Aging recommended assisted living facility to Montgomery General where Mr.
Dier knew a doctor who had treated his mother only two month's earlier and
who had responded that morning to Mr. Dier's call, stating he was available on
this day, rather than to a Hospital whose reputation was less then stellar. The
so called medical doctor who had performed the surgery told Mr. Dier that
more surgery might be needed. Mr. Dier immediately made arrangements to
have his mother transferred to Washington Hospital Center(WHC), in
Washington, D.C. This move was accomplished on Sunday, January 8, 2006, as
Mr. Dier left a series of urgent messages with Judge Sweeney's chambers.

DOROTHY DIER, while at Howard County General passed multiple swallow
tests, at least one in the presence of her son Jerry L. Dier. Moreover, one
particular instance is very instructive as to the nature of DOROTHY DIER'S
depression, totally ignored at Summit Park, as well as in the main not heeded,
although recognized at WHC. On a day or so prior to DOROTHY DIER being
transferred to WHC from Howard County General, Jerry L. Dier was in his
mother's room talking to a rather attractive nurse, and DOROTHY DIER,
commented, that it was nice that he[her son] was he talking to such an
attractive young lady. The nurse was startled to hear DOROTHY DIER TALK
and told them that the secret was out that she know that DOROTHY DIER
COULD TALK, RESPOND AND UNDERSTAND EVERYTHING THAT
WAS TAKING PLACE AROUND HER. THE N URSE ASKED THIS

14

QUESTION, WHY DID HIS MOTHER PICK AND CHOOSE, WHEN TO TALK? The answer lay in DOROTHY DIER'S mental status, depression-she would pick and choose when and what she wanted to talk about.

6- At WHC Dr. De Jonge was assigned to assist My Mother. Initially everything went smooth. Then there were calls from the Howard County Office of Aging and/or Social Services and everything changed. My Mother who had been in intensive care and in the general ward at Howard County General with constant testing, monitoring and feeding for two weeks was found by Dr. De Jonge to suffer from severe malnutrition. This is the same DOROTHY DIER who Ms. Ross had stated in court on January 4, 2006, only 4 days before Mrs. Dier's transfer to the Washington Hospital Center, that DOROTHY DIER was able to take in about 25 percent of her breakfast and 100 percent of, like, a supplement shake, the nasogastric tube had been removed and she was on the way to be taken back to her recommended assisted living facility. Dr. DeJonge acknowledged that he had NEVER read or reviewed or seen the medical history from Howard County General. He told Mr. Dier, first feeding by the mouth is preferable, then a nasogastric tube was used due to the extreme amounts of food, liquid supplement he required to effectively deal with My Mother's, according to Dr. DeJonge malnourished state; Dr. DeJonge initially suggested to Jerry L Dier that Mrs. Dier could go back to her assisted living residence with a nasogastric tube, which he and the staff at the hospital could show him how to use, it could be used safety for a short period of time, up to three weeks, until Mrs. Dier began eating sufficient amounts of food on her own. Abruptly, this plan of action was dismissed by Dr. DeJonge, apparently after he spoke to. Representatives from the above Howard County agencies who were seen at Washington Hospital Center so as to <u>direct</u> the doctors assigned to DOROTHY DIER to complete physician certificates to assist them and the Maryland Court, their principle in the litigation in Maryland (Janice DiSibio also acknowledged that she had been at Sibley Hospital to speak to Dr. Hamm-to apparently <u>direct</u> him to complete two physician certificates so as to as she believed to be in compliance with Maryland law). Dr. DeJonge's NEW <u>plan apparently at the direction of the Howard County agency representatives</u> became to insert a gastric feeding tube into DOROTHY DIER'S stomach. I specifically told Dr.DeJonge, with as much emphasis as possible, that in My Mother's present mental state, depression, the insertion of a stomach feeding tube would and could only be interpreted by her, as a sign of total and complete surrender, and only serve to make worse My Mother's mental state, by deepening her state of depression to a level where she had never been before. He told me that he had spoken to *his mother* about what was to be done if she was ever in a condition where a gastric feeding tube was contemplated and they (he and his mother) had agreed to remove all supportive life sustaining devices and procedures, rather than engage in such a procedure. I was taken back at this comment, now, being much more aware than before of this Doctor's personal viewpoint as to life and the treatment of the elderly. The <u>feeding tube</u> was inserted on January 25, 2006, causing tortuous injury to My Mother as a

<u>direct consequence</u> of Judge Sweeney and his appointment of Aging as temporary guardian on January 23, 2007, who through their agent at the time, Peggy Rightenauer gave permission for the insertion of the feeding tube, in direct contradiction to Dr. DeJonge's initial plan to utilize a nasogastric tube, Dr. DeJonge's observation of My Mother eating ice cream on or about January 18, 2006, as well as Aging's other agent, Opheila Ross' statement in court on January 4, 2006, that DOROTHY DIER was eating 25 percent of her breakfast and was taking 100 percent of her liquid supplement, and also in spite of the fact that DOROTHY DIER has passed multiple swallow tests at Howard County General prior to being given foodstuffs and liquid supplements.

I was there as always for My Mother, no one from Aging or Social Services was present-the gastric feeding tube was inserted during a surgical procedure in spite of the fact that I had related to the medical doctors at Washington Hospital Center a full and complete account of My Mother's psychiatric history since her breakdown at the Washington Hospital Center, 14 years earlier, after My Father, My Mother's Husband, Rabbi Richard R. Dier had his chest opened three times within a little more than a day after a second heart bypass surgery(my father's first bypass surgery was in 1983, he also had an abdominal aneurism surgery in 1985, hip surgery in 1989, and angioplasty in 1991, My Mother cared for My Father fully and completely after each major surgery, nursing him back to health) in order to stop the bleeding and then My Father contracted pneumonia and was in the WHC intensive care unit for 9 weeks while at the same time My Mother, who had no prior psychiatric history, she was 76, suffered a complete mental breakdown and initially was in the WHC psychiatric unit while her husband was in the intensive care unit. My Mother recovered immediately upon hearing My Father's voice, he would be coming to see her and then take "Dot" back home with him, which he did.

I can not close this portion of this filing without emphasizing as I did to Dr. DeJonge the importance to My Mother of eating-she loves food, especially chocolate, ice cream, pizza and French fries and had recently developed a taste for Wendy's Frosty. My Mother could eat it all, No dietary restriction, as healthy as any human being could be at any age prior to her daughter, Michelle Lyons, my sister telling My Mother in late July, early August 2005, that she thought she had liver cancer in spite of the fact that I had warned my sister as to how Our Mother might react to this news-to My Mother, family is EVERYTHING. I was sitting within a few feet of My SISTER WHEN SHE TOLD MY MOTHER, I IMMEDIATELY SAW MY MOTHER'S HEAD GO DOWN, HER EYES CLOSE and that is the point in time that had led My Mother to where she is at the present time. All this was made known to Dr. DeJonge as well as where he could go to get her medical records. Dr. DeJonge, in spite of what he had been told and what he had seen for himself went forward, no matter that his patient, DOROTHY DIER, when asked only a few days before the insertion of the feeding tube, what was her name and where was she, was able to respond and answer fully and completely, and that he in

my presence had given her ice cream as reward which she ate without any difficulty, as well as some that I gave her in Dr.DeJonge's presence. An order went out for chocolate ice cream, my Mother's favorite, however said order was never acted upon. Apparently, Ophelia Ross and Janice DeSibio had set the train in motion, with Judge Sweeney as the conductor, nothing was to stand in their way.

7-Moreover, on or about January 23, 2006, the Office of Aging was named as temporary guardian of My Mother DOROTHY DIER by Howard County Circuit Judge Dennis M. Sweeney ground soley on the testimony of Dr. Tabler Dr. DeJonge's supervisor at the Washington Hospital Center. In the State of Maryland, the case law is clear that no matter who the court appoints as guardian, in reality the Court is the guardian. *Mack v. Mack, 618 A,2d 744(1993,* citing *Kicherer v. Kicherer, 400A. 2d 1097. 1100 (1979),* "In reality the court is the guardian, an individual who is given that title is merely an agent or arm of that tribunal in carrying out its sacred responsibility"
Judge Sweeney was truly both driving and directing this train, providing protection to those acting in his behalf under the color of law..

8-The Howard County Department of Social Services and Office of Aging abandoned both earlier filed physician certificates with the petition and added two other physician certificates which they had directed Dr. Tabler and Dr. DeJonge-to complete. Said additional physician certificates were based solely on observations taking place in the District of Columbia, while DOROTHY DIER was a patient at the Washington Hospital Center, although directed by the agents of Judge Sweeney, Aging and/or Social Services, with the Court, as the true guardian, the Court in a *real sense* was directing its agent to correct what it had noted at a status hearing on December 7, 2005, as a deficiency in one of the filed physician certificates. Ophelia Ross having failed in her mission at Howard County General, now WASHINGTON HOSPITAL CENTER PHYSICIANS WERE TO BE UTILIZED SO AS TO GAIN WHAT THE COURT BELIEVED TO BE NEEDED, COMPLETED PHYSICIAN CERTIFICATES SO AS TO SUPPORT IT PRE-ORDAINED FINDING, THAT DOROTHY DIER WAS IN NEED OF A GUARDIAN. Also, the Court must be held *accountable* for the insertion of the gastric feeding tube which was directed at the order of its agent, Aging, and from January 23rd on, the Court was in a *real sense* the guardian under Maryland law as noted in paragraph 7.

At trial on March 7,, 2006, both the physician certificates and the testimony of Dr. DeJonge were based entirely on observations at the Washington Hospital Center in the District of Columbia.

9-State of Maryland, Howard County Judge Dennis M. Sweeney, was not at reluctant to state who was in total and complete charge, and directing this extra legal operation.. When the issue of how and under what circumstances My Mother was taken from the Washington Hospital Center to Summit Park,

Judge Dennis M. Sweeney, who, according to Judge Sweeney, whose sister lives three houses from Summit Park, and his Attorney in Place, Anthony Doyle's office is only blocks away, and he, Judge Dennis M. Sweeney initially stated that he might, and this is a place which not forgettable, have been in, and latter attempt to retract said statement, stated,

> Mr. Dier:. ...The individual-individuals that placed my Mother in this facility are Miss Ross and the Department of Aging, And---

> The Court: <u>Under this Court Order</u>. September 22, 2006, guardian Of property trial.

10-The court proceeding on March 7, 2006, came down to the following, (1) a court, Judge Dennis M. Sweeney who warmly embraced a PURPORTED wa iver of DOROTHY DIER'S right to jury trial, right to be present and an affirmative statement that DOROTHY DIER expressly desired a guardian be appointed, ALL made by her court appointed attorney in place, Anthony Doyle, who acknowledged AFTER inquiry by JerryL. Dier that his representations both in open court and by a signed filing Were False, having been made Without Consultation after appointment, AND (2) the acceptance by the trial court of said waiver with full knowledge of its source and its false and misleading character, stating to Jerry L. Dier, who demanded a jury trial in behalf of His Mother, guaranteed under the United States Constitution, the State Constitution of Maryland and Maryland Rules  and Maryland Law, weeks before trial, you can't really want a jury trial, it is clear that your mother needs a guardian. Judge Dennis M. Sweeney, State of Maryland Howard County Circuit Court Judge had improperly <u>directed</u> that be made the fact finder, and further openly and notoriously declared that he had reached a decision weeks before trial. The actions of State of Maryland Howard County Circuit Judge Dennis M. Sweeney by way of a crafted scheme, robbed DOROTHY DIER of her guaranteed protections under the United States Constitution, so as to reach a pre-ordained result.

## THE LAW:  PERSONAL JURISDICITON AND VENUE
### APPLICATION TO THE FACTS

### PERSONAL JURISDICTION

In *Georgacarakos v. Watts, et al,* in Civil Action No. 06-1022(JR), a judge of this court ADDRESSED the twin issues of Personal Jurisdiction and Venue in a case where an inmate alleged that the employees of the Bureau of Prisons violated his constitutional rights. the plaintiff being held in Florence, Colorado, and the defendant Watts located at Bureau of Prisons headquarters in Washington, D.C..

Turning to the District of Columbia long-arm statute, D.C. Code Sect. 13-423, which is the basis upon which personal jurisdiction may be exercised over defendants who do not reside within or maintain a place of business in the District. The long-arm statute provides that a Court may exercise personal jurisdiction over those who have (1) transacted business in the District of Columbia; (2) contracted to supply services in the District of Columbia; (3) caused a tortuous injury in the District of Columbia by an act or omission : or (4) caused a tortuous injury in the District of Columbia by an act or omission outside the District while regularly doing or soliciting business or engaging in any other persistent of course of conduct in the District.

The defendants are subject to personal jurisdiction in a forum if they purposely "establish minimal contacts" such that "the maintenance of the suit does not offend traditions notions of fair and substantial justice. "Int'l S hoe Co.v.Washington, 326 U.S. 310, 326 (1945)..

FOR there to be personal jurisdiction under the long arm statute, a plaintiff must allege some specific acts evincing purposeful activity by defendants in the District of

Columbia, by which they invoked the benefits and protection of its laws, and specific acts connecting the defendants with the forum. A defendant must "reasonably anticipate "being haled into" the plaintiff's chosen forum. *World-Wide Volkswagon Corp. v. Woodson*, 444 U.S. 286, 297 (1980),

This petition describes in detail, with great specificity the nature and fashion and to what degree the defendants transacted business in the District of Columbia or committed and/or caused a tortious injury in the District of Columbia, and/or caused tortuous injury in the District of Columbia by an act or omission outside the District of Columbia while engaging in any other persistent course of conduct in the District of Columbia. From the facts set forth herein, DOROTHY DIER'S claim for relief clearly has a "discernible relationship" with the defendant's activities directed at her in the District of Columbia. Her claims relate to the activities engaged in by the defendant's in the District of Columbia, but for, there could have been NO judicial proceeding in the State of Maryland. The defendant's "purposely availed" themselves of the benefits and privileges of conducting activities in Washington, D.C., "such that [they] should reasonably anticipate being haled into court here. " *World-Wide Volkswagon Corp* Therefore, Jurisdiction here also does not offend "traditional notions of fair play and substantial justice" because relevant events occurred in this district and the situs of the defendants from the district, only the distance of a normal commute to work. The Court has personal jurisdiction over the defendant's based on the long arm statute.

The defendant's, State of Maryland, Howard County, Office of Aging, Phyllis Madachy, Director, and Peggy Rightenauer and Ophelia Ross, designated agents, the State of Maryland, Howard County Circuit Court Judge Dennis M. Sweeney, both in his

status as Judge in the State of Maryland Howard County Circuit Court and in addition, his role flowing therefrom, as the **true** guardian of DOROTHY DIER, and Summit Park, as an agent of the Court in both of its roles and/or the Office of Aging, and/or Department of Social Services reached into the District of Columbia by Court at various times either on their own or pursuant to order, by Judge Dennis M. Sweeney, SO AS TO engage in a process, a persistent course of conduct, wherein as of direct consequence("arising from") of the aforesaid DOROTHY DIER was put on trial in the State of Maryland Howard County Circuit Court and was swept away from the district and removed from the District of Columbia to the State of Maryland resulting in her described captivity at Summit Park, subjected to the most barbaric of treatments over an extended period of time..

**VENUE**

Venue is governed by 28 U.S.C. 1391. Under that statute venue is proper in (b)(2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred.. ... The purpose of venue statutes is to protect "a defendant from the inconvenience of having to defend an action in a trial court that is either remote from the defendant's reside or from the place where the acts underlying the controversy occurred." Venue is proper if the "activities that transpired in the forum district were not insubstantial in relation to the totality of the events" alleged by the plaintiff..

Venue is proper in this judicial district because the overwhelming nature of events took place in the District of Columbia, which clearly "gave rise" to the claims advanced by the plaintiff here. If the defendant(s) claim that a more substantial portion of the relevant events occurred in Maryland, their argument was addressed by a brother Judge

of this Court, the Honorable John D. Bates, on July 24, 2006, in his Memorandum

Opinion in *Modaressi v. Vedadi*, Civil Action No. 05-2424(JDB), 441 f. Supp. 2d 51

(2006), " …. Defendants may even be right that this suit has a closer transactional nexus

with the District of Maryland than with the District of Columbia. That argument,

however, misapprehends the question of law that the Court must answer. Nothing in

section 1391(b)(2) mandates that a plaintiff bring suit in the district where *the most*

*substantial portion*(in the case at bar this is most certain true, the most substantial events

took place in the District of Columbia, the Maryland Court only acting as an empty

shell), nor does it require a plaintiff to establish that every event that supports an element

of a claim occurred in the district where venue is sought. To the contrary, a plaintiff need

only show that a 'substantial part of the events or omissions giving rise to the claim

occurred" in that district. 28 U.S. C. Sect. 1391(b)(2). Indeed, the transactional-venue

provision of section 1391(b)(2) clearly allows that, in some cases, a plaintiff will have a

choice among multiple districts where a substantial portion of the underlying events

occurred. Venue may be proper even if a greater part of the events giving rise to a claim

happened in another forum. It appears that section 1391(b)(2) is intended to place venue

within the District of Columbia, even where the case also might be brought in another

forum."

   Judge Bates concluded, "Simply put, even if a substantial part of the events in this

case took place in Maryland, that does not preclude plaintiff from filing suit in the

District of Columbia if a substantial part of the events took place here, as well." See also,

the Memorandum Opinion of the Honorable Judge Emmet G. Sullivan, United States

District Judge, July 17, 2007 in *Radtke, et al,. v. Caschetta*, et al., Civil Action No. 06-2031 (EGS) for a further learned discussion as regards personal jurisdiction and venue .

**CONCLUSION**

**<u>Personal jurisdiction</u>**

An signature pattern of conduct has been set forth describing in detail how the State of Maryland Howard County Circuit Court Judge Dennis M. Sweeney, either individually and/or in concert with State of Maryland government agencies, or said Agencies acting on their own at some point in time and at other points in time acting at the direction of the State of Maryland Howard County Circuit Court Judge Dennis M. Sweeney were involved in a process to place DOROTHY DIER in "legal custody" to suffer "cruel and unusual punishment," including that inflicted at Summit Park, under the color of State law, by depriving DOROTHY DIER of her rights both guaranteed and protected by the United States Constitution , by engaging in conduct both in the District of Columbia, at times, and outside the District of Columbia at other times, and when outside the District of Columbia be part of a pattern("persistent course of conduct") designed to amongst matters to cause tortuous injury to DOROTHY DIER in the District of Columbia, SUCH as to both give this Court jurisdiction in this Action and require that this Court immediately issue a Writ of Habeas Corpus so as to grant relief to this innocent, DOROTHY DIER, while relief can still be meaningful.


**<u>Venue</u>**

DOROTHY DIER by and through her son, Jerry L. Dier  has set forth WITH specificity a fact pattern of material, significant and substantive events in this paper

which "gave rise" to her claim, to wit, the nature and fashion of her person being held in "legal custody" by the State of Maryland, contrary to laws of the United States of America, subjected to restraints of the kind and to the degree that can only be considered to be "cruel and unusual punishment" of an innocent, from which DOROTHY DIER seeks justice and mercy from this Court.

There can be *no* question that the Constitutional errors noted by Your Petitioner by and through her son, Jerry L. Dier in this paper rise well beyond the magnitude of being "substantial" in nature and "injurious" to Your Petitioner's right to due process of law, so as to cloak DOROTHY DIER in darkness, as if to hold DOROTHY DIER separate and apart from accepted standards of fair play, impartiality and justice guaranteed by and through the United States Constitution to "all" citizens, no matter what their status in life, governed by the Rule of Law, not that of the individual notions of men and/or women.

Upon this presentation, the issues of jurisdiction having been addressed, both factually and the application of the law to the facts, the matter immediately before this Court is  how best to save an innocent, MY MOTHER DOROTHY DIER, who is and has been held for almost two years in the darkest of dungeons conceived by mankind in the in the dark recesses of his mind, in darkest of its hours to bring about such a horrific result as been described herein.

DOROTHY DIER HAS SUFFERED ALMOST INDESCRIBABLE INJURY, RELIEF HAS TOO LONG BEEN COMING.  I, JERRY L. DIER, IN BEHALF OF MY MOTHER, DOROTHY DIER PRAY THAT THIS COURT WILL ACT NOW.

## BODY OF REQUEST FOR HABEAS RELIEF

Comes now the Petitioner DOROTHY DIER, by and through her Son and next friend, Jerry L. Dier, Pro se, pursuant to 28 U.S.C. Sect. 2254 and 28 U.S.C. Sect. 1331 who submit the following Petition for Writ of Habeas Corpus in behalf of the Petitioner, DOROTHY DIER, in State custody subject to court order as a **direct consequence** of medical testimony based **soley** on analysis and examinations conducted in Washington, D.C. by medical doctors attached to the Washington Hospital Center(hereinafter referred to in the main as "WHC") in a guardian proceeding in the State of Maryland, Howard County. When the petitioner, Howard County Department of Social Services moved to support its *claim* at the very least "a substantial part of the events" (see 28 U.S.C. 1391(b)(2) **occurred in the District of Columbia**, utilizing testimony and documentation founded from the same source, **Without which** Judge Dennis M. Sweeney, His Verdict Already Dictated on the record would not have had any support at all for engaging in carefully crafted a process wherein DOROTHY DIER was denied her right to effective assistance of counsel who was appointed by Judge Dennis M. Sweeney, State of Maryland, Howard County Circuit Court, who(court appointed counsel) knowingly acknowledged making false representations as regards DOROTHY DIER'S waiver of Right to Jury trial, Right to be Present and her Desire to have a guardian appointed, all taking place in the context of judicial proceedings applauded by the court on one hand, while on the other recognizing at times that his court appointed counsel was asleep, inattentive, non-participatory and not interested, walking out with court approval, the hearing continuing concerning the health, safety and well-being of his client, amongst other matters, resulting in judicial errors of such a magnitude, so far outside the ordinary

25

judicial process that they could not possibly take place through ignorance or by mistake, especially when corroborated by Judge Sweeney himself in a subsequent statement in a later filed guardian of the property action when Jerry L. Dier requested that the court recuse itself having appointed the same court appointed counsel, Anthony E. Doyle, the court responded by further applauding the efforts of Mr. Doyle certainly not made in DOROTHY DIER'S behalf, but from the record consistent with the wishes of the court which expressed prior to trial that DOROTHY DIER needed a guardian when discussing her waiver of right to jury trial, making himself the fact finder in a proceeding in which he had already reached a conclusion. which he rubber stamped on March 7, 2006, by extra-legal conduct placing DOROTHY DIER under the color of State law in **legal custody** having constraints(See paragraphs 53-63) placed upon her liberty far in excess than those imposed on the general public, the very definition of "legal custody" in defining "to be in legal custody" within the meaning of 28 U.S.C. 2254(a) in family related habeas matters as set forth by the United States Supreme Court in *Lehman v. Lycoming County*, 458 U.S. 502(1982) under the care and control of the State of Maryland, Office of Aging, Howard County by and through the authority and supervision of Judge Dennis M. Sweeney depriving DOROTHY DIER of her rights and privileges guaranteed under the protection of the United States Constitution, utilizing as their tool of destruction **Events** taking place wholly in the District of Columbia, orchestrated by the Howard County Department of Social Services (HCDSS) and Howard County, Office of Aging so as to condemn DOROTHY DIER without due process of law by making use of Events taking place in the District of Columbia, in a District of Columbia institution, the WHC, wherein analysis and examination were procured by Howard County Social

Services and Aging by extra legal means, concluding when DOROTHY DIER was ordered by Judge Sweeney to be brought to Maryland, from the District of Columbia Hospital, a trial purportedly taking place resting on the testimony of a medical doctor from the WHC, testifying as to what took place in the District of Columbia at which time the court made findings consistent with its earlier announced decision, five weeks before trial, holding DOROTHY DIER in need of a guardian.  The delayed Court of Special Appeals for Maryland opinion issued April 18, 2007, spoke for itself in supporting the unsupportable, State of Maryland, Howard County Circuit Court, Judge Dennis M. Sweeney, providing him cover, at least for the moment in an opinion rendered four months after its mandatory due according to Maryland   Rules. Furthermore, the guardian of property action which was affirmed in the Court of Special Appeals for Maryland, October 19, 2007, and further addressed and affirmed denying the request for reconsideration on November 30, 2007, as regards in the main a recusal request grounded on the unethical and illegal conduct on the part of the Howard County Circuit Court during the guardian of person action. This is **New** **Information** not available at the time of an earlier filings in this Court requesting habeas relief. The  PLAINTIFFS(DOROTHY DIER and her son and next best friend, Jerry L. Dier)  request this Court to issue an Order, Writ of Habeas Corpus, setting aside the appointment of a Guardian of the Person for DOROTHY DIER by the State of Maryland, Howard County Circuit Court due to the denial by the State of Maryland Court under the color of law to provide DOROTHY DIER the protections guaranteed by the United States Constitution, pursuant to the Fourth, Sixth, Eighth and Fourteenth Amendments amongst others, violating Due Process of Law, Right to Privacy, Equal Protection under Law, Right to a Jury Trial, Right to be

Present and Confront Witnesses, Right to Counsel in a meaningful fashion, and Right to a Hearing before a Fair and Impartial Court. To do other than set DOROTHY DIER free from the legal custody imposed by the Howard County Circuit Court would be to condemn her without remedy. In support thereof, PLAINTIFFS show unto this Court as follows in a manner and fashion which are consistent with the model form for use and application for habeas corpus relief pursuant to 28 U.S.C. Sect. 2254.

STATE OF MARYLAND HOWARD CIRCUIT COURT OPERATING OUTSIDE OF DISTRICT OF COLUMBIA

By what authority can a federal court reach into a state court not within its terrotiry, so as to acquire jurisdiction over the state court?

*Mr. Justice Kennedy*, with whom *Justice O'Connor* joined concurring in *Rumsfield v. Padilla*, 542 U.S. 426 (2004), "In my view, the question of proper location for a habeas petition is best understood as a question of personal jurisdiction or venue. This view is more in keeping with the opinion in *Braden* and its discussion explaining the rules for proper forum for habeas petitions. 410 U.S. at 493, 500(indicating that the analysis is guided by 'traditional venue considerations' and 'traditional principles of venue')" ; Mr. Justice Brennan in *Braden v. 30th Judicial Circuit Court of Kentucky*, 410 U.S. 484 (1973) addressed the issue of "service of process, "Read literally, the language of 2241(a) requires nothing more than that the court issuing the writ have jurisdiction over the custodian. So long as the custodian[in the case at bar, the legal custodian, the Howard

County Circuit Court] can be reached service of process, the court can issue a writ 'within its jurisdiction,' requiring that the prisoner be brought before the court for a hearing on his claim, or requiring that he be released outright from custody, even if the prisoner himself is confined **outside this court's territorial jurisdiction**(emphasis added) *Id.* at 495. ... .Accordingly we turn to the determination of the forum in which the petition for habeas corpus should be brought in terms of traditional venue considerations. *Id.* at 493. . ...Relying on our decisions in *Ahrens v. Clark*, 335 U.S. 188 (1948) respondent contends-and the Court of Appeals held. ... limit a District Court's jurisdiction. Since that interpretation is not compelled either by language of the statute 28 U.S.C. 2241(a) or by the decision in Ahrens and since it is fundamentally at odds with the purpose of the statutory scheme, we cannot agree. *Id* at 494."

To do Other than grant this request by DOROTHY DIER would be to allow the District of Columbia to supply the very tools for Mrs. Dier's present **custody** and then remain aloft and silent Enabling by inaction the grave wrong to continue, Thereby ignoring the use of one of District of Columbia's most respected institutions, the WHC and its medical staff by a lawless Maryland judicial system, while condemning DOROTHY DIER to endless unjustified cruel and unusual punishment.(see paragraphs 53-62 for specific acts).

## PRELIMINARY STATEMENT

DOROTHY DIER was placed in legal custody pursuant to the orders of Judge Dennis M. Sweeney, Howard County, Maryland Circuit Court in violation of her rights

under the Fourth, Sixth, Eighth and Fourteenth Amendments to the Constitution of the United States under the color of Maryland state law.

**Background**

The petitioner, Howard County Department of Social Services(hereafter referred to in the main as "HCDSS") on September 28, 2005, filed a petition for guardian of person. The court appointed counsel for Dorothy Dier. On March 7, 2006, during the trial, the court described the care and devotion shown by Interested Person Jerry L. Dier toward his mother as "unparalleled attention to his mother's condition." This finding led the court to request that HCDSS represented by seasoned counsel agree to a Stipulation Whereby it was agreed amongst the parties that Jerry L. Dier exhibited the highest degree of care and devotion to his mother. Yet, the trial court found that Jerry L. Dier based on a lifetime of knowledge concerning his mother was overly optimistic as regards her condition and held that a guardian need be appointed. The court held that pursuant to the filed petition and applicable law that Dorothy Dier was in need of a guardian and appointed the Howard County Office of Aging despite the fact that the court found that if the choice was Dorothy Dier's to make, she should most certainly choose her son as decision maker, *to act in her behalf*, not a stranger such as the Office of Aging.  An appeal followed to the Court of Special Appeals for Maryland, opinion dated April 18, 2007, affirming the Howard County Court and this request for habeas relief follows.

## COURT APPOINTED ATTORNEY-CLIENT AND THECOURT

The Court of Special Appeal for Maryland, in In Re Sonny Lee, 754 A. 2d 426(Md. App. 2000) addressed issues relating to effectiveness and standards for ascertaining the same in guardian of the person actions.

One aspect of the standard for determining whether or not Effective Assistance of Counsel has been rendered in guardian of person proceedings is, "the duties of an attorney may at times directly conflict with the duties of a guardian ad litem. It is the role of the attorney to explain the proceedings to his client and advise him of his rights, keep his confidences, advocate his position, and protect his interests. Due Process demands nothing less, particularly as here, when the alleged disabled person faces significant and usually permanent loss of basic rights and liberties." (emphasis added). Lee at 439.

A further aspect of the standard concerns itself with counsel's representation at trial, "In guardianship proceedings effective representation by counsel ensures that the proper procedures are followed by the court." (emphasis added). Lee at 439). In addition, to serve as a guidepost, the court in Lee set forth the following specific standard so as to preclude an attorney from waiving his clients rights without consultation under some notion of his client's 'best interests,' "The duty to maintain 'as far as reasonably possible' …a normal client-lawyer relationship precludes an attorney from acting solely as an arm of the court, somewhat in the nature of a special master, and using his assessment of the 'best interests' of the client to justify waiving his clients rights, without consultation. …disregarding his clients wishes, and even presenting evidence against him. …which is apparently what occurred in this case." (emphasis added). Lee at 440.

### Court Appointed Counsel, Without Consultation, Misleading Representations

In this guardian of the person action court appointed counsel, Anthony Doyle, for DOROTHY DIER **Without Consultation**, WAIVED as if exercising her express will

and intent as to her rights under the United States Constitution and Maryland law (Estates and Trust 13-705(e) and Maryland Rule 10-205(b)(1)), respectively,

to be Present and to have a Jury trial, as well as Affirmatively representing to Judge Sweeney that she wanted a guardian of the person appointed. Interested Person Jerry L. Dier brought to the court's attention that Mr. Doyle had never met with or consulted with DOROTHY DIER prior to his making these most important but unfounded representations in her behalf. Mr. Doyle acknowledged this truth.

In pertinent part, the Answer to the Petition for Guardianship of the Person, filed and presented to the court at the initial hearing, October 14, 2005, reads as follows,

"Now comes Dorothy Dier, by and through her attorney, Anthony Doyle, Jr., and in Answer to the Petition for Guardian of the Person, respectively states as follows:

5. That in further answer thereto, the Respondent waives her right to have this matter tried before a jury, as well as her right to appear before this Honorable Court.

WHEREFORE, having fully answered the Petition, the Respondent prays this Honorable Court:

A. Appoint a guardian of her person.

B. Accept her waiver of her right to a jury trial and her right to appear at a hearing.

_____

Anthony E. Doyle, Jr. "

Judge Sweeney thought nothing of this most inappropriate and unethical conduct and the matter went forward with testimony taken under oath in the absence of

32

DOROTHY DIER. It was apparent from the outset and addressed directly on the record on February 2, 2006, when Judge Sweeney gave Court approval to the above described dark conduct that he and Mr. Doyle were acting as one, a process that continued throughout the proceedings exemplified when the court gave approval to Mr. Doyle's request  "**to exit by the back door,**" to attend a meeting and then continued the hearing in his absence during a most important proceeding when issues of health, safety and well being of his client were being addressed as well as issues that focused on the underpinnings of the viability of the petition itself.

> The Court: Oh no. That's fine. We got – I think we can go-
>
> We Can –because we're talking about comparing nursing homes—
>
> *              *              *              *              *
>
> The Court:--we can go on without Mr. –without Mr. Doyle. All right.
>
> Go  ahead.

Dorothy Dier's absence was not even deemed worthy of mention by either the court or her court appointed counsel.

 Further, even though the court took specific notice of court appointed counsel's lack of attentiveness and participation in the proceedings such as asking Mr. Doyle at a status hearing(October 25, 2005), "**Are you awake,**" and during the trial, "**Are you all right.**" **And then Only asking five questions of a secondary witness during the whole of the trial after being so admonished, the court took no immediate corrective action..**

 **ABANDONMENT BY THE COURT OF THE RULE OF LAW**

**Prejudgment by the Court, February 2, 2006**

**The Court: . ...why should we drag everybody, including your poor mother through a jury trial proceeding if there's–it's clear and it's clear to me beyond any co-eval that your mom is—is well within the range of people that seriously need a guardian?**

**The court's embrace of the waiver of right to jury trial by court appointed counsel Without Consulted was taken one further step by the Howard County Court-he is declared five weeks before the trial date(March 7, 2006) that the person before him, Dorothy Dier was in "serious need" of a guardian, Thereby having prejudged the issue before him, turning the trial into a mere formality, as if to give legality to his already declared extralegal result.**

**The Howard County Court further used this tactic of basing its decision on a notion of unfettered discretion in guardianship cases when considering whether or not the court as statutory jurisdiction even to hear the case before it,**

**The Court: Even assuming the statutory jurisdiction was not able to be ascertained, the Court believes its inherent powers as guardians of persons with disabilities would fill in any gaps in that determination. February 2, 2006.**

The Howard County Court utilized his stated "inherent powers" to fill in the gaps as to "venue" where the information contained within the record, there was no evidentiary hearing, was that Dorothy Dier resided at Washington Adventist Hospital in Montgomery County, Maryland at the time of the filing of the petition and a few days thereafter, on October 6, 2006, moved to an Assisted Living Residence in Montgomery County, where she resided at the time of the initial court hearing on October 14, 2005; not Howard County as required by Maryland Rule 10-201(b)(1).Furthermore, the Howard County Court used this process to bypass a stated statutory provision, Md. Ann. Code, Estates

& Trusts 13-707(a)(10) which specifically excluded social services from guardianship as regards individuals over 65, such as Dorothy Dier where as in her case, there had been no prior relationship before she was 65, Thereby not including the HCDSS as a entity within the four corners of the definition of an "interested person," Maryland Rule 10-201(a) and Rule 10-103(f). HCDSS by Maryland Rule, by way of definition did not have the requisite standing under Maryland law to file a petition for guardian of the person for Dorothy Dier. Even at this stage in the proceedings, five weeks before trial the Howard County Circuit Court had assumed what it believed to be its role as the guardian of persons with disabilities, he had become much more than just an embodiment o the law as a judicial officer, he had become *the law* in his courtroom in the State of Maryland, Howard County.

The waiver of rights granted by the United States Constitution such as right to **Jury trial and right to be Present**, both also specifically addressed and granted under Maryland law(see Md. Ann. Code, Estates & Trusts 13-705(e) and Maryland Rule 10-205(b)(1)) in guardian of the person actions, are matters of great concern and to be jealously protected, and therefore their *waiver* is a matter of great importance with full examination by the court and complete disclosure by counsel required. However, the Howard County Circuit Court embraced court appointed counsel presenting incorrect and misleading information before him as regards the purported waivers and further commented to Interested Person Jerry L. Dier as regards Dorothy Dier's right to a jury trial,

> The Court: Let—let—let me make sure I understand. The Only thing your entitled to a jury trial on, if I understand it, is Whether or not you need a guardian. All right. That's—when That's, you know, you—need a guardian.

> Are you telling me today that you think there's a serious--
> Question about whether or not your—
>
> Mr. Dier:
> I'm telling you –
>
> The Court:
> --your mother needs a guardian?

Clearly the court had prejudged this matter as evidenced by this statement made on

February 2, 2006, weeks in advance of trial. Therefore, the court was indifferent to the

fact that Dorothy Dier had a right to be present and was entitled to a jury trial under

Maryland law, and that court appointed counsel had mislead the court by misrepresenting

in his Answer to Petition that Dorothy Dier *waived* her right to be present and right to

a jury trial, as well as Dorothy Dier's desire to have a court appointed guardian of

person- WITHOUT CONSULTATION. The mindset of the Howard County Court was

clear and unambiguous, a jury trial was not needed because he had already made up his

mind to appoint a guardian, which required that he not a jury be the fact-finder.

## COURT AS AN ADVOCATE AND PARTICIPANT

> …it's clear to me beyond co-eval that your mom is— is well within the
> range of people that seriously need a guardian?" What is –I mean the
> only—to me the only real question is whether the guardian is going to be
> you, your sister or the Office of Aging or someone else.

The court had become a full fledged participant, an advocate for guardianship in these

proceedings, Thereby setting up a framework where he became the judge of his own

advocacy to the harm of the person before him, Dorothy Dier. The question of the

ineffective representation became a non-issue before him.

This case presents an example of extreme conduct on the part of court appointed counsel

embraced by the court, wherein, at no time from the inception of these proceedings to

their conclusion, was Dorothy Dier "provided with legal representation contemplated by

36

Maryland law or the Rules of Professional Conduct." **Lee** at 441.

The Howard County Circuit Court praised Mr. Doyle's conduct as exemplary throughout the proceedings and felt so secure in his position within the Maryland Court system as to appoint Mr. Doyle in a further case, guardian of property as regards DOROTHY DIER.

Apparently the notion of Judge Sweeney's belief system was grounded in the "inherent powers" of a Court, sweeping away both English Common Law and American jurisprudence. In all due respect to his office, Judge Dennis M. Sweeney, State of Maryland, Howard County Circuit Court, is accountable to the Rule of Law and his conduct is to be measured not by the color of his robe but by the content of his actions.

## COURT PROCEDURAL HISTORY

:

**The Court moved the petitioner, Howard County Department of Social Services to Stipulate and it Agreed as regards the Good Character of Interested Person Jerry L. Dier and the Court further stated that if DOROTHY DIER'S Intent and Will were to be given weight she would want her Son as Guardian**

1-DOROTHY DIER was found by the State of Maryland, Howard County Circuit Court Case No. 13-C-0563324, after a trial by the court, March 7, 2006, to be disabled and incapacitated with no other reasonable alternative available, other then the appointment of a guardian of the person. The trial court further specifically held that her son, Jerry L. Dier was the most caring and concerned son he had ever seen and seasoned counsel for the petitioner, Howard County Department of Social Services immediately so **STIPULATED** to the same. In addition, the court stated that if this was choice for Dorothy Dier to make, she most definitely would choose her son, Jerry L. Dier, not some stranger. However, in pertinent part, the Judge Dennis M. Sweeney ordered

WHEREAS, this Court has found by clear and convincing evidence
That Dorothy Dier lacks sufficient understanding or capacity to make
Or communicate responsible decisions concerning her person because
Of a disability as defined in the Md. Code Ann., Est. & Trusts 13-705,
The nature and disability being Dementia; and

WHEREAS, the Court finds that it is in Dorothy Dier's best interests
To have a Guardian of the Person appointed; and

WHEREAS, the disabled person needs a Guardian of the Person and
There is no less restrictive form of intervention available which is
Is consistent with the person's welfare and safety, and it is therefore

ORDERED, THIS 7TH Day of March 2006, by the Circuit Court for
Howard County, that Phyllis Madachy, Director of the Howard County
Office on Aging, or her successor or designee, 6751 Gateway Drive,
Columbia, MD 21046 be and is hereby appointed Guardian of the
Person of Dorothy Dier with all of the rights enumerated in Md. Code
Ann., Estates & Trusts 13-708; and it is further

ORDERED, that the Guardian of the Person may consent to medical,
dental, or other professional care, medication, including psychotropic
medication, counseling, treatment, services, or admission to a nursing
home for the disabled person..

At trial, on March 7, 2006, in response to Jerry L. Dier's attempt to introduce a tape

recording of mother speaking to him in a most caring and loving fashion as only a mother

can for her child, the following exchange took place between Jerry L. Dier, Judge Dennis

M. Sweeney and counsel for the petitioner, Ms. Heydon

MR. DIER: --It's love, care and affection, Your Honor.

THE COURT: --And your mother loves you. I have no doubt that your mother
Loves you tremendously, and I'm not being facetious here--

MR. DIER: If you hear--

THE COURT: Because it's obvious.—

MR DIER: --The tape...

THE COURT: --It's obvious to everybody in this proceeding that you have

The closest, most intense relationship with you and your mother. That is a
A given as far I'm concerned. That is a fact I would find, I will find, and
I think the Petitioner could probably **STIPULATE**. And is that correct Ms. Heydon
[counsel for the petitioner, Howard County Department of Social Services].

MS. HEYDON: YES, it is, Your Honor.
********************************************************************

THE COURT: I have no doubt that—your mother would have designated
Either you or Michele, your sister, to be the people to make those
Decisions. I have no doubt about that, that your other would have done
That, and would certainly not have designated a public agency to do so . ...

PLAINTIFFS submit that there was not even the **appearance** of justice in this case. The

linkage between the trial court and court appointed counsel has been in part set forth and

it will be further shown in this Petition in unmistakable and in shocking detail, so as to

constitute a fatal" "structural" defect in these proceedings that rendered the March 7,

2006, trial by the court depriving DOROTHY DIER of her rights guaranteed and

protected by the United States Constitution, namely those rights set forth in Fourth, Sixth,

Eighth, and Fourteenth Amendments.

2. On September 28, 2005, a petition for the appointment of a guardian of the person,

Case No. 13C-05-63324  was filed by the Howard County Department of Social Services

in State of Maryland, Howard County Circuit Court. On October 4, 2005, the trial court

appointed Anthony Doyle, as court appointed counsel for Dorothy Dier.

a- Immediately upon being notified of this proceeding Jerry L. Dier, the son of
DOROTHY DIER an attorney licensed to practice law in the State of Maryland entered
his appearance as counsel for his mother and filed a Response to said petition.

b- At the initial hearing on October 14, 2005, the trial court removed Jerry L. Dier as
counsel finding that his role as counsel would be inconsistent with the allegations
contained within the petition which were vehemently denied by Jerry L. Dier, And later
implicitly found by the court to have been **Abandoned** by the petitioner due to their
failure to produce evidence at trial or at any proceeding consistent with the rules of

evidence, as well as removed from the case by way of Stipulation concerning the character of Jerry L. Dier, as suggested by the court.

c- However, the trial court allowed Jerry L. Dier to fully participate in the proceedings as an **INTERESTED PERSON**.

d- Said petition required two physician certificates(Maryland Rule 10-201©)(10) and 10-202, and both filed certificates were founded on observations and care rendered in the Washington, D.C., at Sibley Hospital in September 2005, and gained absent compliance with Maryland law, and without the consent of the Dorothy Dier or her children.

**Petitioner's Abandonment of Allegations Founding the Petition as Regards Interested Person Jerry L. Dier and Physician Certificates Constituting in the main the heart of the September filed Petition Relying at trial in the main on the testimony of a WHC doctor who testified about his analysis and examination of Dorothy Dier while at the WHC, in Washington, D.C.**

e-The petitioner, Howard County Department of Social Services **ABANDONED** Allegations contained within said petition concerning Jerry L. Dier, as to both its failure to produce evidence

> THE COURT: Well, I think we're bound by the –we can't take
> representations of   what you say other testimony would be that
> you[petitioner] haven't presented, So –

and its voluntary entry into the **Stipulation** set forth in  paragraph 1, above, concerning the love, care and devotion of Jerry L. Dier toward his mother, DOROTHY DIER.

In addition, the petitioner further **ABANDONED** the heart of its filed petition. The attached to petition physician certificates filed on September 28, 2005, secured without consent of Dorothy Dier or her family apparently done in  the early morning hours to avoid detection, were deemed inadequate by the petitioner as it filed a second set of physician certificates on February 1, 2006 to correct their deficient presentation in said attached to petition physician certificates. However, there is no support in the law for this attempted corrective filing with a second set of physician certificates. Maryland Rule 10-202(a) requires, "shall include" physician certificates be attached to petition and said physician certificates cite examinations that "shall occur" within twenty one(21) days of the filing of the petition. Said second set of physician certificates bearing examination dates of January 27, 2006, did not meet the timeliness standard set forth in mandatory language under Maryland law as cited above.

**Second set of physician certificates secured and used by the petitioner contrary to law**

f-The petitioner secured a new set of physician certificates which were again secured contrary to Maryland law, in that 1- if the first set were deemed inadequate the petition

should have been immediately dismissed not meeting the filing standards for a guardianship of the person petition, 2-there was an outstanding REQUEST FOR PROTECTIVE ORDER filed by Interested Person Jerry L. Dier at the time the second set of physician certificates were completed. This second set of physician's certificates were gained on January 27, 2006. At the time the second set of physician certificates were secured there was an outstanding Motion for a Protective Order pursuant to Maryland Rule 2-403 and Rule 2-423 filed by Interested Person Jerry L. Dier, on December 30, 2005, to protect his mother' right to privacy. The Howard County Court ignored this breach of duty, faith and legal obligation by the petitioner required in Maryland Rule 2-423. **Mental or physical examination of persons,** and resorted to self help bypassing the process of judicial review and notice set forth . In resorting to self help the petitioner intruded on a most private right, the right to ones own thoughts and thought process without invasion from a governmental agency. The Howard County Court's response to this invasion of privacy and action contrary to court rule was,

> The Court: There is Mr. Dier's request for a protective order
> Pursuant to Rule 2-403 regarding mental examinations of
> Mrs. Dier. I am denying that order and I think it, In fact is
> Is moot, but I will deny that order.

3-At the initial hearing, October 14, 2005, initial hearing, October 14, 2005, court

appointed counsel acknowledged in response  to Jerry L. Dier's inquires, questions

and representations that the affirmative statements in his filed Answer to

Petition and his statements to the court, on their face purportedly expressing

the desires and wishes of DOROTHY DIER and placed under his signature, including but

not limited to a waiver of Jury trial, a waiver of right to be Present and expression of

DOROTHY DIER'S desire to have a guardian of the person appointed were made

**WITHOUT CONSULTATION** of his court appointed client, DOROTHY DIER.

Clearly this conduct was not part of a legally recognizable protective plan to assist his

client, but were shockingly part of a process to expedite a case quickly through the court

system with as little being contested as possible. The court now armed with full

knowledge stated,

> "But I think there's a lot of things here and like, for example Mr.
> Doyle has not been, for whatever reason, has not been able to see
> the disabled person. ....,"

BUT took no action to remove court appointed counsel Thereby sending a strong

message that he had embraced the conduct of court appointed counsel which was plainly

unrelated to advocating the position of his client..

**Attentiveness/Participation of Court Appointed Counsel and Lack of Effectiveness**

4- The degree and fashion of Attentiveness of Anthony Doyle, court appointed counsel

during proceedings where DOROTHY DIER'S interests were at risk were demonstrated

by comments of the court, for example  a-on October 25, 2005, the trial court admonished

court appointed counsel asking him **"Are you awake?,"** after commenting

that he had found court appointed uncharacteristically silent, and  b- during the

trial on March 7, 2006, the trial court had to further make inquiry of a silent court

appointed counsel by asking him, **"Are you all right."**

**Court appointed counsel walked out on his client DOROTHY DIER and the Proceeding Continued with the Court's Permission when Important Substantive Issues as regards his Client were being Discussed as well as her health, safety and well being**

5- In addition, during a hearing on February 2, 2006, as regards the health, safety and

well-being of his client DOROTHY DIER, who had been moved from Washington  D.C.

pursuant to Court order the day before to the Summit Park Nursing and Rehabilitation

Facility in Baltimore County by the designated agent of the court, the State of Maryland,

Howard County Office of Aging. Ophelia Ross managed said move, without having

performed due diligence pertaining to ascertaining its suitability to meaningfully meet

DOROTHY DIER'S needs. Anthony Doyle's participation in this hearing was marked by

his request for permission to leave the courtroom by the backdoor during the hearing, he

had a meeting to attend, and was excused by the trial court, the hearing continued in his

absence and he returned approximately 30 minutes later.

MR. DOYLE: Your Honor, let me interrupt. I've got a meeting to--

THE COURT: Oh yeah, you need to—

THE COURT: Yeah, why don't you—why don't you take—

 MR. DOYLE: **Can I go out the back door**?(emphasis added).

 THE COURT: **Sure**.(emphasis added).

**Court appointed counsel only asked Five questions of a Secondary witness for the petitioner throughout the whole of petitioner's case**

6- During the March 7, 2006, trial by the court, court appointed counsel in addition to conducting himself as referenced in above paragraphs 3-5, court appointed counsel only asked Five(5) questions of a secondary witness during the whole of the petitioner's case, and moreover, these 5 questions were only asked after being admonished by the trial court as referenced in paragraph 4.

7- The trial court's finding included what is referenced in paragraph 1 as regards Jerry L. Dier being described as the most concerned and caring son he had ever known, so Stipulated by the petitioner and that if the choice was one to be made by DOROTHY DIER she would most certainly want her son to continue to assist her as he always had. However the trial court found DOROTHY DIER'S son was overly optimistic in his expectations concerning his mother and therefore there was no reasonable viable alternative available, Thereby requiring the appointment of guardian of the person for DOROTHY DIER. The court appointed the Howard County Office of Aging, as Guardian of the person for DOROTHY DIER, the agency that had mismanaged

DOROTHY DIER'S movement to Summit Park(1502 Frederick

Rd). By happenstance, Summit Park turned out to be, **ACKNOWLEDGED BY**

**JUDGE SWEENEY**, only three houses away from where his sister lived and then

miraculously only a few blocks away from the office of Anthony Doyle(1002 Frederick

Rd.), the counsel appointed by the trial court in this matter. Both Judge Sweeney's

sister's residence and the office of Anthony Doyle were in Catonsville, Baltimore

County.

8- An appeal to the Court of Special Appeals for Maryland followed,

captioned Jerry L. Dier v. Phyllis Macdachy Guardian et al.

No. 236, September Term 2006. The decision of the Howard County trial court was

affirmed, the opinion filed April 18, 2007, on a Notice of Appeal in a

guardianship matter wherein an **Expedited Appeal** had been noted on or about March 29,

2006.

**Same court appointed counsel appointed in subsequent guardian of property case**

9-While the appeal was pending a guardian of the property of DOROTHY DIER action

was filed by Summit Park. The same trial court as in the guardian of the person action

was assigned to the guardian of property action(Case No 13-06-065465 ). The trial court

appointed in turn the same attorney, Anthony Doyle for DOROTHY DIER. This is the

same Anthony Doyle who at the best could be said to have done no good for his court

appointed client DOROTHY DIER, while conducting himself under the apparent

protection of the court in a manner and fashion consistent with the trial court's clearly

noted preconceived notion of how guardianship actions should be processed in his

system pursuant to his sense of justice. The trial court's appointment of Anthony Doyle

sent a strong message, right in your face to DOROTHY DIER and her son Jerry L. Dier, in that the guardian of person case was pending in the Court of Special Appeals for Maryland with the issue of the lack of effectiveness of court appointed counsel front and center. The trial court apparently deemed itself **Untouchable** in the **Maryland Court System and thus far this has proven correct.**. Judge Sweeney's further appointment of Anthony Doyle for DOROTHY DIER had the effect **Casting a New Light,** by bringing to the forefront matters such as lack of impartiality by the trial court front and center which now clearly reached well beyond the previously thought constitutional dimensions of effective assistance of counsel and a terribly misguided court to a **NEW AND EVEN MORE DANGEROUS ARENA** where **NOW** it was apparent that court action and attorney conduct were joined at the hip and the **Rule of Law** had been caste aside.

**Request that trial court recuse itself in the guardian of property case**

DOROTHY DIER'S son, Jerry L. Dier requested that the trial court recuse itself, that issue amongst others was decided-denied by the Court of Special Appeals for Maryland, No.1595, September 2006 Term, on October 19, 2007, a request for reconsideration denied, November 30, 2007, further demonstrating a clear and unmistakable signal that something had terribly gone wrong, justice was nowhere to be found, facts had been distorted, the law has been ignored, and consequently the rule of man had prevailed over the Rule of Law, to the lasting detriment of DOROTHY DIER'S LIFE AND LIBERTY INTERESTS which the Maryland Court System was entrusted to Protect, and which this Court has a duty recognize, restore  and set DOROTHY DIER Free.

It surely cannot be argued that an alleged disabled person deserves fewer procedural and substantive safeguards than an accused criminal in proceedings seeking to cause a deprivation of life, liberty and property. The Court of Special Appeals for Maryland in In Re Sonny E. Lee, 754 A.2d 426, 438 and 439 (Md. App. 2000) in discussing the role of counsel and his duty to protect his client's interests held,

> Due process demands nothing less, particularly as here, when the alleged Disabled person faces significant and usually permanent loss of his basic Rights and liberties. See *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S. Ct. 893, 902, 47 L. Ed. 2d 18 (1976) (stating that the "[t]he right to be heard heard before being condemned to suffer grievous loss of any kind even though it may not involve the stigma and hardship of a criminal conviction is a principle basic to our society") (quoting *Joint Anti-Fascist Comm. v. Mc Grath*, 341 U.S. 123, 168, 71 S. Ct. 624, 646 95 L. Ed 817 (1951) (Frankfurter, J. concurring); see also *Lassiter v. Department of Soc. Servs. of Durham County, N.C.* 452 U.S. 18, 26-27, 101 S. Ct. 2153, 68 L. Ed 2d 640 (1981), *reh'g denied*, 453 U.S. 927, 102 S. Ct. 889, 69 L. Ed.1023 (1981). In a guardianship proceeding effective representation by counsel insures that the proper procedures are followed by the court. ...

In the case at bar, the trial court and court appointed counsel acted as "one" with the trial court driving the train with no one but Interested Person Jerry L. Dier, the son of DOROTHY DIER to attempt to protect and safeguard his mother's guaranteed rights under the United States Constitution, with the trial court and court appointed counsel thwarting the due and just exercise of those rights at every step, placing DOROTHY DIER'S right to a Jury trial, U.S. Constitution, Sixth Amendment, beyond her reach, so as to make certain that their voice would be the only one heard.

## JURISDICTION AND VENUE

**Personal Jurisdiction-see detailed discussion with specificity on pages 2-29**

**Subject Matter Jurisdiction**

**10-This action** arises under the United States Constitution, particularly the on the Sixth, Eighth and Fourteenth Amendments, Article I, Sect. 9, Habeas Corpus, and under Federal law, specifically, Title 28 U.S.C. Sect. 2254 and Title 42 U.S.C. Sect. 1983. This court has jurisdiction over PLAINTIFF'S claims relating to the State of Maryland, Howard County Circuit Court, Judge Dennis M. Sweeney's conduct holding DOROTHY DIER disabled, and appointing as guardian of the person, State of Maryland, Office of Aging, Howard County relating to PLAINTIFF'S' civil claims arising under the United States Constitution and federal law pursuant to 28 U.S.C. 1331, 28 U.S.C. 2254 and 42 U.S.C. 1983. Each and all of the acts alleged herein were done by the Defendants under the color and pretense of state law, statutes, ordinances, regulations, or customs.

**Venue**

11- Venue is proper under 28 U.S.C. Sect. 1391(b)(2) , the United States District Court for District of Columbia is clearly the District Court in which a "substantial part of the events or omissions giving rise to the claim occurred," the *events* wholly taking place in the *District of Columbia* which *gave rise* to the claim set forth, to wit, a total and complete departure of jurisprudence as guided by the principles set forth in the United States Constitution depriving DOROTHY DIER of her right to privacy, right to effective assistance of counsel, a fair and impartial court, right to jury trial, right to be present, due process of law resulting in her being placed in the legal custody of the State of Maryland, Howard County Circuit Court and its agent the State of Maryland, Howard County Office of Aging subjecting DOROTHY DIER to drastic and most uncommon restraints upon her freedom taking the form in part of cruel and unusual punishment. Said deprivation of DOROTHY DIER'S protected rights guaranteed under the United States Constitution could not have take place *but for* the "substantial events" taking place wholly in the District of Columbia.

## THE PARTIES

Plaintiffs

12. Plaintiff Dorothy Dier is a citizen of the United States and pursuant to State of Maryland, Howard County Circuit Court order is in custody residing at Summit Park in the State of Maryland, Baltimore County.

13. Plaintiff Jerry L. Dier is a citizen of the United States and the natural son of DOROTHY DIER.

Defendants

14. Defendant Office of Aging, Howard County, State of Maryland is the court appointed(State of Maryland, Howard County Circuit Court) guardian of the person for DOROTHY DIER.

47

15. Defendant Judge Dennis Sweeney is presently a Howard County Circuit Court Judge, State of Maryland. He is named in his official capacity as regards his conduct under color and authority of state law.

## SUMMARY OF FACTS

**State of Maryland, Howard County Circuit Court-The relationship between the trial court and court appointed counsel**

16- The chronology of court proceedings in Howard County Circuit Court is as follows,

a-petition for guardian of the person filed in Case No. 13 C-05-063324, September 28,

2005, Anthony Doyle appointed as counsel for DOROTHY DIER, October 4, 2005, b-

initial hearing, October 14, 2005, wherein it came to Judge Sweeney's attention that court

appointed counsel in his Answer to Petition under his signature and in his

representations in open court had misrepresented to the Court that DOROTHY DIER had

"waived" her rights under the United States Constitution to Jury trial, and to be Present,

and in addition had affirmatively stated that DOROTHY DIER desired to have a guardian

appointed by the court as well as other factual statements concerning allegations in the

petition for guardian of the person, ALL DONE WITHOUT CONSULTATION OF HIS

COURT APPOINTED CLIENT, c-October 25, 2005, status hearing, d-December 7,

2005, status hearing, e- status hearing, January 4, 2005, f--temporary guardian of the

person hearing, January 23, 2006, g--status and motions hearing, February 2, 2006, h-

trial by the court, March 7, 2006 and order appointing guardian of the person entered

March 7, 2006, i-Appeal to Court of Special Appeals for Maryland No. 236, September

2006 Term, opinion affirming trial court dated April 18, 2007, j- guardian of the property

action filed in Howard County Circuit Court, Case No. C-13-06-065465, May 16, 2006,

k- Anthony Doyle appointed by the trial court as counsel for DOROTHY DIER , May

25,2006, l-guardian of property trial continued without informing Interested Person Jerry L. Dier, he appeared in court, September 6, 2006 to September 22, 2006, m- guardian of property hearing including both a recusal request and trial, September 22, 2006, n— motion for reconsideration and Supplement filed on September 25, 2006 and September 27, 2006, respectively o-memorandum and order by the court denying said motions denied, dated September 27, 2006, p-court order appointing a guardian of property court entered October 4, 2006, q- appeal filed on or about October 5, 2006, Appeal No. 1595, September 2006 Term, r-Court of Special Appeals affirming trial court's decision, opinion dated April 18, 2007, s-Court of Special Appeals affirming trial court's decision, opinion dated October 19, 2007, t-Court of Special Appeals denying request for reconsideration, dated November 30, 2007, and u-the Howard County Circuit Court denying Aging's request to withdraw and withhold dated November 27, 2007. ..

17- Anthony Doyle, court appointed counsel for DOROTHY DIER filed an Answer on October 14, 2005, WITHOUT CONSULTATION **waiving** DOROTHY DIER'S right under the United States Constitution to Jury trial, right to be Present, affirmatively stating that DOROTHY DIER wanted a guardian of the person appointed as well as making factual representations as if they were those of DOROTHY DIER regarding allegations within said petition.

18- Anthony Doyle acknowledged the conduct described in above paragraph 17, which was consistent with the nature and fashion which the trial court evidenced by this statement on September 22, 2006, AS REGARDS  Anthony E. Doyle's further appointment by Judge Sweeney in a guardian of property action, which by the nature of the timing of the filing and the hearing could not be available to Mr. Dier at either the

49

trial, March 7, 2006 or during the attendant subsequent appellate filings. Judge Sweeney

in a sweeping action of partiality and an utter disregard for the Rule of Law stated the

following in response to Mr. Dier's fact based assertions as regards Anthony Doyle

concerning the breath of Anthony Doyle's representation of DOROTHY DIER under

Judge Sweeney's stewardship

> [The court] As to the allegations regarding—suggested that Mr. Doyle
> is not adequately performing his function, the Court has, for the past
> 15 years, has utilized Mr. Doyle as well as every other judge of this
> Court, to my knowledge, in Court appointments and his competence
> And abilities and –are well-known to the Court to be more than adequate
> And quite frankly, that's one of the reasons that, not only myself, but other
> Judges of this Court, have—frequently appoint him as well as taking the
> Time to do it.

Judge Sweeney's statement in support of Anthony Doyle can be reasonably interpreted as

a defense of himself. The words and actions by the Howard County trial court are

indefensible if the Rule of Law is to be upheld and human dignity, the interests of justice

and the integrity of the judicial process are deemed worthy of protection by those who are

empowered to monitor it and afford protection, not abuse, to those innocents that come

under its vast umbrella.

19- At a brief status hearing on October 25, 2005, the trial court admonished court

appointed counsel for being uncharacteristically silent, asking him if he was awake?

20- At a status hearing on February 2, 2006, when matters such as the care, safety and

well being of court appointed counsel's client, DOROTHY DIER were being discussed

as well as the sufficiency of the petition and the adequacy of his representation Anthony

Doyle, after twenty or so minutes, when he was in the main silent, interrupted the hearing

requesting that the trial court allow him to attend a meeting and exit by the back door and

the court agreed. Relevant and potentially critical matters such as Summit Park's prior

history and independent evaluations of its care structure were brought to the court's

attention by Interested Person Jerry L. Dier, which included an article noting that some
years earlier Summit Park was by its paperwork seemingly providing good care for a
patient, but for one most important matter, the patient had passed away some time earlier.
More than being grossly ineffective and acting as a agent of the court, court appointed
counsel's absence, not just that of DOROTHY DIER, the subject of the proceeding was
deemed by the trial court to be unnecessary.

> THE COURT: Sure. … We can go on without
> Mr. – without Mr. Doyle. All right go ahead[to Mr. Dier].

21- Furthermore, during said February 2, 2006, status/motions hearing the trial court
noted familiarity with Summit Park, stating that his sister lived only three houses from it
and that he thought he had been inside said facility. See paragraph 34 for further detail.

22- On February 2, 2006, when discussing the financial status of DOROTHY DIER with
Mrs. DIER'S daughter, Michelle Lyons, the trial court stated that one can not expect
Mercedes Benz treatment on a Chevrolet budget. The trial court did not understand the
nature of his obligation as judge, the issue being not whether DOROTHY DIER should
reasonably expect the best treatment and care in accordance with her needs, but would
she get the kind of treatment and care that was reasonably consistent with her needs and
condition.

23- The trial court further stated that it had knowledge about Summit Park gained
separate and apart from the four corners of the judicial proceeding before it and
instead of appointing an independent investigator, or recusing himself, the trial court
stated it was not going to make any judgments. The nature and scope of the trial court's
prior contact with and the information gained from that contact, or in any other manner

was not further addressed by the court at that time. See paragraph 34, its development.

24- The trial court found that even though he acknowledged and the petitioner so

Stipulated that Jerry L. Dier, DOROTHY' DIER'S son was the most caring and loving

son that he had ever heard of and that if DOROTHY DIER was given the choice she

would most certainly choose him as her guardian, however he chose the Office of Aging,

Howard County as the guardian of the person for DOROTHY DIER, the governmental

institution which mismanaged the placement of DOROTHY DIER at Summit Park,

outside its geographical area of familiarity.

25- In the guardian of person action, DOROTHY DIER was **not present** and

her absence was not addressed at the guardian of the person status hearings, October 25,

2005, December 7, 2005, January 4, 2006, the so called emergency guardian of the

person hearing, January 23, 2006, the status/motions hearing, February 2006, and the

trial, March 7, 2006. In addition, DOROTHY DIER was not present during the

September 22, 2006, recusal hearing and guardian of property trial.

Judge Sweeney's October 4, 2006, Court order pertaining to the guardian

of the property trial, reads in pertinent part,

> The Court finds after hearing, that the disabled person cannot be
> present because of physical and mental incapacity

However, the trial court did not hear or address at trial the issue of DOROTHY DIER'S

**absence** from the  September 22, 2006, recusal hearing and trial by the court. This was a

continuation of the trial court's conduct throughout these proceedings depriving

DOROTHY DIER of her rights under the United States Constitution as if she was a non-

Person, seeming an after the fact cover-up.

Judge Sweeney's earlier filed Court order, March 7, 2006, in the guardian of person

action, reads in pertinent part,

> WHEREAS, the Court finds that the disabled person cannot be present
> Because of a physical or mental incapacity and is unable to consent to
> The appointment of a Guardian of the Person; and

DOROTHY DIER did not attend either the trial or any of the proceedings in this action

for guardian of the person and **no required inquiry** was made regarding her absence by

the Court or an explanation offered by her court appointed counsel, but for initial

representations in court appointed counsel's Answer to Petition filed Without

Consultation with his client. There is an affirmative obligation under Maryland law for

the trial court to properly inquire and for court appointed counsel to assist if appropriate

under Maryland law as regards the status of the person before the court, at each and every

hearing

> Presence at hearing; presentation of evidence; closed hearing; sealing, ... .
> The person alleged to be disabled is entitled to be present at the hearing
> Unless he has knowingly and voluntarily waived the right to be present
> Or cannot be present because of physical or mental incapacity. Waiver
> Or incapacity may not be presumed from nonappearance, but **SHALL**
> (emphasis added) be determined on the basis of factual information
> supplied to the court by counsel or a representative appointed by the
> court. Md. Ann. Code, Estates and Trusts 13-705(e).

**New Information that Came to Light after the Guardian of the Person Proceedings
that Directly Related to the Relationship Regarding the Trial Court and Court
Appointed Counsel**

26- Summit Park filed a petition for guardian of property for DOROTHY DIER on May

16, 2006, in State of Maryland, Howard County Circuit Court.

27- The same trial court, Judge Dennis M. Sweeney, State of Maryland, Howard County

Circuit Court appointed Anthony Doyle as court appointed counsel for DOROTHY

DIER in a guardian of property proceeding initiated by Summit Park, a purported

creditor- petitioner who had no standing under the law in the State of Maryland to file

said petition. (Maryland Rule 10-301(a) Who may file. The trial court's reasoning seemingly was that DOROTHY DIER would have to pay for care and treatment wherever she was and since she was where the court placed her, that place Summit Park should be paid, and Summit Park was the best entity to bring this request before the court even if in the form of a guardian of property action, a concern beyond the bounds of the proceeding.

28- The guardian of property petition stated that DOROTHY DIER resided at Summit Park in Baltimore County, so as to place DOROTHY DIER by admission of the creditor/petitioner Summit Park outside the venue of the Howard County Court. Maryland Rule 10-301(b) Venue, which defines 'venue' in terms of where the subject resides at the time of the filing of the petition, outside of the jurisdiction of the Howard County Circuit Court. The trial court's reasoning was that was just a mere technicality, since it[the Court] had placed DOROTHY DIER OUTSIDE its jurisdiction.

29- On September 22, 2006, during the guardian of property hearing the trial court demonstrated an inability to acknowledge for whatever reason the reality of the legal ramifications of its conduct that seemingly had its origin in its inability to act as a fair and impartial judge, so as assure the orderly administration of justice consistent within the framework of the Rule of Law, and in its place the trial court resorted in its Memorandum and Order denying(September 27, 2006) the request of Interested Person Jerry L. Dier for Reconsideration and a Supplement thereto, to the long discarded tactic of labeling and avoidance, rather than judicially addressing the important issues pertaining to a guardian matter where the rights of an alleged disabled person are most in need of protection in the form of the conduct of a trial where the Rule of Law must be upheld, rules of evidence

54

accorded their proper place and justice is rendered within the metes and bounds of a justice system whose integrity is unquestioned.

30- Interested Person Jerry L. Dier requested the trial court recuse itself from hearing the guardian of property matter and certify the issue of determination of recusal to the Administrative Judge for the Circuit. The trial court insisted on hearing from Interested Person Jerry L. Dier, as regards the substance of his request and then denied the request for recusal.

31- The substance of the request was directed to the nature and fashion of the relationship between the trial court, Judge Dennis M. Sweeney, State of Maryland, Howard County Circuit Court, and court appointed counsel, Anthony Doyle, that moved the seasoned trial court to appoint the same counsel to represent the same person, DOROTHY DIER in a guardian of property action only months after an earlier guardian of person action, which was pending before the Court of Special for Maryland, in which the actions of court appointed counsel and those of the trial court in commenting and regulating the conduct of court appointed counsel.should have been subject to review.

32- The matters addressed in paragraphs 3 through 6 set forth the issues of court appointed counsel making affirmative representations waiving DOROTHY DIER'S rights under the United States Constitution to Jury trial, right to be Present as well as affirmatively requested a guardian of the person be appointed, WITHOUT

In addition, the trial court admonished court appointed counsel on October 25, 2005, as regards his silence, asking him are you awake, and furthermore, during the March 7, 2006, trial, court appointed counsel having been silent for an extended period of time, the trial court asked him if he was all right and only then did court appointed counsel ask a

few questions, five of a secondary witness.

33- During the February 2, 2006, status/motions hearing with issues concerning the health, safety and well being of his client, DOROTHY DIER, being addressed, court appointed with permission of the trial left by the back door to attend a meeting and the hearing continued.

**The Trial Court acknowledged extra-judicial knowledge as regards Summit Park and took No Curative Action**

34- In addition, during the recusal portion of the September 22, 2006, guardian of property hearing Interested Person Jerry L. Dier brought to the trial court's attention that he had voluntarily stated at the February 2, 2006, guardian of the person hearing that he his sister lived on three houses away from Summit Park and he thought he had inside the facility. The Maryland Code of Judicial Conduct, Canon 3, Performance of Judicial Duties, Maryland Rule 16-813(D) Recusal reads in pertinent part, followed by a brief history the Judge Sweeney's contradictory statements concerning his prior knowledge of Summit Park, during the February 2nd hearing, the September 22, 2006, guardian of property trial and Judge Sweeney's attempt to explain himself in its September 27th Memorandum and Order, only creating further doubt on its credibility and impartiality,.

(1) A judge **shall(emphasis added)** recuse himself or herself from a proceeding in which the judge's impartiality might reasonably be questioned,including a instance when: (a) the judge has **Extra-Judicial** knowledge(emphasis added) of a dispute evidentiary fact concerning the proceeding;

### February 2, 2006

I know the place. I think I've actually been in there. My sister lives Three houses away from it. So, I know the area. I know the place a Little bit.

56

### September 22, 2006

I've never been in Summit Park at all.

### Memorandum and Order, September 27, 2006

The Court did not select the nursing home for Ms. Dier, and had only
The most general knowledge of the facility, as placed on the record.

### The Attempts of the Trial Court to Craft an Explanation

This series of assertions by Judge Sweeney in addition to his further statements in his

Memorandum and Order dated September 27, 2006, as regards *his* court appointed

counsel, Anthony Doyle, including the trial court's evaluation of his representation and

the linkage of court appointed counsel to the trial court provided further insight into the

trial court's lack of impartiality.

a-the trial court's comments regarding Mr. Doyle being "awake" and "all right," "It in no
way reflected any observation about Mr. Doyle's lack of attentiveness." -

b- "Mr Doyle's representation of Ms. Dier in these proceedings has been well within the
Court's expectations, and the Court commends Mr. Doyle for his patience and
forebearance in dealing with the totally unwarranted accusations and unrealistic demands
of Mr. Dier.

c-"Mr. Doyle did not seek the appointment, but took it on as a public service at the
request of the Court, as he has done for over 15 years, oftentimes at great personal
sacrifice and with only infrequently being paid near the going rate for his services."

### COUNT ONE

Violation of Fourteenth Amendment
Due Process Right to a Fair and Impartial Trial

35- PLAINTIFFS incorporate by reference the preliminary statement and paragraphs 1-

34 as if fully restated here and not limited to the following further state:

57

36- Judge Sweeney became an advocate for guardianship during the proceeding for guardian of the person without any concern for due process of law totally and completely abandoning his rightful role to assure that the conduct of the proceedings protected DOROTHY DIER'S rights as guaranteed under the United States Constitution.

37- Judge Sweeney acted in concert with his chosen court appointed attorney, Anthony Doyle in violating and THEREBY denying DOROTHY DIER due process of law.

38- Once Judge Sweeney became an advocate for a guardianship in this action, it became impossible for Judge Sweeney to maintain his role as a impartial judge. Judge Sweeney as an advocate apparently realizing that there were substantial shortcomings in HCDSS's presentation allowed into evidence at the guardianship trial, testimonial and/or documentary evidence from earlier judicial proceedings under the theory "That's all incorporated and I'm considering that as part of the whole ball of wax here." Whereby, the Howard County Court by a declaration of *blanket* incorporation had again caste aside the Rule of Law so as to reach preordained result.

**COUNT TWO**

Violation of Sixth Amendment
Right to Effective Assistance of Counsel

39- PLAINTIFFS incorporate by reference the preliminary statement and paragraphs 1-38 as if fully restated here and not limited to the following further state:

40- Judge Sweeney adopted a standard of competence for his court appointed counsel, wherein the only requirement was to follow his lead and walk in his footsteps through the court system- so be it that court appointed counsel paid little if any attention to this matter, such as when he walked out by the back door to attend a meeting when the health, safety and well-being of his client \was at issue, when he remained silent throughout

58

lengthy parts of the proceedings including at trial causing the trial court to comment, "Are you awake?" and "are you all right?" Thereby violating the protection of DOROTHY DIER'S guaranteed right of effective assistance of counsel under the United States Constitution. DOROTHY DIER was not the beneficiary of any positive assistance of counsel by way of Anthony Doyle's representation whose clearly only interest was to work hand in hand with the court even if it meant signing a pleading that he knew contained incorrect and misleading information, Answer to Petition.. Anthony Doyle and the court had worked together for fifteen years and it is horrifying to think how many times they must have done this dance together. It was apparent from the first hearing on October 14, 2005, that Mr. Doyle could do no wrong as long as he did nothing right for his client. Without Consultation, as Mr. Doyle acknowledged, he had affirmatively represented under his signature in his Answer to Petition and in open court without pause, embarrassment or seemingly concern for admonishment and/or punishment that DOROTHY DIER HAD WAIVED HER RIGHT TO A JURY TRIAL(Maryland Rule 10-205(b)(1) AND TO BE PRESENT(Estates and Trusts 13-705(e)) AT THE INITIAL HEARING, OCTOBER 14, 2005, AND WITH THESE FACTS AMONGST OTHERS, HAVING BEEN MADE KNOWN TO THE JUDGE SWEENEY, JUDGE SWEENEY EMBRACED THIS BLATANT GROSSLY INEFFECTIVE UNETHICIAL CONDUCT AND DECLARED THAT IT FIT WITHIN THE RANGE OF WHAT HE DEEMED TO BE PERMISSIBLE AND APPARENTLY EXEMPLARY CONDUCT, NOT REPREHENSIBLE ON THE PART OF COURT APPOINTED COUNSEL.

41- Judge Sweeney's actions in concert with his court appointed counsel for DOROTHY DIER denied DOROTHY DIER a fair and impartial trial in violation of the Due Process

Clause of the Fourteenth Amendment to the United States Constitution as well as her

right to Effective Assistance of Counsel, Jury trial and Confrontation under the Sixth

Amendment to the United States Constitution as he purported to act as the impartial trial

judge under color of law.

## COUNT THREE

Violation of Sixth Amendment
Right to be Present and Confront Witnesses

42- PLAINTIFFS incorporate by reference the preliminary statement and paragraphs 1-

41 as if fully restated here and not limited to the following further state:

43- Judge Sweeney gave mere lip service to DOROTHY DIER'S right to be present

protected by the Sixth Amendment of the United States Constitution as well as in

violation of State law, not even addressing the issue of DOROTHY DIER'S presence

made most clear by her absence as the Howard County Court and court appointed counsel

ignored their duty to make a independent evaluation, fact based as regards each hearing

and most emphatically at trial and in its place employed a reference back technique..

44- Maryland Rule 10-212, sheds further light on the right of the alleged disabled person

to be present, .and how far the Maryland legislature has gone to jealously guard the rights

of an alleged disabled person so as not to be deprived of their United States Constitution

rights to life, liberty and property which are in issue in a guardianship proceeding where

the alleged disabled every opportunity to be present.

> Waiver may not be presumed from nonappearance but shall be
> Be determined on the basis of factual information supplied by
> The person's attorney or a representative appointed by the court.
> Upon motion by or on behalf of the person alleged to be in need of

Of emergency protective services that, because of his or her disability
The person cannot attend at the courthouse, the court may hold the
The hearing at a place to which the person has reasonable access.

## COUNT FOUR

Violation of Fourteenth Amendment
Right to Equal Protection of the Law

45- PLAINTIFFS incorporate by reference the preliminary statement and paragraphs 1-

44 as if fully restated here and not limited to the following further state:

46- As set forth in paragraph 44, the State of Maryland has set forth a procedure to

protect an alleged disabled person's constitutional right to be present and confront

witnesses at each and every proceeding in a guardian of the person action where

the person has life, liberty and property rights and interests at risk.

47- Denying DOROTHY DIER a fair and impartial trial merely because she was thought

in the trial court's mindset to be incapacitated and disabled, Thereby enabling him to

decide questions of fact at his will that were only to be decided after a trial on the

merits, violating her right to equal protection of the law under the Fourteenth

Amendment to the United States Constitution.

## Count Five

Violation of Fourth Amendment
Right to Privacy

48- PLAINTIFF'S incorporate by reference the preliminary statement and paragraphs 1-

47, as if fully restated here and not limited to the following further state:

49-The initial set of physician certificates, those attached to the petition at time of filing,

61

September 28, 2005, were apparently taken pursuant to state action, the HCDSS, without

consent of DOROTHY DIER or her family. The Howard County Court in addressing this

issue stated, "Whatever merit there may be to that, would be the basis for a potential civil

suit against the particular offender under civil rights laws or tort law or otherwise. I do

not see as the basis for suppressing evidence or refusing to consider evidence that is

available to the Court."

50- Moreover, Interested Person Jerry L. Dier had filed a request for a Protective Order ,

Maryland Rule 2-403, on December 30, 2005, after the Office of Aging had attempted to

secure a further physician certificate by falsely representing their authority a nurse who

was caring for DOROTHY DIER and when asked to produce her documentation the

representative of Aging left. The Howard County Court stated that it was moot in that it

was a *fact accompli*, as if the court was powerless to remedy the unlawful conduct of

HCDSS, Thereby placing its notion of both self-help and the appropriateness of

deprivation of rights guaranteed under the United States Constitution that it has sworn to

uphold, above the Rule of Law.

The proper procedure for a party who is requesting a Mental Examination is set forth in

Maryland Rule 2-423, where notice is required, and a time response is available and a

judicial determination is required. HCDSS sought to bypass this mandated procedure to

protect an individual such as DOROTHY DIER'S' right to privacy, not surprising under

the factual context of the complained litigation, where earlier Dorothy Dier's court

appointed attorney sought to circumvent rights guaranteed to Dorothy Dier under the

United States Constitution by making incorrect and misleading statements including that

Answer to Petition under his signature and the Howard County Court warmly embraced

such conduct applauding the deprivation of Dorothy Dier's rights under a notion that he

knew best, there was no need for the Rule of Law, when the rule of man had the upper

hand.

## COUNT VI

**Violation of 42 U.S.C. 1983**
**Deprivation of rights secured**
**by United States Constitution**

51- PLAINTIFFS incorporate by reference the preliminary statement and paragraphs 1-

50, as if fully restated here and not limited to the following further state:

52- The federal questions presented in the context of this action have had a direct

impact on DOROTHY DIER. Under the color of law the State of Maryland, Howard

County, Circuit Court, Judge Dennis Sweeney, and his delegated agent, the court

appointed guardian of the person(Howard County Office of Aging) of DOROTHY DIER

have taken custody and control of DOROTHY DIER in violation of her rights of life,

liberty and property guaranteed and to be protected under the United States Constitution

placing her at substantial risk under the color of state law, whose integrity is open to

serious question due to the conduct of the trial court and its agents.

## COUNT VII

**Violation of Dorothy Dier's**
**Right to be free from cruel and**
**Unusual Punishment secured by**
**Eighth Amendment, U..S. Constitution**

53- PLAINTIFFS  incorporate by reference the preliminary statement and paragraphs 1-

52, as if fully restated here and not limited to the following further state:

63

## Background

Your Petitioner, DOROTHY DIER was ordered to be moved to Summit Park by Judge M. Sweeney on or about February 1, 2006. Soon after her arrival at Summit Park DOROTHY DIER was seen by a psychiatric nurse. Jerry L. Dier had fully explained to the medical staff at Summit Park and now he further related to said nurse that his mother had had a mental health breakdown in 1993 when her husband during a second heart bypass operation developed dramatic complications, his chest wall had to be opened and closed three times within 24 hours to stop the bleeding. Mr. Dier further stated to the psychiatric nurse that his mother's present condition was a direct result of her daughter telling her that she thought she had liver cancer in the summer of 2005. Prior to this time DOROTHY DIER was eating all founds in substantial portions by herself, talking in short sentences, walking without a walker, just requiring at times the finger of her son for assurance. After this conversation with her daughter, DOROTHY DIER head fell to the side, she closed her eyes and was silent and from that moment on she lost interest in her great lover to eat, and walk and talk. The psychiatric nurse was familiar with such incidents and appeared to want to work with DOROTHY DIER to assist her in dealing with her depression. Soon thereafter, Jerry L. Dier was informed that the Office of Aging representative, I believe it was Ms. Rightenauer at the time had stated **No** to any psychiatric help for DOROTHY DIER. DOROTHY DIER was seen by a physical and occupational therapist after being at Summit Park for 7-8 months and she was found to have the ability, even after both her feet in the main had been either locked under her body or adjacent to her body for extended periods of time, to be able to move each leg 90 plus degrees, the functional equivalent of one's leg position while sitting or driving a car.. The physical therapist, William Moore could not understand why DOROTHY DIER'S legs were being locked to her body in such a manner-the occupational therapist, Christine told Jerry L. Dier that he should educate the staff as regards the attention and care to be given to his mother's arms and legs; **Mr, Moore** told Jerry L. Dier on more then one occasion that he would and had  Ordered that DOROTHY DIER'S legs were not to be locked under her body, either with or without the aid of pillows and linen. No matter what the physical therapist said and how Jerry L. Dier protested it fell on deaf ears. On one occasion the charge nurse on the second floor at Summit Park, Mr. Richards told him, let the therapist come up here and stay here if he wants that done. Still, in the end of October 2006, with Jerry L. Dier's constant presence, his mother's strong determination Dr. Bernhard stated to Jerry L.Dier that his mother was healing and on November 5, 2006, DOROTHY DIER was pronounced **WOUND FREE** by Dr. Bernhard, and that he would no longer be seeing her on a weekly basis, but would come by intermittently to look in. Within days of this declaration by Dr. Bernhard, DOROTHY DIER was transferred to the second floor at Summit Park, to be placed under calloused and indifferent  heavy hand of **Mr. Richards**, the charge nurse, **Lottie Dorsey** and **Kim Williams** the Unit managers, with the blessing of the representative of Aging, **Ophelia Ross** and the wound doctor, **Dr. Bernhard** who turned a blind eye to what was plain to see taking place right in front of him. It can only be reasonably concluded that DOROTHY DIER transfer to the second floor was by design, a deliberate actions aimed at the systematic breakdown of DOROTHY DIER'S body and spirit-DOROTHY DIER was placed in a room and given a bed and turned to a position making it most difficult for

her to even watch TV over the protest of her son, WHICH were then and have been up to now, to no avail.

**Cruel and unusual punishment**

54- The State of Maryland, Howard County Circuit Court, Judge Dennis M. Sweeney, by and through his agents the Howard County Department of Social Services and the Office of Aging, Howard County have crafted a scheme by design so as to inflict inhumane, barbaric torturous punishment on the person of Dorothy Dier, reminiscent of Nazi Germany by placing her in a position in a bed where her legs are either locked under her body by both placement and the use of pillows and sheets *as lock-in devices* or where one of her legs, mainly the left leg is placed such that her knee is head high and only a few inches away from her forehead and her left foot is either locked under right leg or her body, while her right foot is either locked under her body or her right leg is placed in a folded position so as to be parallel to the headboard and hugging her buttocks.

**Mr. Richards-December 31, 2006**

Either above cited placement is most difficult to describe and beyond pitiful to observe, as DOROTHY DIER at times yells out in pain most clearly exemplified on December 31, 2006, when her charge nurse, Mr. Richards told Mr. Dier in response to Mr. Dier's request that he change his mother's position to a more comfortable one, his mother's legs placed at extreme angles, one leg raised , the other appeared to be locked under her body, his mother yelling, turning, twisting her body, raising up a few inches and moving her hands and legs as best she could under the circumstances, while sweating profusely all over her body most noticeably on her face and on her scalp, while continuously screaming and moaning. Mr. Richard's reasoning for not doing anything to assist DOROTHY DIER, was that she was faking, attempting to manipulate the staff to get my

attention. My Mother yelled, screamed and moaned and twisted and turned for over two hours until she fell asleep while I stood by her rendered helpless by what can only be described as these monster-like conduct on the part of Mr. Richards, only able to give comfort to my mother by talking to her, stroking her forehead and kissing her on the cheek.

**Judge Sweeney, Office of Aging, Ophelia Ross, Dr. Bernhard**

The State of Maryland, Howard County Circuit Court, Judge Dennis M. Sweeney, Office of Aging, Howard County acting through its designated agents and their Holding facility, Summit Park are directly responsible for this barbaric torture of my mother. Judge Sweeney can not claim ignorance, in that detailed instances of inhumane treatment were brought to his attention by Mr. Dier in open court on October 3, 2007, and Judge Sweeney took no curative action to protect DOROTHY DIER, his ward, made so by his conduct in the instant action.

Also, DOROTHY DIER'S wound doctor, Dr. Bernhnard with knowledge did and said nothing, even after **being informed that Summit Park's In house Physical Therapist, William Moore,** had told Mr. Dier time and time again that such positioning was inappropriate since Mrs. Dier could move both feet 90 plus degrees. On one occasion Dr. Bernhard said he would talk to the physical therapist who was in-house, later that day Mr. .Dier spoke to the physical therapist and asked him if Dr. Bernhard had spoken to him and he said No. The physical therapist, William Moore was not seen at the Summit Park Holding facility again.

**Dr. Bernhard declaration that Dorothy Dier was wound free on November 5, 2006- her transfer to second floor, Lottie Dorsey, Kim Williams and Mr. Richards**

Dr.Bernhard had seen DOROTHY DIER'S legs and feet wet and damp, wrinkled, dirty, with soiled blood stained bandaging, her toes swollen so as to be almost unrecognizable, her toe nails grown to enormous size, deep wounds along her toe line and on her toes in both feet and did and said nothing. This taking place within weeks after DOROTHY DIER had been declared **wound free in late October-early November 2006** by the very same doctor, prior to her being moved to the second floor at the Holding facility, only days later. On one occasion in mid December 2006, Dr. Bernhard after viewing the breakdown of My Mother's legs and feet as described above, told the staff at Summit Park who came to see My Mother once per week that she had to be turned on her right hip in order to protect her left foot that had been locked under her body by the staff on the floor and her left foot was in need of immediate attention. Dr. Bernhard directly ordered such action, however, said order was not followed to any appreciable degree by the staff on the second floor no matter what Jerry L. Dier said and Dr. Bernhard ordered.Dr. Bernhard although seeing My Mother on her left hip with continued skin breakdown, never addressed why the staff had not followed his order. The reaction of the senior medical staff at this Holding facility that came to see DOROTHY DIER once per week, which included Dr. Bernhard, Lottie Dorsey, a unit manager and Kim Williams, a unit manager, to Mr. Dier's complaints was to exclude Mr. Dier from the room when they viewed and talked amongst themselves about Mrs. Dier's condition. They are all gone, removed from the situs of their crimes by Summit Park and seemingly others in response to Mr. Dier's complaints(Mr. Dier can not be certain as to Dr. Bernhard, the wound doctor),

**Mr. Dier's exclusion from his mother's room when the wound team observed and discussed his mother's condition-he had seen too much**

Mr. Dier's exclusion came after a series of observations in December 2006 and January

2007, when he had seen that his mother's bandaging was found to be wet, red and brown,

blood stained and soiled.DOROTHY DIER'S legs were red, wrinkled, and shrunken

and her feet and especially her toes were distorted in appearance almost beyond

recognition with her toe nails grown to enormous length and Mr. Dier had to suggest that

they be cut by a podiatrist. Dr. Bernhard and staff had forgotten what treatment

had previously been ordered which worked to a degree, until reminded by Mr. Dier. In

spite of Mr. Dier's repeated complaints this group, Summit Park wound team seemed

bent on doing everything to inflict harm on DOROTHY DIER. Creating a process where

DOROTHY DIER was made to needlessly to suffer, bedridden for months inflicted with

severe bedsore on her feet as well as on her arms.

**December 20, 2006, meeting with Ophelia Ross and Lottie Dorsey-further mistreatment**

Mr. Dier spoke to Ophelia Ross in his mother's room on December 20, 2006, and

showed Ms. Ross and explained in detail how his mother had been mistreated by the staff

while on the second floor. Ms. Ross instead of taking immediate corrective action to

protect DOROTHY DIER, WHO HAD BEEN ENTRUSTED TO HER CARE. after both

receiving information and seeing for herself the nature of this barbaric treatment, her

response was to speak to Ms. Lottie Dorsey, the unit manager, who stated that although

she had access to DOROTHY DIER'S chart she could not interpret the wording of the

physical therapist, William Moore. DOROTHY DIER was left to suffer.

With this tactic of "stonewalling in place, the staff's response at Summit Park was to

escalate and heighten their mistreatment of DOROTHY DIER, which could not have

reasonably taken place without the acquiescence of Ophelia Ross and Lottie Dorsey. .

The above described lack of care and treatment is beyond the pale of societal human

standards; it is beyond negligence, gross, wanton or otherwise. The nature and fashion of

the conduct described thus far and as will be further set forth all took place with full

knowledge and acquiescence amongst others,  Ms. Dorsey, the unit manager, Mr.

Richards, the charge nurse. Dr. Bernhard, the wound doctor and Peggy Rigthenauer and

Ophelia Ross, the representatives of Office of Aging, under the protective cloak of the

State of Maryland Howard County Circuit Court, and can only be reasonably viewed as

**CRIMINAL IN NATURE.**

**55-Each time Jerry L. Dier would bring these to the attention of the above staff**

**and the representative from Aging, the worse his mother was treated**

**as her body was twisted so as to be placed in the most torturous and inhumane of**

**positions, as she would try mightily to free herself but to no avail.**

**Further mangling of Dorothy Dier's body, her hands**

**56-The above described mangling of the body of DOROTHY DIER in no way**

**describes the full picture as her window was left open in the winter, her bed was**

**placed next to the air conditioning blower in the summer, and when turned on her**

**right hip her right hand was locked under her body causing sores to develop on her**

**ON HER RIGHT ELBOW AND RIGHT WRIST AREA FROM THE PRESSURE**

**OF HAVING THE WHOLE OF HER BODY WEIGHT REST ON THESE**

**AREAS, instead of what Mr. Richards(HAS ALSO RECENTLY DISAPPEARED)**

once stated but almost never followed(NOT EVEN BY HIMSELF), was the right way for my mother to be turned on her right hip, the placement of her right arm and hand separate from her body. Furthermore, it was common practice for the staff to lock my mother's left hand locked under her gown which was tightly wrapped around her body and feet which were locked under her body, SO AS TO LIKENED TO A <u>STRAIGHT JACKET</u>.

Dorothy Dier's black eye

57-In April 2007, Mr. Dier found his mother with a black right eye, this was the second time this had happened. He asked the unit manager at that time Ms. Williams to find out what had happened. The only response by the Holding facility, two days later, was that Ms. Williams had not yet had the opportunity to speak to the people on all shifts-the matter was never raised again. However, immediately thereafter, Ms. Williams raised the issue with Mr. Dier of how did he know so much about his mother's bedsore condition on her arms and feet as if his knowledge of what was there to be seen by anyone who cared was creating a problem for her and her staff, rather then directing her attention to the prevention of and care for

Dorothy Dier's wounds which were a direct result of what *can only* be reasonably

described from what was observed as an intentional and deliberate scheme on the part of the medical staff and help at Summit Park Holding facility, so as to inflict the maximum degree of harm upon the person of DOROTHY DIER. Ms. Williams statement to Mr. Dier(brought to the attention of Lottie Dorsey by Mr. Dier) were only a warning of things to come if Mr. Dier was not quiet and dispassionate about

**the monsterous treatment of his mother. Mr. Dier's complaint to Ms. Dorsey, that**

**the messenger was being blamed for the message, was to no avail.**

**58-When my mother's feeding tube turned black Mr. Dier had to report that matter**

**to the staff and stay on them to have her taken to the hospital for replacement.**

**Enter, Dr. Baskeran**

59-On August 10th , Jerry L. Dier saw a doctor in his mother's room

that he had never seen or spoken to previously, The doctor identified himself as Dr.

Baskaran, the doctor in charge of medical care at Summit Park. He told Mr. Dier that he

was present as regards a code change, meaning, if the facility should enter a DNR order,

do not resuscitate order in my mother's chart. I told him that I objected and further told

him that the degree of contraction that he was observing was a direct cause of staff's

placement of My Mother's arms and legs in torturous positions against the advice of the

physical therapist, William Moore and Dr. Bernhard(Dr. Bernhard was described to me

one occasion by Mr. Richards, My Mother's charge nurse on the second floor, as not

being My Mother's doctor, he[Dr. Bernhard] "was like a person who came to cut her

toenails"). Dr. Baskeran had seen for himself the unnatural position that My Mother's

legs had been placed in by the staff at Summit Park and neither took immediate action to

correct the indignity and barbaric treatment visited upon My Mother by a medical staff

that he had the direct authority and responsibility to supervise nor directed curative action

be taken in the future; apparently, from what I observed it can only be reasonably

construed that his only action as a result of his meeting with me was the subjection of My

Mother to a greater degree of indignity and pain and suffering by the continued and

71

heightened contorted placement of her hands, legs and feet .by his medical staff at

Summit Park. In response to what I had seen and my concern about a possible change in

My Mother's DNR order I called Dr. Baskeran on Wednesday, August 15, 2007, and

explained to Dr. Baskaran in even greater detail that the care and treatment received at

Summit Park could only be described as inhumane and torturous by design and he, as

medical director had a direct responsibility to take charge and put corrective measures in

place-my pleas fell on deaf ears and were to no avail. Dr. Baskeran had seen in part

himself the torture visited upon My Mother and had done Nothing. His heart had

hardened, indifference and self-interest had set in, outweighing his oath as a physician.  I

further told Dr.Baskaran that my 3 to 4 visits per day were based on my love for My

Mother which included my continued presence to afford my mother even a minimal

degree of protection from the staff at Summit Park Holding facility. I also reminded him

that under the Order of Judge Sweeney, before any order such as a DNR could be

entered, it had to come directly from the Court. Dr. Baskeran seemed taken back by this

conversation. The tenor of his responses was such as to tell me indirectly, how dare I

question him, the staff under him and his professional judgment and actions taken based

thereon-I attempted to explain to him that whatever I had said to him was only that of a

loving son for his mother. Apparently this concept was beyond his understanding.

**Unfortunate but most predicable results from Mr. Dier's legitimate complaints
To Dr. Baskeran and staff**

 The result of this conversation was unfortunately predictable. The next morning, August

16 , 2007, I arrived early as usual to see my mother, and was glad to see that her  left leg

had been moved to a more acceptable angle and was not under either her body or right

72

leg, as was the subject of my numerous complaints the day before. However, when I

arrived in the late morning, my second visit, I was told by the receptionist I could not see

my mother and Lottie Dorsey wanted to speak to me. Ms. Dorsey, on this day the acting

director of the facility. She told me that I could not see

my mother and there was an ongoing investigation as regards allegations that I had

somehow changed my mother's position in the bed and something about bandaging. The

next day, Friday,  August 17, 2007,  there was a meeting described by Ms. Dorsey as

initially a care planning get together. It was self evident that Ms.Dorsey,  Ms.

Rightenauer, Ms. Ross and Ms. Hardy, the Director at Summit Park had convened a

kangaroo court, the most severe of punishments was to be inflicted upon My Mother, she

was to be denied the comfort of her son's presence and touch by this  Spanish Inquisition

like Gang of 4, plus an unknown person from the facilities social service office.

Mr. Dier's pleas on behalf of his Mother were turned aside by the Gang of 4.

Ms. Ross dictated as if by warrant that my visits were to be limited to three per week.

Apparently during my multiple visits each day to see my mother I had seen too much and

complained to often so as to protect My Mother as best I could from them and their

response was to warn me that if I did not shut both my mouth and my eyes to the truth of

what was taking place, My Mother, defenseless in their hands, not protected by either

Aging or the Court, in fact the only way this gang of 4 could act as it had against My

Mother with me at hand was to act under the protection of both Aging and the Court,

leaving me no avenue of redress. However, I still attempted, in hope of reaching this

gang of 4 at some level of humanity in behalf of My Mother, but my words begging  in

behalf of My Mother were of no use as they fell on stone- Most of all I explained that to

My Mother, my consistent and constant presence meant that she would know, feel and

understand that she had not been forgotten-she was as always and as will

forever be needed, loved, cared about and forever, be the foundation of the Dier family

unit, all to no avail.. This action is consistent with previous non acceptance of criticism

by both the staff at this Holding facility and Ms. Rightenauer and Ms. Ross from Aging,

in that they appear to be not interested in serving DOROTHY DIER'S but instead act

only to protect their own callous indifference. In addition, the Director at Summit Park,

**Director, Summit Park, Jacqueline Hardy, unwittingly implicating herself**

Jacqueline Hardy stated to me at the care planning meeting on August 17, 2007, that she

had personally visited my mother a number of times during the short time she had been at

Summit Park, since May 2007, Thereby implicating herself, she could not help but see

what was plain and obvious to the naked eye, the contorted and distorted placement of

my mother's hands and legs, in this concerted and orchestrated action to visit harm upon

my mother. The history at Summit Park is that Whenever I complain about my mother's

care and treatment to them, there is retaliation of one kind or another directed at my

mother, such as locking her legs or right arm under body in even a tighter more contorted

position-the message was clear, shut up or your mother will suffer for your words.

On Wednesday, August 15, 2007, I had reported to the night nurse, Sharon, the day nurse

Nicki and the evening nurse, Cindy that my mother's was being placed in a most harmful

and hurtful position and that she was trying to move that left leg but could not since it

was either locked under her body or her right leg(on one occasion that wee, Nicki the day

nurse had to remove a number of pillows which were placed so as to lock my mother's

leg left leg and foot in a most unnatural and harmful position). When I told

74

Cindy(phoenetic spelling) in the late afternoon, she and three her other personnel from

Summit Park were in the nurses area and by facial expression, body movement it was

clear what there combined response was, here he is complaining again and we are going

to get him; and Cindy told me that my mother's left leg could not be moved. As I stated

earlier I had seen my mother attempt to move the position of that leg by wiggling it from

side to side, The next morning, Thursday, August 16th, I found my mother's left leg

positioned differently-my mother's left leg could be and was moved to a more humane

position as compared to the day before. It now was parallel to the head board, not sticking

up straight in the air, as it was on August 15th, folded, next to my mothers forehead,

almost pointing at a sign above my mother's head that read that there should be enough

pillows to protect all skin areas, such as one between her folded left leg-the reality was

that blood stained linen and soiled and bloody bandaging were common place rather than

obeyance to mere directives  placed on signs..

60-It is most important that My Mother see, hear and talk to me as much as possible, and

this both outrageous and inhumane action on the part of Summit Park and the Office of

Aging which could not take place but for the protective umbrella supplied by the Howard

County Circuit Court. This is an example, tragic for all to see of a branch of government

designed to protect individual rights engaged in conduct orchestrated to strip away

every vestige of human dignity.

61- It is not unusual for Jerry L. Dier to find his mother throughout the day with gook in

her eyes and throughout her eyelids, her nose stuffed, her face sweaty both in appearance

and to the touch, her hair either matted from sweat or uncombed with large pockets of

dandruff over scalp, so widespread and deep so as to mat my mother's hair to the scalp,

one or both hands locked under her gown, ringing wet, her right hand up against her chest

wall, skin on skin, in spite of both orders by Dr. Bernhard to the

contrary, as well as a sign above her bed instructing the staff to use pillows, so as to avoid

skin to skin contact, causing both damage to her hand and chest wall area-a bed sore

developed on her right wrist extending to her elbow area, directly related to the

placement of My Mother's right hand under her body-the twin factors of dampness and

pressure had had there way. In addition, I have frequently found my mother sweating

profusely and yelling in pain after having been turned in this manner, the beginnings of a

breakdown of the skin on the left arm brought to the attention of Cindy during the week

of August 13th, bruising on my mother's right shoulder area, seen over the last two

weeks, multiple events of bruising under my mother's right eye and to the left side of said

eye, finding scissors and other medical supplies left in my mother's bed, my mother's

head being placed on the side railing of the bed, my mother's left knee being placed both

on and over the side railing, finding my mother red and flushed and hot to the touch,

relating this to the nurse, who finds she has a fever, but also finds that on this very hot

day someone had placed the heat on in her room instead of air conditioning-immediately

after changing the temperature in the room my mother's temperature returned to normal.

Blue in color expanders were ordered and received for My Mother's hands, however,

they were rarely used, when used they were used improperly, either not inflated at all or

only partially inflated and instead of being placed within the hand they were generally

placed so as to be hanging from her fingers, and furthermore, instead of being removed as

ordered so as to clean My Mother's hands at decent intervals they were allowed to remain

in her hands for extended periods of time causing the formation of gook and causing a

foul odor as well as skin breakdown..

Sadly, and to the detriment of DOROTHY DIER what has been described is only a brief

sampling of the torturous and inhumane treatment such as placing My Mother in a

condition with her <u>legs tucked under body and her right arm tucked under her body</u>

<u>all, soaked in urine, on blood stained lined with discolored bandaging- this has been in</u>

<u>the main the normal everyday level of care and treatment</u> received by DOROTHY DIER

inescapably by design, orchestrated by the medical and administrative staff at Summit

Park, accepted and applauded by the Office of Aging, Howard County and its designated

agents who have been named and all of this under the authority, protection and

apparently with the blessing of State of Maryland, Howard County Circuit Court Judge

Dennis M. Sweeney.

Ms. Rightenauer, a senior staff member at Aging was personally informed as early as the

summer of 2006 of DOROTHY DIER'S mistreatment at Summit Park when she visited

her at St. Agnes hospital after Mrs. Dier was taken there for vomiting a reddish brown

fluid substance. Mr. Dier explained to the staff at the Holding facility that the apparatus,

the feed pump used was inaccurate, he had personally measured the amount being

pumped over time and moreover the medical staff did not properly supervise the timing

of DOROTHY DIER'S feeding and as a result My Mother was being overfed causing the

vomiting. Mr. Dier's complaints were ignored causing three hospitalizations of his

mother during the August and September months, 2006, at which time the medical staff,

Dr. Afsal, the head of the G-I Department at the hospital found nothing wrong with Mrs.

Dier and completely agreed with Mr. Dier's analysis and statement as regards causation,

there being nothing medically wrong with DOROTHY DIER so as to cause that had

taken place and Summit Park and had immediately ceased upon her entry to St. Agnes.

The third visit was caused by the feed tube being clogged having to do with the

appropriate flushing of the tube and giving the patient proper hydration.

**Dorothy Dier's struggle for survival-at this moment her strong will to survive has amazingly overcome the inhumane treatment she has received at the hands of supposed care-givers, at Summit Park, a place known to Judge Sweeney prior to his order condemning Dorothy Dier to reside at such an institution**

DESPITE the torturous conditions that My Mother DOROTHY DIER has been

subjected to under the **authority** of STATE OF MARYLAND, HOWARD COUNTY

CIRCUIT COURT JUDGE DENNIS M. SWEENEY and his WOULD BE

MURDEROUS AGENT, the STATE OF MARYLAND, HOWARD COUNTY OFFICE

OF AGING, My Mother has survived and for example on July 31, 2007, during my visit

**Dorothy Dier speaks**

I specifically recall My Mother stating to me as follows,

1-My Mother uttered "I, I I", and I said to her, "You mean I love you," and Mom
responded, "That's right."
    I said, "Yes"
    Mom responded, "That's right."

2- I asked her, "Do You Want to Talk?" Then after no receiving an immediate response, I
said, "no" and
    Mom immediately responded, "yes.".

3-I showed My Mother something I had written, "You are Dorothy Dier."
    Mom responded, "Yes."

    I said, "You are Dorothy Dier."
    Mom again responded, "Yes."

4-I told My Mother that I was her baby
    Mom responded, "Allright," and added, the word ""Yesterday."

    My Mother raised her head, I bent down and My Mother kissed me.

    My Mother said "What Darling"

78

I said I love you
Mom responded looking somewhat upset and disappointed with me, said "Never"

5- I asked My Mother if she loved me and she responded, "Yes."

My Mother further responded saying, "This is crazy, I, I, I love you
Mom then said , "I love ice," (Mom had been denied liquid refreshment for
I say, "in the mouth."          Almost two years in spite of the fact that
Mom said, "Yes."               She had passed ALL swallow tests and
                               Ophelia Ross, the Office of Aging Representative only
                               Only three weeks before the insertion of the G-tube
                               Stated at a January 4, 2006, status hearing before
                               Judge Sweeney, "She was able to take in about 25
                               Percent of her breakfast and 100 percent of, like a
                               Supplement shake." Furthermore, just days prior
                               To the insertion of the G-tube ordered by Ms. Peggy
                               Rightenauer, Office of Aging, at the Suggestion of
                               Dr. DeJonge and others and this was a few days after
                               My Mother was given
                               Ice cream by Dr. DeJonge at WHC IN MY
                               PRESENCE, I ALSO GAVE SOME TO HER, AS A
                               REWARD
                               For CORRECTLY ANSWERING HIS QUESTION
                               As To HER NAME AND WHERE SHE WAS. Dr.
                               DeJonge personally told me that both he and his
                               mother had decided that she would not want to live
                               if she was incapacitated, TELLING ME FAR MORE
                               THEN HE MIGHT HAVE WANTED CONCERNING
                               HIS MINDSET ABOUT THE CARE AND .
                               TREATMENT OF GERIATRIC PATIENTS)

Mom crinkled her nose and smiled at me.
    On September 6, 2007, during my scheduled visit, 8 a. m to 10 a.m. I found my

mother covered from her neck to her toe with sheeting, and apparently her hands placed

under her gown as if in a straight jacket, as if My Mother **DOROTHY DIER HAD**

**BEEN PLACED IN A STRAIGHT JACKET AND TIED UP IN A SMALL**

**PACKAGE,**with her left knee in an inhumane and barbarous position within inches of

her forehead and nose. I explained to My Mother that I am working every moment of

every day to free her from the Summit Park Holding facility and from the iron grip of

79

Judge Dennis Sweeney and his agent, Ophelia Ross and Peggy Rightenauer, Office of

Aging. My Mother immediately and violently jerked her left leg, with such force as to

remove the sheet covering her knee, Thereby exposing both her knee and a few inches

below her kneecap. Then and there, I was able to observe a large black and blue area that

I had never seen before. I thanked My Mother for helping me to help her and promised I

would continue my efforts with even greater vigor to set her free, begging her to fight

on. This is what has brought me, My Mother's son, Jerry L. Dier, before this Court.

**The Complicity of Dr. Tansandra, appointed doctor for Dorothy Dier**

During a visit with My Mom, Thursday, August 30, 2007, Jerry L. Dier

found his mother turned on her right hip with her right arm locked under her body. My

Mother's feet were in relatively normal position to her body, not locked under her body

or under each other, Thereby negating any contention that my mother's legs are severely

contracted. Jerry L. Dier was able to see her legs when the charge nurse of the day,

Sericus(phoenetic spelling) lifted the sheeting to show me My Mother's legs and feet

explaining that he would re-bandage them, wound dressing after Jerry L. Dier left. A few

minutes earlier Dr. Tansandra, the doctor assigned by Summit Park to look after My

Mother, who Jerry L. Dier had not seen or heard from in almost a year, when he was

subjected to rigorous cross examination during the guardian of property trial, got a nurse,

Sericus to help him and went into my mother's room and closed the door. Dr. Tansandra

stayed in Jerry L. Dier's mother's room from 9:15 a.m. to 9:16 a.m. However, when Jerry

L. Dier left at 9:50 a.m. Dr. Tansandra was still present sitting at the nurses station on the

phone and turned to follow Jerry L. Dier with his eyes as Jerry L. Dier left. Dr. Tansandra

had testified at the guardian of person hearing, September 22, 2006 and at best he came

80

across as both incompetent and inept and moreover, his failure of memory as regards the medical history of Dorothy Dier was inexplainable, although more than satisfactory for Judge Sweeney-when it came to Judge Sweeney's attention by Mr. Dier that Dr. Tansandra had been subpoenaed as regards his testimony and said subpoena was a *subpoena duces tecum*, requiring him to bring his medical records as regards Mrs. Dier..

## Update

As Jerry L. Dier has stated, his mother's legs only appear to be severely contracted when they are placed under her body or each other or at unimaginable angles, with pillows and sheeting used to keep them in place as she tries to free them. However, Jerry L. Dier must report that his mother's feet have had large red areas in the area of each toe, apparently from the placement of her feet either under her body or under each other, the severe angle and placement causing immense pressure to rest on her feet, resulting in skin irritation, dampness and eventual skin breakdown when it takes place over an extended period of time as it has at Summit Park. In addition, now DOROTHY DIER has a bandage covering her left forearm as well as her right forearm, most certainly as result of both her positioning and the fact that arms for the most part are kept under her gown likened to a full body straight jacket. Also, in the past weeks the window next to my mothers bed has been kept open in spite of the weather conditions and my protestations, including but not limited that this is the nature of the conduct that inflicted pneumonia on my mother in August-September 2007. On Sunday, December 23, 2007, with weather conditions , cold, damp, rain I felt a cool breeze as I stood next to my mothers bed. I immediately checked both my mother, her right should area uncovered was cold and the bedding was cool to

81

the touch, the window was open, covered by the window blind. This can be no other than conduct designed to make the this and other filings in behalf of DOROTHY DIER "moot." It is the duty of this Court NOT to allow this to happen. If prisoners at Guantanomo have rights, doesn't DOROTHY DIER, a citizen, an innocent, a contributor to our society also have rights that at this period of her life require protection. See pages 4-5, for a vivid but all to true description of Nazi type barbarism in America in the 21st century.

See pages 4 and 5 of this paper for a most recent example of the barbarism inflected on MY MOTHER, by Judge Dennis M. Sweeney and his agents in crime, the Office of Aging and Summit Park. Judge McKesay in his Senate hearing to be confirmed as Attorney General may not have known what does and does not constitute "torture," but I certainly know it when I see it visited upon MY MOTHER, a true innocent and victim of a court system out of control, having lost both its moral compass and its sworn adherence to the Rule of Law.

**CONCLUSION**

62-The Summit Park Holding facility, their medical staff, administrative staff and nurse assistants and the Office of Aging and the Howard County Circuit Court beyond question have presented a **clear** and **present danger** to DOROTHY DIER rendering her at times at times dependent of Summit Park feeding practices skeletal in appearance. DOROTHY DIER *must be set free.*

63- Not surprisingly, recently Summit Park Holding facility was placed on a **National and Maryland Nursing Home Watch List-Actual Harm and/or Immediate**

**Jeopardy**(App. 3). All results based on data obtained from CMS(Centers for Medicare and Medicaid Services) as of 6/15/07. There can be no doubt that either all this information was known or should have been known in the exercise of reasonable care and diligence to Judge Dennis M. Sweeney, and the Office of Aging; thusly, DOROTHY DIER has been deliberately and intentionally placed in an environment where her each and every moment is subjected to **ACTUAL HARM AND IMMEDIATE JEOPARDY.**

Recently at a hearing to Withhhold and Withdraw brought by Aging on October 3, 2007, The following matters were brought to the direct attention the Howard County Circuit Court and when upon inquiry, November 26, 2007 at a further hearing to Withhold and Withdraw, as to whether or not he had taken any corrective or curative action Judge Sweeney's failure to respond spoke for itself- Judge Sweeney was not about to respond and *de facto* indict himself as regards, 1-Dorothy Dier had no counsel present at the hearing-the Howard County Circuit Court stated it had excused the attorney thinking it was not  necessary for Dorothy Dier to have an attorney when life and death issues were to be considered-the Howard County Circuit Court at the insistence of Jerry L. Dier agreed to appoint a counsel for Dorothy Dier, another one of the circle of attorney's that practice before him so as to further protect his actions from scrutiny, 2-Dorothy Dier was not present and this issue although raised by Mr. Dier was not addressed in any fashion by the Howard County Circuit Court, 3- Mr. Dier set forth in detail the egregious conduct on the part of the Howard County Office of Aging and Summit Park and when complaints were brought to their attention, the care and treatment afforded to his mother worsened, as if an attempt to keep Mr. Dier quiet, and 4-more specifically, when the

83

court asked whether or not there was a crisis situation present, the Office of Aging

answered no- Mr.Dier responded, "Yes" and explained as follows- his mother's

uncovered back had been placed near both an open window and at times near a blowing

air-conditioning fan, where the temperature had been routinely set at 40 degrees, such

that his mother was inflicted with pneumonia-nothing was done until Mr. Dier

brought the obvious severity matter of his mother's condition to the attention of the staff

time after time-the staff at Summit Park only acted after DOROTHY DIER'S symptoms

had worsened as evidenced by a deep dry and persistent cough. See App. 4, transcript

from October 3, 2007, hearing. In addition at the further November 26, 2007, hearing to

Withhold and Withdraw where the Howard County Circuit Court had appointed a new

counsel, Ria Rochvarg for Dorothy Dier, apparently neither the Court, Aging nor Ms.

Rochvarg were aware of the pertinent and controlling Maryland Code sections and had to

be instructed by Mr. Dier-the Court, albeit reluctantly, recognized the error of their ways

and concurred with Mr. Dier, denying Aging's request. Ms. Rochvarg put in a bill for

reasonable attorney fees,$2500, while noting that she had only spent .10 of an hour, six

minutes in preparation for a hearing where life and death issues were to be addressed

pertaining to her client, DOROTHY DIER. Over objection, said fees were awarded,

apparently to be taken from the almost exhausted funds of DOROTHY DIER, which

include government paid social security and the retirement benefits of her husband,

Richard R. Dier..

Prior habeas history

A habeas petition was filed in behalf of DOROTHY DIER by her son and next best friend Jerry L. Dier in the United States District Court for the District of Columbia on January 19, 2007. The Court, the Honorable Coleen Kotelly found that the District of Columbia did not have jurisdiction and that the action should have been filed in United States District Court in Maryland. Judge Kotelly offered to transfer the filed petition to Maryland. At that time Mr. Dier respectively declined the offer and in its place further sought to have the U.S. District Court in the District of Columbia to assume jurisdiction; said petition was dismissed due to lack of jurisdiction without prejudice, not reaching the merits of the legality of the custody. However, at a later time, in May 2007, Mr. Dier filed a habeas petition in the United States District Court for Maryland, at which time, the Judge Blake without reaching the merits dismissed the petition on grounds of lack of standing, the definition of legal custody pursuant to 28 U.S. Code 2254(a) and whether this was in actuality a civil rights action not an action presenting a federal question under the United States Constitution. A further petition for habeas relief was filed in the District Court for the District of Columbia in September 2007, based on New Matter, the April 18, 2007, opinion of the Court of Special Appeals for Maryland. Said petition was denied on jurisdictional grounds, without addressing the substance-merits of the petition, in October 2007, by Judge Robertson..
Now further NEW MATTER IS BEFORE THIS COURT, THE DECISION OF THE COURT OF SPECIAL APPEALS FOR MARYLAND DATED OCTOBER 19, 2007, A REQUEST FOR RECONSIDERATION DENIED NOVEMBER 30, 2007, directed to the very heart of the decision finding DOROTHY DIER in need of a guardian of person. With the facts and the law in favor of Mr. Dier's requests in behalf of his mother DOROTHY DIER the Court of Special Appeals could do not other than just deny the request for reconsideration, setting forth no reasons in support of the unsupportable.
FURTHERMORE, the decisions by the Court of Special Appeals of Maryland were neither based on fact nor law, and failed to address in any manner or fashion the substantial issues raised and by mis-direction appears to be bent on protecting the trial court whose handling of the guardian matter goes well beyond any reasonable standard used to measure and scrutinize "judicial error" or lack of understanding in what can only be described as an open and notorious attempt by Judge Dennis M. Sweeney to place his personal notions of justice and the function of the judicial system on those so unfortunate to come before him, such as my mother DOROTHY DIER, in Howard County, Maryland, Whereby it is incumbent on this Court to reach the merits of this application so as to serve the interests of justice. *Saunders v United States*, 373 U.S. 1 (1963).

**CONCLUSION**

Standing is a non issue in the case at bar, as that issue was decided in the *Lee* case, "[w]hen a relationship between a litigant and a third person is such that the enjoyment of the third person's rights are 'inextricably bound up with the activity the litigant wishes to pursue'; the litigant is 'very nearly, as effective a proponent of the right' as the third person; and the right rights of the third person are likely to be ' "diluted or adversely affected,"' the general rule does not apply. Id. At 572, 474 A. 2d 1297 (quoting *Singleton v. Wulff*, 428 U.S. 106, 115-16, 96 S. Ct. 2868, 2874, 49 L. Ed. 2d 826 (1976). The relationship between Mr. Dier and his mother is not in dispute.

Further, there can be no doubt that that the restraints placed on DOROTHY DIER are much more then faced by the general public, they are cruel and unusual by their very nature, and bring into focus memories of day gone by, something done by others, certainly never to take place in the country, relegations to regimes like the Nazi's who removed those deemed unfit from the population and subjected them to inhumane conditions and treatment.

The issue of Civil Rights versus Constitutional Rights is a little like which came first the chicken or the egg- the question being, can there be one without the other. . However, it is certain that if a citizen is deprived of their rights guaranteed and protected under the United States Constitution as set forth in abundant detail throughout this Petition, the issue of Civil Rights, life, liberty, property and happiness, become a mere academic question when a citizen such as DOROTHY DIER is deprived of her right to a fair trial by a biased authoritarian court, which .appointed his own man a court appointed counsel for her and then they in concert orchestrated a proceeding in which the court as an advocate became the proponent of guardianship by denying her right to a jury trial, her right to be present, her right to privacy, her right to due process of law culminating in a judgment under the color of state law wherein DOROTHY DIER has been subjected to cruel and unusual punishment.

Finally, there ARE material and significant substantial events cited that give rise to the claim, the claim being the deprivation of DOROTHY DIER'S Constitutionally guaranteed and protected rights in the Maryland Court System which acted, at trial on events that took place entirely in Washington, D.C. PRESENTED by a staff member of the Washington Hospital Center, whose testimony and documentation was grounded soley on events that took place in whole in the District of Columbia; but for those events in the District of Columbia there would have been no trial in Maryland, and thus no court order to be issued granting legal custody of DOROTHY DIER to the State of Maryland, Howard County Circuit Court. The trial which resulted in the Order placing DOROTHY DIER in "legal custody" could have happened anywhere, what is of primary importance is that the **events** which made for the trial took place in the District of Columbia. To ignore this reality would also be to ignore that the State of Maryland, Howard County

Circuit Court stated weeks before the trial what his verdict would be having made himself the fact finder by denying DOROTHY DIER her right to a jury trial based an acknowledged false representation by his court appointed counsel for Mrs. Dier.

This Court must grant DOROTHY DIER'S request that a Writ of Habeas Corpus be issued so as to reach the merits of her claim that the Maryland State Courts have violated her federal rights guaranteed to be protected by the United States Constitution as set forth throughout this Petition practically rendering DOROTHY DIER defenseless, by depriving her of her right to effective assistance of counsel, a fair and impartial court, a jury trial, and right to be present, amongst other matters, all to the detriment of DOROTHY DIER, as a human being and as a citizen of the United States under the United States Constitution, wherein, under the color of state law, the court had become the agent for wrongdoing. The plight of DOROTHY DIER goes to the integrity of the judicial process and whether or not the Rule of Law has been supplanted by the rule of man-the issue is clear, the concern is real, can the judicial system be entrusted to handle those most delicate but important matters that pull at our heart strings; are the more senior citizens amongst us to be caste aside no longer seemingly productive and therefore not worthy of being covered under the umbrella of the Rule of Law.

> I SEEM TO RECALL AN AGE OLD ADAGE THAT THE PROGRESS OF A CIVILIZATION IS NOT TO BE MEASUERED BY THE GADGETS IT PRODUCES OR THE EXTENT OF ITS ECONOMIC OR MILITARY REACH, RATHER THE PROPER MEASURE IS HOW IT TREATS AND SAFEGUARDS THE WEAKEST AMONGST THEM

### REQUEST FOR EVIDENTIARY HEARING

PLAINTIFFS submit the state trial court's assumption of inconsistent functions, the judge and advocate for the appointment of a guardian of the person for DOROTHY DIER

87

constituted a fatal "structural" defect in those proceedings that renders his findings constitutionally suspect and its decrees void. PLAINTIFF is therefore entitled to an evidentiary hearing on her constitutional claims that the process employed by the Maryland state court violated her rights to due process, effective representation by counsel, right to be present and confront witnesses, right to a jury trial and equal protection of the laws. In **Keeney v. Tamaco-Reyes**, 504 U.S. 1, 11 (1972), the Supreme Court held that a "habeas petitioner's failure to develop a claim in state court proceedings will be excused and a hearing mandated if he can show that a fundamental miscarriage of justice would result from failure to hold a federal evidentiary hearing. Furthermore, it is respectfully requested that Judge Dennis M. Sweeney, State of Maryland, Howard County Circuit Court and Anthony Doyle, 1002 Frederick Rd., Catonsville, MD 21228 As well as the Director of the Office of Aging, Phyllis Madachy and her designated agents, Peggy Rightenauer and Opheila Ross and in addition the Director of Summit Park, Jacqueline Hardy and her agents, Lottie Dorsey, Kim Williams, Doctors Bernhard, Baskeran and Tansandra and charge nurse Richards Be present along with any and all records having evidentiary value in this action, as well as anyone else this Court deems necessary, including but not limited to all persons and records pertinent to the guardian of the property action so as to present themselves for examination affording them the opportunity to offer an explanation to facilitate the search for the truth, while at the same time protecting the constitutionally guaranteed rights of DOROTHY DIER which have been knowingly, intentionally, and deliberately violated depriving DOROTHY DIER, a now ninety year young naturally born citizen of the United States, mother of two children and grandmother of three and wife of the late Richard R. Dier of her rights under the

United States Constitution and her natural rights as a human being.

PLAINTIFF, Jerry L. Dier presents this petition for habeas corpus relief in behalf of his mother to this Honorable Court as the proud and determined son and next friend of DOROTHY DIER, while being fully cognizant of the nature of this request. However, justice is not to be limited by form, or only open to those of a certain class or those having a certain means, it is to be open to all, which includes the ability to seek the truth from all, no matter who they and what position they hold and what their family background. The conduct of the State Courts in Maryland are undeniably as they appear, casting a long shadow of darkness on the integrity of the legal system as regards those who are brought under its tent and seek justice.

This Court has an opportunity to act while there is still time to do justice; to do otherwise, and take what might seem to be the easier path, that of avoidance will both act so as to doom DOROTHY DIER as well as send a message that the Rule of Law does not apply to those who are trusted to enforce it. The merits of the factual dispute were not resolved in the State Courts, the fact finding procedure employed by the State Courts was not adequate to afford a full and fair hearing-material facts were not adequately developed and placed in context to the issues present, the Rule of Law was not applied, and Thus this habeas applicant was not afforded a full and fair hearing.

In summary, the practices of the State of Maryland, Howard County Circuit Court Judge, Dennis M. Sweeney, so as to Deny DOROTHY DIER any resemblance of Due Process of Law and in utter disregard of the Rule of Law **Can Not** be categorized as a mere lack of knowledge and appreciation for the law when referring the this well-seasoned, highly educated judge State of Maryland. Judge Dennis M. Sweeney's conduct was beyond

question, **intentional** and **deliberate** with full knowledge of their consequences but apparently felt secure that his actions, while they remained at any level within the Maryland Court System, no matter how outrageous and inhumane aimed at depriving DOROTHY DIER of her Rights guaranteed and Therefore protected by the Constitution of the United States so as to establish within his domain, the rule of man over the Rule of Law.

I pray that this Court will hear my words and correct this manifest injustice while time remains. The treatment of My Mother has been what can only described as Criminal in Nature by the State of Maryland, Howard County Circuit Court and its attendant government institutions. I beg this Court to save My Mother, it may be her last hope, Her life has been dedicated to her family, she deserves so much better then this at the hands of her government. This is the United States of America where justice holds true. My Dear and Darling Mother's Life is directly in your hands.

My Mother has fought back as best she could having been denied treatment for her complained of Depression by the Office of Aging, placed in torturous positions day by the medical staff at Summit with the acquiescence of Dr. Baskeran, Dr. Bernhard and Dr. Tansandra and the Office of Aging and with full knowledge of the State of Maryland Howard County Circuit Court. My Mother has further been Denied the comfort of being with her Son while she remains hour upon hour in the main wrapped in a gown with her hands kept under her gown as if in a full length body straight jacket with her legs locked by placement in torturous positions as described herein that bring to mind the darkness of torture chamber during the Spanish Inquisition, in an attempt to Isolate her Body, Mind and Soul from her true self and Her Family. My Mother's crinkling of

90

her nose has sent a clear message to me, evil one's have failed. This Court, if it is to act

as a court of Law and Justice under the United States Constitution **must** intercede Now.

Humanity, and DOROTHY DIER demand and deserve no less.

## YOUR PETITIONER DOROTHY DIER LIVES AND FIGHTS ON AS SHE STRUGGLES MIGHTILY TO SURVIVE-HER WILL TO LIVE IS AMAZINGLY STRONG

However, thus far these barbaric attempts to inflict suffering upon My Mother

have failed. Her continued efforts at survival under the most barbaric of conditions can

only be described as "heroic." I recall an incident when a dead mouse was found in My

Mother's room and the personnel at Summit Park joked amongst themselves that Summit

Park was like a hotel, they come in and go out. While there is still time, it is Now time for

My Mother to leave by the Authority of this Court-My Mother is not a mouse to be

scooped up and thrown away..

This Court must act Now to save this most Noble of Ladies, My Dear and Darling

Mother, who is mightily struggling for her very existence, but is in urgent need of the

help of this Court.

**Let it be known, It is long overdue, the Judicial System, long absent must return to**

**right this grave wrong.**


### PRAYER FOR RELIEF

WHEREFORE, PETITIONER, **DOROTHY DIER**, by and through her son and

next friend Jerry L. Dier, requests relief as follows, in the belief that this Honorable Court

will heed the warning set forth in **Mack v. Mack**, 618 A. 2d 744(Md. 1993),

The extreme illustration of the "slippery slope" argument

91

Is presented in Alexander, *Medical Science Under Dictatorship*,
The New England Journal of Medicine, Vol 241, No. 2, at 39
(July 14, 1949). The article describes the annihilation of whole
segments of the population and the so-called medical experiments
on live and conscious prisoners under Nazi Germany. Dr. Alexander
then summed up with these words:

"Whatever proportions these crimes finally assumed, it became
evident to all who investigated them that they had started from
small beginnings. The beginnings at first were merely a subtle
shift in emphasis in the basic attitude of the physicians. It
started with the acceptance of the attitude, basic in the euthanasia
movement, that there is such a thing as life not worthy to be lived.
This attitude in its early stages concerned itself merely with the
Severely and chronically sick. Gradually the sphere of those to be
Included in this category was enlarged to encompass the socially
Unproductive, the ideologically unwanted, the racially unwanted and
Finally all non-Germans. *But it is important to realize that the
Infinitely small wedged-in-lever from which this entire trend of
Mind received its impetus was the attitude toward the
Nonrehabilitable sick.*" *Id. At 44* (emphasis added).

:

1.  Schedule an immediate hearing on the question of issuing a
    writ of habeas corpus requiring Respondents,
    Judge Dennis M.  Sweeney, Phyllis Madachy,
    Director, and her designated agents,
    Peggy Rightenauer and Opheila Ross,
    Office of Aging,
    And Jacqueline Hardy, Summit Park, Director, and her agent,
    Lottie Dorsey, to
    Show Cause as why their actions
    are not in violation of Petitioner's rights under the Fourth,
    Sixth, Eighth and Fourteenth Amendments to the Constitution of
    the United States, and  Title 42 U.S.C. Sect. 1983.

2.  IMMEDIATELY REMOVE DOROTHY DIER FROM THE
    CARE AND CUSTODY OF THE STATE OF MARYLAND,
    HOWARD COUNTY CIRCUIT COURT,
    HOWARD COUNTY OFFICE OF AGING AND
    SUMMIT PARK HOLDING FACILITY.

3.  Enter an order issuing said writ of habeas corpus.

4.  Release DOROTHY DIER from state custody by setting

92

aside the March 7, 2006, State of Maryland, Howard County Circuit Court order appointing a guardian of person for DOROTHY DIER.

5.  Grant such other and further relief as this Court shall seem just and equitable.

6   THAT this Court retain jurisdiction of this matter for the purpose of enforcing this Court's order.

Dated: January 2, 2008

Respectfully submitted,

Jerry L. Dier, Pro se
11448 Rowley Rd.
Clarksville, MD 21029
Son and next best friend
(202)276-8716

Verification

I declare under penalty of perjury under the laws of the United States of America that the foregoing in true and correct. Executed on January 2 , 2008.

Jerry L. Dier

93

**APPENDIX**

Appendix 1 –   March 7, 2006, Howard County Court Order, guardian
of person action

Appendix 2-    Opinion, Court of Special Appeals, October 19, 2007, Request for
Reconsideration denied without reason November 30, 2007

Appendix 3-    Summit Park Holding facility, National and Maryland Watch List.

Appendix 4-    October 3, 2007, transcript

ENTERED
MAR 7 2006
CLERK ... COURT
HOWARD COUNTY

IN THE

CIRCUIT COURT

FOR HOWARD COUNTY

CASE NO. 13-C-0563324

: : : : : : : : : : : : : : : : : : : : : : : : : : : : : : :

## ORDER
## GUARDIAN OF THE PERSON

The Court has considered the Petition and the Amended Petition for the Appointment of a Guardian of the Person of Dorothy Dier, a person alleged to be under a disability, and the Certificates of Competency attached to the Petition and the Amended Petition. The Court has also considered the Answer filed on behalf of Dorothy Dier by her attorney, Anthony Doyle, Esq. This matter came before the court for a hearing on March 7, 2006, and the court considered the arguments of all counsel and all parties. It is this _7th_ day of _March_, 2006, that the Court makes the following findings of fact, pursuant to Md. Code Ann., Est. & Trusts § 13-705(b):

WHEREAS, the Court finds that the disabled person cannot be present because of a physical or mental incapacity and is unable to consent to the appointment of a Guardian of the Person; and

WHEREAS, the disabled person was represented by counsel and has waived her right to a jury trial; and

WHEREAS, this Court has found by clear and convincing evidence that Dorothy Dier lacks sufficient understanding or capacity to make or communicate responsible decisions concerning her person because of a disability as defined in the Md. Code Ann., Est. & Trusts §13-705, the nature of the disability being Dementia; and

App. 1

FILED    08 0002

JAN - 2 2008

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

49000

Guardian of the Person appointed; and

WHEREAS, the disabled person needs a Guardian of the Person and there is no less restrictive form of intervention available which is consistent with the person's welfare and safety; it is therefore

ORDERED, this ___7th___ day of __March__, 2006, by the Circuit Court for Howard County, that, Phyllis Madachy, Director of the Howard County Office on Aging, or her successor or designee, 6751 Columbia Gateway Drive, Columbia, MD 21046 be and is hereby appointed Guardian of the Person of Dorothy Dier with all of the rights enumerated in Md. Code Ann., Est. & Trust §13-708; and it is further

ORDERED, that the Guardian of the Person may consent to medical, dental, or other professional care, medication, including psychotropic medication, counseling, treatment, services, or admission to a nursing home for the disabled person; and it is further

ORDERED, that this Court must authorize the Guardian to consent to any medical procedure that involves a substantial risk to the life of the disabled person; and the withholding or withdrawal of any medical procedure that involves a substantial risk to the life of the disabled person; and it is further

ORDERED, that pursuant to Maryland Rule 10-206, the Guardian of the Person shall file an Annual Report with the Clerk of the Court, no later than sixty (60) days following March 7th of each year, indicating the present place of residence of both the

App. 2

2

the Guardian's plan of care, the disabled person, whether there is a need for the continuation of the guardianship, any reason to change the Guardian's powers, or if the guardianship should be terminated; and it is further

ORDERED, that the contract attorney for the Department of Human Resources is hereby authorized to represent Dorothy Dier before the Adult Public Guardianship Review Board; and it is further

ORDERED, that this matter shall be scheduled for a review hearing at the discretion of this Court, or upon petition of any party.

Dennis M. Sweeney
Judge, Circuit Court for Howard
County

App. 3

3

UNREPORTED

IN THE COURT OF SPECIAL APPEALS OF
MARYLAND

No. 1595

September Term, 2006

---

JERRY L. DIER

v.

SUMMIT PARK HEALTH AND
REHABILITATION CENTER

---

Hollander,
Krauser,
Barbera,

JJ.

---

Opinion by Krauser, J.

---

Filed: October 19, 2007

13C060065465

Jerry Lee Dier appeals from an order of the Circuit Court for Howard County, appointing a guardian[1] of the property of his mother, Dorothy Dier. He presents six questions for our review. Restated, they are:

I.     Did the circuit court judge (Hon. Dennis M. Sweeney) err in refusing to recuse himself from hearing the petition for appointment of a guardian of the property of Ms. Dier?

II.    Did the circuit court err in failing to dismiss the petition due to lack of standing on the part of Summit Park Health and Rehabilitation Center?

III.   Did the circuit court err in failing to dismiss the petition for lack of venue?

IV.   Did the circuit court err in failing to dismiss the petition for insufficiency of the physician certificates?

V.     Did the circuit court err in failing to address the absence of Ms. Dier during the trial?

VI.   Did the circuit court err in *sua sponte* incorporating an earlier proceeding regarding Ms. Dier?

For the reasons that follow, we shall affirm the circuit court's order.

## Background

On March 7, 2006, the Howard County Office on Aging, having been appointed by the Circuit Court for Howard County as the guardian of then-89-year-old Dorothy Dier

---

[1] The court appointed Thomas M. Meachum, Esq., to be guardian of Ms. Dier's property.

("Ms. Dier")[2], placed her in the Summit Park Health and Rehabilitation Center ("Summit Park"). At the time, Ms. Dier's financial affairs were handled by her daughter, Michele Lyons. But that would soon change.

Less than a week after her placement at Summit Park, on March 13, 2006, Ms. Lyons resigned as her mother's attorney-in-fact[3].    No successor agent was named, leaving no one to manage Ms. Dier's property and to pay for her care at Summit Park.

On May 16, 2006, Summit Park filed a petition in the circuit court seeking appointment of a guardian for Ms. Dier's property.   In that petition, Summit Park stated that Ms. Dier was "a disabled person within the meaning of the Annotated Code of Maryland, Estates and Trust Article (ET), Sections 13-201[4] and 13-705(b)[5], as she lack[ed] sufficient

---

[2] Appellant also challenged, in a separate appeal, the circuit court's appointment of a guardian for Ms. Dier's person.  That appeal was decided by this Court in a recent unpublished decision.  *See Jerry L. Dier v. Phyllis Madachy, Guardian et al.,* No. 236, Sept. Term, 2006 (filed April 4, 2007).

[3] Ms. Lyons was "designated to transact business" for her mother and to "serve as her legal agent," thus meeting the requirements of an "attorney-in-fact." (Black's Letter Law Dictionary)

[4] **§ 13-201. Grounds for appointment**
(a) Upon petition, and after any notice or hearing prescribed by law or the Maryland Rules, the court may appoint a guardian of the property of a minor or a disabled person.
(b) A guardian shall be appointed if the court determines that:
(1) A minor owns or is entitled to property that requires management or protection; or
(2) Funds are needed for his support, care, welfare, and education and protection is necessary or desirable to obtain or provide funds.
(c) A guardian shall be appointed if the court determines  that:
(1) The person is unable to manage his property and affairs effectively because of physical or mental disability, disease, habitual drunkenness, addiction to drugs, imprisonment, compulsory hospitalization, confinement, detention by a foreign power, or

-2-

understanding and capacity to make or communicate responsible decisions concerning the management of her property and affairs because of physical and mental disability, including a diagnosis of Dementia."

In support of its petition, Summit Park submitted the certificates of two physicians: James Tansinda, M.D., Ms. Dier's primary care doctor at Summit Park who diagnosed her with dementia; and Harold Bob, M.D., who also treated Ms. Dier at the facility and provided a second opinion concurring with Dr. Tansinda's diagnosis of dementia. Dr. Tansinda's certificate was dated April 25, 2006, and Dr. Bob's was dated April 18, 2006. Summit Park also filed with that petition a notice to interested persons[6], and a motion for the appointment of an attorney for her[7].

_____

disappearance; and
(2) The person has or may be entitled to property or benefits which require proper management.

[5] **§ 13-705. Appointment process**
(b) A guardian of the person shall be appointed if the court determines from clear and convincing evidence that a person lacks sufficient understanding or capacity to make or communicate responsible decisions concerning his person, including provisions for health care, food, clothing, or shelter, because of any mental disability, disease, habitual drunkenness, or addiction to drugs, and that no less restrictive form of intervention is available which is consistent with the person's welfare and safety."

[6] Maryland Rule 10-203(b)(2) requires that all interested persons be notified of the guardianship matter. "Interested person" means the guardian, the heirs of the minor or disabled person, any governmental agency paying benefits to the minor or disabled person, or any person or agency eligible to serve as guardian of the disabled person under §§ 13-707 of this subtitle...'" ET §§ 13-101(j); *see also* Maryland Rule 10-103(f). Maryland Rule 10-203(c) governs the form and content of notice that petitioner must provide interested persons. The rule permits, among other things, interested persons to object to the appointment of a guardian or otherwise participate in the proceedings.

[7] The law requires the court to appoint an attorney for the alleged disabled person if he or she is not represented by counsel. *See* ET § 13-705(d) (providing, in part, that

Thereafter, circuit court issued an order appointing Anthony Doyle, Esq. – whom the court had previously named as Ms. Dier's attorney during the proceedings involving the appointment of a guardian of her person – to serve as her attorney in the pending property guardianship proceeding.   The court also issued a notice of advice of rights to Ms. Dier[8] through her attorney, as well as an order requiring Ms. Dier and the other interested persons named therein – her personal guardian, the Office on Aging; the Social Security Administration; and appellant – to "show cause ... why the relief sought in the aforegoing Petition should not be granted."

In response to the court's show cause order, the Office on Aging stated that it "believe[ed] and aver[red] that it would be in Ms. Dier's best interest for the Court to appoint a Guardian of the Property."  Ms. Dier's attorney, Doyle, also filed a response to the show cause order urging the circuit court to "[a]ppoint a guardian of her property, if the Court f[ound] there [wa]s no less restrictive alternative available to provide financial assistance to [Summit Park]."

Appellant, however, urged the circuit court to dismiss the petition on the grounds that

---

"'unless the alleged disabled person has counsel of his own choice, the court shall appoint an attorney to represent him in the proceeding'").  *See also* Maryland Rule 10-106(a) (cross referencing, *inter alia*, § 13-705(d) of the Estates and Trusts Article and directing attention to "Rule 1.14 of the Maryland Lawyers' Rules of Professional Conduct with respect to the attorney's role and obligation").

   [8]  Maryland Rule 10-203(a) requires that the alleged disabled person be advised of his or her rights before a guardian is appointed. Maryland Rule 10-204 provides the form for an advice of rights that is served on the alleged disabled person.

-4-

Summit Park did not meet the definition of an "interested person" under Maryland Rule, 10-103(f), and, thus, lacked standing to file it; that, because Summit Park was located in Baltimore County, venue was improper; and that the physician certificates were "in part ... illegible" and "appear[ed] to be conclusionary[sic] and not fact driven."[9]

After filing its guardianship petition, but prior to the hearing on that matter, Summit Park sent a letter to appellant inquiring whether he would be willing to be his mother's guardian of the property.   No response was made prior to the guardianship hearing.

## Guardianship Hearing

On September 22, 2006, the circuit court (Sweeney, J.) conducted a hearing on Summit Park's guardianship petition.  Summit Park presented three witnesses: Dr. James Tansinda; Christine Teague, director of nursing services at Summit Park; and Maria Valdenegro, Summit Park's business office manager in charge of billing and receiving payment for Ms. Dier's care at that facility. Appellant, representing himself, testified in opposition to the petition.

At the start of the proceedings, appellant moved for recusal of Judge Sweeney, stating "that the impartiality of this Court might reasonably be questioned by the conduct that has taken place regarding matters of Dorothy Dier that have, in fact, been present before this

---

[9] In his answer, appellant also alleged the Certificate of Service accompanying the guardianship petition was defective; that contention is not relevant to this appeal.

-5-

Court." Appellant proceeded to recount the prior hearings[10] over which Judge Sweeney had presided in the case involving guardianship of Ms. Dier's person. During those proceedings, Judge Sweeney demonstrated, according to appellant, a lack of impartiality with respect to Ms. Dier's court-appointed attorney, Mr. Doyle, who had done an inadequate job, appellant insisted, of representing her.

Specifically, appellant contended that, during one hearing on March 7, 2006, Doyle was "silent for about an hour, hour-and-half," at which point Judge Sweeney purportedly "said 'Are You all right?' to Mr. Doyle" because "he hadn't said anything." Moreover, according to appellant, Doyle's subsequent participation during that hearing consisted of "ask[ing] five questions of one witness ... No filings. No nothing." As a result, Judge Sweeney, appellant claimed, "knew of Mr. Doyle's action and conduct" when he appointed him for the second time to serve as Ms. Dier's attorney in the instant case. Hence, "[o]ne can only reasonably infer," appellant alleged, "that Mr. Doyle has some sort of tie or connection in the sense that the Court has knowledge of him...I can't get into the motivations, but I know, objectively, you can't reach any other conclusion...It's irrefutable that one might reasonably question the impartiality of the Court."

Judge Sweeney subsequently denied appellant's motion for recusal. In doing so, the judge noted that appellant had waited until the day of the hearing to present his motion for

---

[10] Those prior hearings took place on October 14, 2005; October 25, 2005; December 13, 2005; January 4, 2006; January 23, 2006; February 2, 2006; and March 7, 2006.

recusal when he could have done so earlier because "everything that has been stated" in support of recusal "has been known or available for many, many, many months." Judge Sweeney further stated that, on its merits, the motion did not require recusal, pointing out that Mr. Doyle's "competence and abilities" as a representative were well known not only by him, but by "every other judge on this court to be more than adequate."

In addition to moving for Judge Sweeney's recusal, appellant presented oral motions requesting a change in venue; dismissal of the guardianship petition; and a stay in proceedings. He further challenged Summit Park's "adequacy" to file a petition for guardianship of Ms. Dier's property; the "adequacy" of the petition itself; and the "adequacy" of the physicians' certificates accompanying that petition. All of those motions were denied.

### Testimony of James Tansinda, M.D.

Dr. Tansinda testified that he was Ms. Dier's attending physician at Summit Park and that he had last examined her "about a week" prior to the hearing. At that time, he observed that Ms. Dier was "nonverbal ... noncommunicative," "contracted" and "bedridden." He further stated that she was "not capable of understanding," talking, or decision-making, and that "within a reasonable degree of medical probability," she lacked "sufficient mental capacity to understand the nature of, and consent to, the appointment of a guardian for her property."

### Testimony of Christine Teague

Ms. Teague testified that, as director of nursing services at Summit Park, she saw Ms. Dier "on a daily basis" and observed her to be awake but "non-responsive." While Ms. Dier could "move an extremity a small portion" she remained "bed-bound" because of "two wounds," which she had "when she was admitted to the facility.

### Testimony of Maria Valdenegro

Ms. Valdenegro stated that, when Ms. Dier was admitted to Summit Park earlier that year, the costs of her care had been covered by Medicare. But that coverage ended May 2, 2006, by which time it "had already become clear to [Ms. Valdenegro] that Michelle Lyons [Ms. Dier's daughter] was not going to pay." As a result, Summit Park "initiated a Medical Assistance [Medicaid] application," which was "denied for lack of information." That left Summit Park with no means of obtaining payment for Ms. Dier's care, which, as of September 30, 2006, had an outstanding balance of $32,655.00.

### Appellant's Testimony

Appellant testified that he visited his mother frequently and believed that her non-responsiveness was caused not by dementia, but by depression. He expressly stated that he was unwilling to serve as guardian of his mother's property and asserted that she had no need for such a guardian.

-8-

## Conclusion of Hearing

At the close of the proceedings, Judge Sweeney, after finding that Ms. Dier was unable to make or communicate responsible decisions regarding her property and that there was no less restrictive means to have her property managed, granted Summit Park's petition to have a guardian appointed for her property, and appointed Thomas M. Meachum, Esq., to serve in that capacity. Thereafter, appellant filed a motion for reconsideration of the guardianship appointment, which was denied. This appeal followed.

## Standard of Review

In reviewing whether the circuit court erred in ordering the appointment of a guardian for Ms. Dier's property, "this Court must view the facts and all reasonable inferences in the light most favorable to the prevailing party." *Mack v. Mack*, 329 Md. 188, 230 (1993). The circuit "court's decision will not be clearly erroneous where there was substantial evidence on the record to support the [court's] decision. *Id.* (citing *I.W. Berman Prop. v. Porter Bros.*, 276 Md. 1, 12, 344 A.2d 65, 72 (1975)).

## Discussion

### I.

Appellant contends that Judge Sweeney erred in refusing to recuse himself from

-9-

hearing the petition for appointment of a guardian of the property of Ms. Dier.    In support

of that argument, appellant points out that Judge Sweeney had previously presided over a

related  proceeding,  namely, the case involving the guardianship of Mrs. Dier's person.[11]

As a result, Judge Sweeney had an obligation, according to appellant, to recuse himself from

the instant matter, pursuant to Maryland Rule 16-813, Canon 3, (D)(1), which states:

> A judge shall recuse himself or herself from a proceeding in which the judge's
> impartiality might reasonably be questioned, including an instance when: (a)
> the judge has a personal bias or prejudice concerning a party or a party's
> lawyer or extra-judicial knowledge of a disputed evidentiary fact concerning
> the proceeding.

But that canon, as the Court of Appeals observed in *Jefferson-El v. State*, 330 Md. 99

(1993), "has not been interpreted to require a trial judge, who has presided over a prior case,

involving the same defendant or incident, automatically to recuse him or herself from

presiding over a subsequent trial involving the defendant. *Id.* at 106-107 (citing *Boyd v. State*

321 Md. 69, 74-75 (1990)).  To the contrary, "there is a strong presumption in Maryland ...

and elsewhere ... that judges are impartial participants in the legal process, whose duty to

preside when qualified is as strong as their duty to refrain from presiding when not qualified

... The recusal decision, therefore, is discretionary ... and the exercise of that discretion will

not be overturned except for abuse." *Id.* (Internal citations omitted.)

---

[11]  As indicated in footnote 3, appellant unsuccessfully appealed the circuit court's
order appointing a guardian for Ms. Dier's person.

-10-

Moreover, "to overcome the presumption of impartiality, the party requesting recusal must prove," the Court of Appeals emphasized, "that the trial judge has 'a personal bias or prejudice' concerning him or 'personal knowledge of disputed evidentiary facts concerning the proceedings.'" *Id.* The Court further stressed that "[o]nly bias, prejudice, or knowledge derived from an extra-judicial source is 'personal'" and that "[w]here knowledge is acquired in a judicial setting, or an opinion arguably expressing bias is formed on the basis of information 'acquired from evidence presented in the course of judicial proceedings before him,' neither that knowledge nor that opinion qualifies as 'personal.'" *Id.* (Internal citations omitted).

Appellant does not claim that Judge Sweeney had any "personal knowledge," that is, any "personal bias or prejudice against [appellant]" derived from "an extra-judicial source." *Id.* On the contrary, appellant expressly admits that Judge Sweeney did *not* exhibit "an exact motivation such as favoritism or bias or some self-serving intent." And, although appellant uses the term "extra-judicial" to describe the judge's knowledge of the related proceeding, he subsequently maintains that that knowledge was, in fact, acquired "in a judicial setting," that is, during the prior hearings involving guardianship of Ms. Dier's person. Thus, it did not meet the definition of "personal knowledge" sufficient "to overcome the presumption of impartiality." *Jefferson-El v. State*, 330 Md. at 107.

Nonetheless, appellant contends that Judge Sweeney implied a lack of impartiality when he "warmly embraced and viewed as exemplary" the actions of Ms. Dier's court-

-11-

appointed counsel, Mr. Doyle, by reappointing him to represent her in the instant case des[pite] having knowledge, appellant insists, of Mr. Doyle's incompetence in the earlier c[ase] involving guardianship of her person.    As an example of Mr. Doyle's purporte[d] incompetence and of Judge Sweeney's awareness thereof, appellant points to the episode from the March 7, 2006, hearing on the petition to appoint a personal guardian for Ms. Dier. There, according to appellant, Mr. Doyle was "silent for about an hour, hour-and-half," at which point Judge Sweeney purportedly "said 'Are You all right?'" With that one remark, appellant contends, the judge demonstrated his awareness of Mr. Doyle's incompetence. Hence, the only explanation for why Judge Sweeney would subsequently reappoint Mr. Doyle as Ms. Dier's attorney in the instant case was, according to appellant, "that Mr. Doyle ha[d] some sort of tie or connection" to the judge.    And, therefore, appellant insists, "one might reasonably question the impartiality of [Judge Sweeney]."

But, as Judge Sweeney pointed out when he denied appellant's motion for reconsideration, that offhand remark, "Are you Okay[12]?" was "intended merely as a statement of humor in an otherwise long and drawn-out proceeding," and "in no way reflected any observation about Mr. Doyle's lack of attentiveness." Judge Sweeney further emphasized that "Mr. Doyle's representation of Ms. Dier in [those] proceedings was well within the court's expectations."

---

[12] While appellant, in his brief, maintains that Judge Sweeney had asked Mr. Doyle," Are You all right?" the judge, in denying appellant's motion for reconsideration, indicated that he had, in fact, asked Mr. Doyle, "Are You Okay?"

Clearly, Mr. Doyle's representation of Ms. Dier did not meet appellant's own expectations, and he was unhappy that Judge Sweeney allowed Mr. Doyle to represent her in this second guardianship action. But, as Summit Park points out, appellant's subjective unhappiness did not constitute a legitimate reason for Judge Sweeney to recuse himself absent some indication that that unhappiness was based on the judge having "personal knowledge of disputed evidentiary facts." *Jefferson-El*, 330 Md. at 107. As we have observed, no such basis existed here.

Still, appellant maintains that, even if the circuit court's actions did not fall below the level of "impartiality," they nonetheless triggered "the appearance of impropriety," which, as the Court of Appeals noted in *Jefferson-El*, "ought to be avoided as well." 330 Md. at 106. And appellant urges us to apply the test, outlined in that case and in its predecessors, for determining whether a trial court's impropriety necessitates recusal:

> Judges determine appearance of impropriety-not by what a straw poll of the only partly informed man-in-the-street would show-but by examining the record facts and the law, and then **deciding whether a reasonable person knowing and understanding all the relevant facts would recuse the judge**.

*Jefferson-El*, 330 Md. at 108 (quoting *In re Drexel Burnham Lambert, Inc.*, 861 F.2d 1307, 1313, (2d Cir.1988), *cert. denied*, 490 U.S. 1102, 109 S.Ct. 2458, 104 L.Ed.2d 1012 (1989) (citing *Surratt v. Prince George's County*, 320 Md. 439 (1990) (Emphasis added.)

The "appearance of impropriety" was an issue before the Court of Appeals in *In re*

*Turney,* 311 Md. 246 (1987). That case involved a defendant who was the stepson of the trial judge's ex-wife. The judge was aware of this connection at the time of trial. 311 Md. at 250-54. Subsequently, on appeal, our state's highest court concluded that "'a reasonable member of the public knowing all the circumstances would be led to the conclusion that the judge's impartiality might reasonably be questioned.'" *Id.* at 253. It therefore held that the trial judge should have recused himself, on his own motion, to avoid the appearance of impropriety.

But, applying that same standard in the instant case, we hold that recusal was not warranted. Indeed, while appellant calls our attention to the circuit court's "mindset" during the prior guardianship proceeding – in particular, during a February 2, 2006, status hearing where the court ruled that Ms. Dier had waived her right to a jury trial even though, appellant claims, her court-appointed counsel "failed to consult with [her]" about that matter – we find no shade of impropriety on the court's part, in light of the "relevant facts," *Jefferson-El,* 330 Md. at 106, and "circumstances," *Turney,* 311 Md. at 253. Those "relevant facts" and "circumstances," as we observed previously, included the testimony of Ms. Dier's primary care physician, Dr. Tansinda; the physician's certificate from Dr. Tansinda; and a second physician's certificate from Dr. Harold Bob, all of which indicated that Ms. Dier had advanced-stage dementia and spent her days confined to her bed in a contracted state, unable to communicate, walk, bathe, manually eat, use the toilet or dress.

While appellant maintains that Ms. Dier was not suffering from dementia, but was

-14-

merely depressed and non-responsive, he offers no expert testimony or any other evidence to back up that claim.   Hence, we conclude that no "reasonable member of the public knowing all the circumstances would be led to the conclusion that [Judge Sweeney's] impartiality might reasonably be questioned." *Turnkey*, 311 Md. at 253.

## II.

Appellant claims that the circuit court erred in failing to dismiss the petition due to lack of standing on the part of Summit Park.   That facility lacked standing to file the petition for guardianship, appellant asserts, because it did not qualify as an "interested person," pursuant to Maryland Rules 10-301(a)[13] and Rule 10-103(f)(2)[14].

Under 10-301(a), only an "interested person may file a petition requesting a court to appoint a guardian of the property... alleged disabled person." Rule 10-103(f)(2) defines an "interested person" as one who "would be a interested person under 10-103(f)(1)[15]" – that

---

[13] Maryland **Rule 10-301. Petition for Appointment of a Guardian of Property (a) Who May File.** Any interested person may file a petition requesting a court to appoint a guardian of the property of a minor or an alleged disabled person.

[14] Maryland Rule 10-103. Definitions
(...)
**(f) Interested Person** (2) In connection with a guardianship of the property or other fiduciary proceedings, "interested person" means a person who would be an interested person under subsection (f)(1) of this Rule and a current income beneficiary of the fiduciary estate; a fiduciary and co-fiduciary of the fiduciary estate; and the creator of the fiduciary estate.

[15] Maryland Rule 10-103. Definitions
(...)
**(f) Interested Person.**

-15-

is, a "minor or the disabled person; the guardian and heirs of that person; a governmental agency paying benefits to that person or a person or agency eligible to serve as guardian of the person ... and any other person designated by the court" – and one who is "a current income beneficiary of the fiduciary estate."

Here, Summit Park was "designated by the court" as an interested person in the guardianship proceeding. Indeed, the court stated at the September 22nd hearing that it was common practice for such nursing care facilities to file petitions for guardianship and that "in many cases ... the nursing home is the only one that can ... bring the case." Because Summit Park provided nursing care services to Ms. Dier and expected to be paid for those services – indeed, that was the reason it filed the guardianship petition in the first place – it clearly qualified as a "current income beneficiary" of Ms. Dier's estate. Thus, Summit Park met the criteria of an "interested person" under Rule 10-103(f)(2)and was entitled to "file a petition requesting a court to appoint a guardian" for Ms. Dier's property.

Moreover, although appellant claims that Summit Park "was a facility unknown to the family of Dorothy Dier" and that, at the time of her placement there, her attorney-in-fact was still her daughter, Ms. Lyons, those claims, even if true, have no bearing on Summit Park's

---

(1) In connection with a guardianship of the person or the authorization of emergency protective services, "interested person" means the minor or the disabled person; the guardian and heirs of that person; a governmental agency paying benefits to that person or a person or agency eligible to serve as guardian of the person under Code, Estates and Trusts Article, §§ 13-707; the Department of Veterans Affairs as directed by Code, Estates and Trusts Article, §§ 13-801; and any other person designated by the court

status as an "interested person" under the Maryland Rules.

### III.

Appellant alleges that the circuit court erred in failing to dismiss the petition for lack of venue. Summit Park filed its petition in the wrong venue, appellant insists, given Ms. Dier's residence at the time of filing. This contention, however, is without merit. For Maryland Rule 10-301(b)[16] provides that if the "alleged disabled person is a resident of Maryland, the petition shall be filed in the county where . . . the . . . alleged disabled person resides, even if the person is temporarily absent." Ms. Dier resided with appellant in Howard County at the time of her hospitalization. The Court of Appeals's longstanding test on residency has been expressed as follows:

> The words reside or resident mean domicile unless a contrary intent is shown. A person may have several places of abode or dwelling, but he can have only one domicile at a time. Domicile has been defined as the place with which an individual has a settled connection for legal purposes and the place where a person has his true, fixed, permanent home, habitation and principal establishment, without any present intention of removing therefrom, and to which place he has, whenever he is absent, the intention of returning. **The controlling factor in determining a person's domicile is his intent.** One's domicile, generally, is that place where he intends to be. The determination of his intent, however, is not dependent upon what he says at a particular time, since his intent may be more satisfactorily shown by what is done than by what is said. **Once a domicile is determined or established a person retains his domicile at such place unless the evidence affirmatively shows an**

---

[16] **Rule 10-301. Petition for Appointment of a Guardian of Property**
(...)
(b) Venue.
(1) Resident. If the minor or alleged disabled person is a resident of Maryland, the petition shall be filed in the county where the minor or alleged disabled person resides, even if the person is temporarily absent.

**abandonment of that domicile.** *Oglesby v. Williams*, 372 Md. 360, 373 (2002) (quoting *Roberts v. Lakin*, 340 Md. 147, 153 (1995) (quotations omitted)). (Emphasis added.)

Ms. Dier made no affirmative abandonment of her domicile. Thus, at the time of the filing of the petition on September 28, 2005, Ms. Dier was a resident of Howard County and venue was proper.

## IV.

Appellant next claims that the circuit court erred in failing to dismiss Summit Park's petition for insufficiency of the physician certificates. Appellant maintains that the certificates did not comply with Maryland Rule 10-202(a),[17] which states that a petitioner for guardianship

> shall file with the petition signed and verified certificates of (A) two physicians licensed to practice medicine in the United States who have examined the disabled person, or (B) one licensed physician who has examined the disabled person and one licensed psychologist who has seen and evaluated the disabled person. An examination or evaluation by at least one of the health care professionals under this subsection **shall occur within 21 days before the filing of a petition for guardianship of a disabled person** ... (Emphasis added.)

---

[17] We wish to point out that, while Rule 10-202 directly pertains to petitions for guardianship of the person, it has been extended to matters involving property guardianships:

**Rule 10-301. Petition for Appointment of a Guardian of Property**

(...)

**(d) Required Exhibits.** The petitioner shall attach to the petition as exhibits (1) a copy of any instrument nominating a guardian; (2)(A) any physician's or psychologist's certificates required by Rule 10-202 . . .

Summit Park did not comply with this rule, appellant argues, because the more recent of the two physician certificates[18] – the one from Dr. Tansinda – was dated April 25, 2006. That was, according to appellant, 22 days before the facility filed its guardianship petition on May 16, 2006 and, hence, it did not occur, he insists, "within 21 days before the filing of a petition for guardianship of a disabled person" as required by Rule 10-202(a).[19]

But, given that the physician certificate was signed on April 25th, the petition was, in fact, filed exactly twenty one days later, in accordance with the Rule 10-202(a).[20] And, as

---

[18] As we previously noted, the physician certificate from Dr. Bob was dated April 18, 2006.

[19] **Rule 10-202. Certificates–Requirement and Content**
**(a) To be Attached to Petition.** (1) *Generally.* If guardianship of the person of a disabled person is sought, the petitioner shall file with the petition signed and verified certificates of (A) two physicians licensed to practice medicine in the United States who have examined the disabled person, or (B) one licensed physician who has examined the disabled person and one licensed psychologist who has seen and evaluated the disabled person. An examination or evaluation by at least one of the health care professionals under this subsection shall occur within 21 days before the filing of a petition for guardianship of a disabled person. Each certificate shall state the name, address, and qualifications of the physician or psychologist, a brief history of the physician's or psychologist's involvement with the disabled person, the date of the physician's last examination of the disabled person or the psychologist's last evaluation of the disabled person, and the physician's or psychologist's opinion as to: (1) the cause, nature, extent, and probable duration of the disability, (2) whether the person requires institutional care, and (3) whether the person has sufficient mental capacity to understand the nature of and consent to the appointment of a guardian.

[20] As Summit Park points out, and appellant does not dispute, "[i]t is the usual practice of the Clerk of the Circuit Court for Howard County to begin the calculation of the twenty-one day period, within which the petition must be filed, with the first day after the signing of the physician certificate. "

-19-

Summit Park points out, if the certificate had been stale, the clerk of the circuit court would have been obligated to reject it at the time Summit Park filed its petition. That the clerk did not do so in this case suggests that the certificate was indeed timely filed.

Moreover, even if the certificate had been filed one day late, as appellant contends, he failed to object to its purported lateness at his first opportunity, which arose at the time he filed his answer to Summit Park's petition. Hence, appellant waived his right to raise that particular objection later. *See* Maryland Rule 2-517(a)[21] ("An objection to the admission of evidence shall be made at the time the evidence is offered or as soon thereafter as the grounds for objection become apparent. Otherwise, the objection is waived.")

Furthermore, even if appellant had preserved his right to object and had succeeded in establishing that the certificate was filed one day late, such a minor defect would have amounted to harmless error because, at the time appellant raised his objection about the certificate – specifically, at the September 22nd hearing – he had the opportunity to cross-examine Dr. Tansinda about the contents of that certificate and to verify that the physician

---

[21] **Rule 2-517. Method of Making Objections**
**(a) Objections to Evidence.** An objection to the admission of evidence shall be made at the time the evidence is offered or as soon thereafter as the grounds for objection become apparent. Otherwise, the objection is waived. The grounds for the objection need not be stated unless the court, at the request of a party or on its own initiative, so directs. The court shall rule upon the objection promptly. When the relevancy of evidence depends upon the fulfillment of a condition of fact, the court may admit the evidence subject to the introduction of additional evidence sufficient to support a finding of the fulfillment of the condition. The objection is waived unless, at some time before final argument in a jury trial or before the entry of judgment in a court trial, the objecting party moves to strike the evidence on the ground that the condition was not fulfilled.

had, in fact, examined his mother as recently as a week before. *See Francies v. Debaugh*, 194 Md. 448, 458 (1950) (The improper admission of evidence over objection is harmless error where the same evidence is afterwards admitted without objection.)

Nonetheless, appellant contends that Dr. Tansinda's certificate was otherwise insufficient because it failed to comply with the requirements that "each certificate [i]nclude a brief history of involvement with the disabled person and specify the cause of the purported disability," as set forth in *In Re: Sonny E. Lee*, 132 Md. App. 696, 702 (2000) (citing Maryland Rule 10-202(a)(1))).

In that case, this Court vacated and remanded a trial court's order granting a petition for personal guardianship of Sonny E. Lee. The petition had been brought by Lee's daughter, who claimed that he was suffering from alcohol-induced dementia. Lee's son, however, challenged the petition on the several grounds, including that the two physicians – who were present during the trial court proceedings, but did not testify – had produced certificates accompanying the petition that neither included a history of their involvement with Lee nor indicated whether they had ever reviewed Lee's medical records. In reversing the trial court's order, we held that, given the aforementioned insufficiencies in the physicians' certificates, the trial court "erred in not permitting [either] doctor[] to testify." *Id.* at 717-718. But our holding is inapplicable to the instant case because, here, Dr. Tansinda *did* testify about the extent of his involvement with Ms. Dier and the date that he last examined her and reviewed her records: "about one week" prior to the September 22nd hearing. Thus, any

-21-

insufficiencies in Dr. Tansinda's physician certificate, at the time it was filed, were addressed by the very method prescribed in *Lee*.

Still, appellant claims that Dr. Tansinda's certificate and ensuing testimony were insufficient because in neither did he indicate whether he had diagnosed Ms. Dier with depression. But such a diagnosis, as Summit Park points out, would have required the doctor to be able to communicate directly with Ms. Dier, which sadly, because of her non-responsive state, he was unable to do. That Dr. Tansinda declined to speculate as to whether Ms. Dier was, in fact, depressed was therefore logical and not, as appellant contends, an insufficiency in either his certificate or his subsequent testimony.

Finally, appellant asserts that the physician certificate of Dr. Bob was insufficient because, while it was deemed to be a "second opinion," it was dated seven days earlier than the certificate of the physician – Dr. Tansinda – who provided the "primary opinion." Specifically, appellant states in his brief that, "it has not gone unnoticed that the earlier dated physician certificate ... is cited by its author, a physician, as a 'second opinion' bearing a date 7 days before the purported primary opinion, which colored the totality of the required filed physician certificates." But appellant cites no statute, rule, case or other authority for why the "totality of the required filed physician certificates" would have been, in his words, "colored." And, as Summit Park points out, there is substantial evidence in the record below that, regardless of the dates on their respective physician certificates, Dr. Bob was, as he represented himself in his certificate, the second doctor who saw Mrs. Dier at Summit Park

to diagnose her inability to make or communicate responsible decision because of her dementia, while Dr. Tansinda was her primary care physician from the time that she entered that facility. Hence, we conclude that the circuit court did not err in declining to dismiss Dr. Bob's certificate as insufficient on the grounds raised by appellant.

V.

Appellant further claims that the circuit court erred in failing to address the absence of Ms. Dier at the September 22nd guardianship hearing, which it was required to do, he insists, under the Sixth Amendment of the United States Constitution and under §13-705(e) of the Maryland Code, Estates and Trusts Article.  But those provisions, as we shall see, placed no such requirement on the circuit court.

As Summit Park points out, the Sixth Amendment's Confrontation Clause relates exclusively to criminal matters and is not a basis for contesting a civil guardianship proceeding.  *See, e.g., In re Adoption/Guardianship No. 6Z980001 in Dist. Court,* 131 Md.App. 187, 192 (2000) (quoting *One 1995 Corvette VIN No. 1G1YY22P585103433 v. Mayor and City Council of Baltimore,* 353 Md. 114, 129 (1999) (other citations omitted) ("'[T]he Supreme Court has noted that the Sixth Amendment Confrontation Clause is limited to criminal proceedings.'"); *Bridges v. State,* 116 Md.App. 113, 129 (1997) ( "'The Sixth Amendment, also by its very terms, is a package of rights only for the benefit of 'the accused.'"); *see also People in Interest of C.G.,* 885 P.2d 355, 357 (Colo.Ct.App.1994) *See, e.g., Lassiter v. Department of Soc. Servs.,* 452 U.S. 18, 25, 101 S.Ct. 2153, 68 L.Ed.2d 640

-23-

(1981) (A termination of parental rights proceeding is a civil and not a criminal proceeding). *See* U.S. Const. Amend. VI; *United States v. Zucker,* 161 U.S. 475, 481, 16 S.Ct. 641, 40 L.Ed. 777 (1896) ("'The sixth amendment relates to a prosecution of an accused person which is technically criminal in its nature.'"); (An action to terminate parental rights is a civil proceeding; therefore, the sixth amendment confers no right of confrontation); *Matter of Adoption of J.S.P.L.,* 532 N.W.2d 653, 660 (N.D.1995) (same).    Hence, as a general principle, the Sixth Amendment right of a criminal defendant to be present at trial does nothing to bolster appellant's claim.

Nor is there support for appellant's position in §13-705(e) of the Maryland Code, Estates and Trusts Article.[22]    Indeed, its language is clearly unfavorable to appellant. Section 13-705(e) states that "[t]he person alleged to be disabled is entitled to be present at the hearing unless he has knowingly and voluntarily waived the right to be present *or cannot be present because of physical or mental incapacity ...* " (Emphasis added.) It continues that "[w]aiver or incapacity may not be presumed from nonappearance but shall be determined on the basis of factual information supplied to the court by counsel or a representative appointed by the court." This was precisely the determination that the circuit court reached.

---

[22] We wish to point out that, while §13-705 generally applies only to proceedings involving guardianship of persons – specifically, disabled persons – the Court of Appeals has also applied that provision to property guardianships. *Department of Health and Mental Hygiene v. Campbell,* 364 Md. 108, 115, fn. 6 ("§ 13-705 of the Estates and Trusts Article addresses the appointment of guardians of the property of disabled persons.")

-24-

Indeed, as stated in its order, the court found that Ms. Dier could not be present because of physical or mental incapacity after hearing testimony from the medical experts treating her – Dr. Tansinda and Christine Teague – that she was unable to walk, stand or even sit up, and that her presence at the courthouse would have been confined to a hospital bed and she would have been unable to contribute to or understand the nature of the proceedings.

Nonetheless, appellant contends that, because the circuit court announced its finding as to Ms. Dier's "incapacity" not at the hearing itself, but in its order twelve days later, it failed to show that, at the time of the hearing, it had considered the issue of her absence as required by §13-705(e). But we find that argument unpersuasive. For, although the court may not have articulated its finding until the order, the information on which that finding was based was presented to the court at the hearing. And the circuit court knew long before that hearing that Ms. Dier was incapacitated with progressive and permanent senile dementia. Indeed, as we previously observed, Judge Sweeney had presided over the prior matter involving guardianship of Ms. Dier's person, which, as the judge himself noted, had involved "extensive proceedings and hearings last[ing] for many, many hours." Hence, for appellant to claim that the circuit court had not "considered the issue" of her absence from the September 22nd hearing at the time that hearing was held borders on the disingenuous.

VI.

Finally, appellant claims that the circuit court erred when it *sua sponte* incorporated an earlier proceeding involving Ms. Dier. The court did so, appellant maintains, at the

-25-

September 22nd hearing, when it stated:

> The Court would note for the record, and I will take notice, the extensive days of hearing we had from medical experts in the guardianship of the person case, in which it was clear from that testimony – and without doubt in that testimony, that Mrs. Dier's mental capacity to perform any type of matters regarding daily activities was extraordinarily impaired, and that she was basically helpless.

> And the Court would note that that testimony, and I think it's fair to – because these are companion cases that deal with the very same issues, that it's fair to note that and to take that into consideration also here.

By referring to the previous "companion case" involving guardianship of Ms. Dier's person, the circuit court, appellant alleges, violated the requirements of the Sixth Amendment's Confrontation Clause. But that provision, as we previously discussed, is inapplicable to civil guardianship proceedings and, thus, does not support appellant's argument.

Nonetheless, appellant maintains that the circuit court's reference to that prior case also violated the requirements for admission of an out of court declaration, which are set forth, according to appellant, in "Maryland Practice: Maryland Evidence State and Federal Section §804(1).[23] Specifically, appellant cites that text for the proposition that, "'in order to admit into evidence an out of court declaration taken under oath in a prior judicial

---

[23]We presume appellant cites to Lynn Mclain, Maryland Evidence: State and Federal (2 vols.) (West Pub. Co., 1987) or (3 vols.) (rev. 3rd ed. 2001).

-26-

proceeding, the twin prongs of identity of parties and substantial identity of issues, and the demonstrated unavailability of the witness under law ha[ve] to be met; in addition, the availability of the transcript of the earlier judicial proceeding ha[s] to be satisfied.'" Those conditions, he claims, were not satisfied in this case.  But, as we shall see, appellant is mistaken both in his reliance on 6A Maryland Evidence, § 804(1):1 as a source of binding legal authority and in his belief that the circuit court's reference to the earlier guardianship proceeding constituted an out of court declaration.

At the outset, we wish to point out that 6A Maryland Evidence, § 804(1):1 is part of a well-known text on the Maryland Rules of Evidence.  But, while that text is persuasive authority for courts in Maryland, it is not binding law.  To the contrary, it merely examines and interprets the evidentiary laws in this jurisdiction.  Indeed, § 804(1):1 addresses 5-804,[24]

---

[24] **Rule 5-804. Hearsay Exceptions; Declarant Unavailable**
(a) **Definition of Unavailability.** "Unavailability as a witness" includes situations in which the declarant:
(1) is exempted by ruling of the court on the ground of privilege from testifying concerning the subject matter of the declarant's statement;
(2) refuses to testify concerning the subject matter of the declarant's statement despite an order of the court to do so;
(3) testifies to a lack of memory of the subject matter of the declarant's statement;
(4) is unable to be present or to testify at the hearing because of death or then existing physical or mental illness or infirmity; or
(5) is absent from the hearing and the proponent of the statement has been unable to procure the declarant's attendance (or in the case of a hearsay exception under subsection (b)(2), (3), or (4) of this Rule, the declarant's attendance or testimony) by process or other reasonable means.
A statement will not qualify under section (b) of this Rule if the unavailability is due to the procurement or wrongdoing of the proponent of the statement for the purpose of preventing the witness from attending or testifying.

**(b) Hearsay Exceptions.** The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

(1) *Former Testimony*. Testimony given as a witness in any action or proceeding or in a deposition taken in compliance with law in the course of any action or proceeding, if the party against whom the testimony is now offered, or, in a civil action or proceeding, a predecessor in interest, had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.

(2) *Statement Under Belief of Impending Death*. In a prosecution for an offense based upon an unlawful homicide, attempted homicide, or assault with intent to commit a homicide or in any civil action, a statement made by a declarant, while believing that the declarant's death was imminent, concerning the cause or circumstances of what the declarant believed to be his or her impending death.

(3) *Statement Against Interest*. A statement which was at the time of its making so contrary to the declarant's pecuniary or proprietary interest, so tended to subject the declarant to civil or criminal liability, or so tended to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless the person believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

(4) *Statement of Personal or Family History*.

(A) A statement concerning the declarant's own birth; adoption; marriage; divorce; legitimacy; ancestry; relationship by blood, adoption, or marriage; or other similar fact of personal or family history, even though the declarant had no means of acquiring personal knowledge of the matter stated.

(B) A statement concerning the death of, or any of the facts listed in subsection (4)(A) about another person, if the declarant was related to the other person by blood, adoption, or marriage or was so intimately associated with the other person's family as to be likely to have accurate information concerning the matter declared.

(5) *Witness Unavailable Because of Party's Wrongdoing*.

(A) Civil Actions. In civil actions in which a witness is unavailable because of a party's wrongdoing, a statement that (i) was (a) given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding or in a deposition; (b) reduced to writing and was signed by the declarant; or (c) recorded in substantially verbatim fashion by stenographic or electronic means contemporaneously with the making of the statement, and (ii) is offered against a party who has engaged in, directed, or conspired to commit wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness, provided however the statement may not be admitted unless, as soon as practicable after the proponent of the statement learns that the declarant will be unavailable, the proponent makes known to the adverse party the intention to offer the statement and the particulars

the Maryland rule covering hearsay exceptions. Curiously, appellant does not even mention Rule 5-804, even though that, and not § 804(1):1 , is the legal authority for the issue he addresses. Hence, § 804(1):1 did not impose any mandatory requirements on the circuit court with regard to out of court declarations.

In any event, the circuit court did not make an out of court declaration. Indeed, it did not introduce any out of court statement, that is, any out of court "oral or written assertion or nonverbal conduct .... intended .... as an assertion," when it referred to the prior "companion case" that appellant had previously mentioned. *See* Rule 5-801(a).[25]  To the contrary, all that the circuit court did was take notice of the "extensive days of hearings in the guardianship of the person case" and of the testimony presented therein, without repeating any of that testimony verbatim.

Moreover, the court did so only after appellant had gone on at length about those hearings during his request that the circuit court recuse itself from the instant proceeding. In fact, it was appellant, and not the circuit court, who introduced the out of court statements from those prior hearings.[26]  Hence, the circuit court's subsequent reference to those prior

---

of it.

[25]  **Rule 5-801. Hearsay Definitions**
The following definitions apply under this Chapter:
(a) **Statement.** A "statement" is (1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by the person as an assertion....

[26]  Because appellant is the party who raised this issue, we need not decide whether his own introduction of those prior out of court declarations would have constituted

hearings was merely a confirmation of what appellant himself had brought up in the instant case. And, given that, as this Court has previously held, it is not error for a trial court to "consider[] evidence outside of the proceedings before it, where such evidence was merely confirmatory of the evidence in the instant proceedings," *Tarachanskaya v. Volodarsky*, 168 Md. App. 587, 620 (2006), *rev'd on other grounds*, 397 Md. 291 (2007), we hold that the circuit court did not err in doing precisely that.

Furthermore, the testimony from the earlier hearings of which the circuit court took notice – "testimony that Ms. Dier's mental capacity to perform any type of matters regarding daily activities was extraordinarily impaired" – was tantamount to the testimony presented by the medical experts at the September 22nd hearing. Thus, even if it was improper for the circuit court to take notice of the testimony from those earlier hearings, such error was harmless because "the same evidence [was] afterwards admitted without objection." *Francies*, 194 Md. at 458 .

**ORDER AFFIRMED.**
**COSTS TO BE PAID BY APPELLANT.**

---

impermissible hearsay.

**COURT OF SPECIAL APPEALS FOR MARYLAND**

HOWARD COUNTY, CIRCUIT COURT

JERRY L. DIER, in behalf of
His Mother, DOROTHY DIER    File No.1595, September 2006 Term

v.

SUMMIT PARK

Circuit Court No.13C0665465
JUDGE DENNIS M. SWEENEY

**************************************************************************

**REQUEST FOR RECONSIDERATION**

Interested Person Jerry L. Dier in behalf of His Mother DOROTHY DIER

respectfully requests that this court pursuant to Maryland Rule 8-605  Reconsider the

opinion in *JERRY L. DIER v.. SUMMIT PARK HEALTH AND REHABILITATION*

*CENTER;* said opinion is neither grounded on fact nor law, and only tends to corroborate

the thrust of Appellant's brief.  For the purposes of this Request for Reconsideration,

kindly incorporate by reference Appellant's brief as if fully stated herein.

**As grounds for Reconsideration, Appellant states the following,**

**RECUSAL**

1 -The appellate court overlooked the numerous detailed instances cited in Appellant's

brief, which when taken either individually or provide significant and substantial grounds

depicting *favoritism, bias, prejudice and personal knowledge* on the part of the state court

whose lack of impartiality and impropriety required recusal.

256

**The appellate court grounded its opinion pertaining to the issue of *Recusal* on this statement,**

> As an example of Mr. Doyle's purported incompetence and of
> Judge Sweeney's awareness thereof, appellant points to the
> Episode from the March 7, 2006, hearing on the petition to
> Appoint a personal guardian for Ms. Dier. There, according
> To Appellant Mr. Doyle was silent for about an hour, hour-and
> Half," at which point Judge Sweeney purportedly "said 'Are you
> Allright?'"With that **one remark(emphasis added)**
> appellant contends, the judge demonstrated his awareness of
> Mr. Doyle's incompetence. Hence, the only explanation for
> Why Judge Sweeney would subsequently reappoint Mr. Doyle as
> Ms. Dier's attorney in the instant case was, according to appellant,
> 'that Mr. Doyle had some sort of tie or connection' to the judge.
> And, therefore appellant insists, 'one might reasonably question
> The impartiality of [Judge Sweeney].'

> But, as Judge Sweeney pointed out when he denied appellant's
> Motion for reconsideration, that offhand remark, 'Are you
> Okay?'was intended merely as a statement of humor in an
> Otherwise long and drawn-out proceeding, and 'in no way
> Reflected any observation about Mr. Doyle's attentiveness.'
> Judge Sweeney further emphasized that 'Mr. Doyle's representation
> Of Ms. Dier in [those] proceedings was well within the court's
> Expectations.' p.12.

2-The transcript is clear and unequivocal that the state court was inquiring into the well-

being of his court appointed counsel knowing he had just gotten back from vacation,.

And whose participation in this most important proceeding was marked by his silence.

There was absolutely <u>no hint of humor</u> in the state court's statement and any contention

to the contrary is incorrect and misleading. The appellate court rather than acting as

independent observer made Judge Sweeney the judge of his own actions. Judge

Sweeney's appointment of Anthony Doyle set up a circumstance where the state court

wore the dual hats of judge and jury by acting in concert with his appointed counsel so as

to deny DOROTHY DIER her constitutional right to a Jury trial Whereby the state court

made itself the ultimate fact finder.

This is the nature .of the manner in which the state court's appointed counsel for

DOROTHY DIER met the state court's "expectations."

To remove any question and place to rest what the state court stated and the response of

his court appointed counsel, as regards this so called "one remark," the appellant herein

sets forth the quote directly from the transcript which is attached to this paper. (E-1),

> THE COURT: And so we don't hold him up, too. Mr. Doyle, are you
> allright there? I know you just go back—
>
> MR. DOYLE: Yes, sir.
>
> THE COURT: - - From vacation, Okay; you're looking. …
>
> MR: DOYLE: Trying to get used to the low altitude here..
>
> THE COURT: Oh, I see; being back at work, huh?

3-This was only one of many words and deeds made by state court and its appointed

counsel which evidenced a relationship that operated in total disregard of the life and

and liberty of DOROTHY DIER. To the credit of the state court, if

credit is to be afforded for such conduct, the state court did not attempt to hide its

*favoritism, bias, prejudice and lack of impartiality and impropriety.*

4-Rather than immediately remove Anthony Doyle, the state court's *expectations* having

been met by Mr. Doyle's non-appearance, both figuratively and literally, but to mirror the

court, the state court rewarded its attorney in place by also appointing him in the instant

guardian of property action, so as to be certain that he[state court] would again control

the ultimate outcome. The rule of man had triumphed and the Rule of Law was nowhere

to be found..

**Other detailed instances of favoritism, bias, prejudice and lack of impartiality and impropriety**

5-At a morning call, October 25, 2005, 9:30 a.m. during a short status hearing, the state court viewing court appointed counsel as uncharacteristically silent, asked him, **"Are you awake?"**This is another instance of *favoritism*, a *bias* in favor of Mr. Doyle by Judge Sweeney to the *prejudice* of DOROTHY DIER. Only a week or so earlier, on October 14th the state court had warmly embraced his court appointed counsel after he[Mr. Doyle] acknowledged signing a pleading which incorporated false and misleading representations concerning DOROTHY DIER as if to be an expression of her desires and wishes, **ALL MADE WITHOUT CONSULTATION**, including but not limited to DOROTHY DIER'S purported *Waiver* of her *Right* to a **Jury trial**, and to be **Present**, as well as an affirmative representation that DOROTHY DIER desired to have a guardian of person appointed. Said acknowledgement only came after a probing inquiry by Interested Person Jerry L. Dier, but it was to no avail.

This is a further example of the "bias" and "prejudice" directed against DOROTHY DIER-DOROTHY DIER, the United States Constitution and the Rule of Law bore the brunt of the state courts' special treatment.

The lack of impartiality on the part of the state court was unmistakable, the degree of impropriety can not be described by mere words, it can only be defined by looking carefully at what took place as the state court and its appointed counsel stripped the justice system of its integrity while condemning an "innocent."

6-During a February 2, 2006, status hearing five weeks before trial, the following dialogue took place between the state court and his court appointed counsel when issues

as regards the health safety and well being of Mrs. Dier were being addressed after it had

been made clear by Mr. Dier that Aging had not performed the required due diligence

prior to Mrs. Dier's placement,

    MR; DOYLE: Your Honor, let me interrupt, I've got a meeting to—

    THE COURT: Oh yeah, you need to –

    MR. DOYLE: **Can I go out the back door?**

    THE COURT: **Sure.**

    THE COURT: Oh no. That's fine. We got—I think we can go—we can—because we're talking about comparing nursing homes--.

    MR. DOYLE: Okay

    THE COURT: **--We can go on with Mr. –without Mr. Doyle. All right. Go ahead.**

The state court was so brazen, such that it could boldly state on the

record that it recognized that court appointed counsel's contribution in behalf of

Mrs. Dier was of no matter, especially startling at a point in time when DOROTHY

DIER'S health, safety and well being were discussed.

The appellate court's opinion is abundantly clear, it could not openly condemn the state

court without severely reprimanding said court, and reversing both guardian of person

and guardian of property actions, an arena that the appellate court was not prepared to

enter, despite of the fact that "due process of law," fair play, and justice required it to do

so. It took the appellate court 30 pages to address as best it could, reaching and stretching

as if to find a safe harbor so as to combat Appellant's raised issues, **None** of which were

raised by the state court's appointed counsel for DOROTHY DIER, for otherwise the

state court's **expectations would have been thwarted-the state court's favoritism,**

bias, prejudice and lack of impartiality and impropriety had raised up for all to see;

the question before this court is not whether it knows and understands what took

place, but whether it is willing to do anything about it?

## MINDSET OF STATE COURT, WHICH THE APPELLATE COURT IGNORED, AS IT HAD TO IF IT WAS TO AFFIRM THE STATE COURT

7-    February 2, 2006, hearing pertaining to DOROTHY DIER, guardian of person,

> THE COURT: Even assuming the statutory jurisdiction was *not*
> Able to be sustained, the Court believes it's **inherent powers** as
> **Guardian** of person with disabilities would **fill in any gap** in that
> Determination. (emphasis added).

The opinion did not address this statement by the state court made five weeks

in advance of trial. This statement moved the state court past the issue of *jurisdiction*

an issue known to all practicing lawyers as to whether or not a court can hear or

entertain such a matter. Furthermore, the state court declared weeks before trial that it

already deemed itself as guardian of person and could make any adjustments so as to

fill in the gap in a matter that should never have been heard on its merits before the

state court. The state court by resorting to some notion of *inherent powers* such as

divine right of kings attempted to justify the unjustifiable, its words and conduct..

The state court had made the foundation parts of American jurisprudence, fair and

impartial justice irrelevant; the state court had established within the

confines of its courtroom a kingdom founded on its own notions of right and wrong

through the exercise of what it believed to be its "inherent powers."

8-Moreover, during the February 2, 2006, hearing the state court addressed the issue

of whether or not it thought DOROTHY DIER should be able to exercise her right

261

under the United States Constitution to a Jury trial, that right having been waived by

her court appointed counsel, who openly acknowledged as earlier stated that said

waiver was *not* an affirmative decision of DOROTHY DIER; it was his decision,

made **WITHOUT CONSULTATION** with his client, DOROTHY DIER. This

practice apparently was in full accord with the state court's *expectations,*.

> THE COURT: … .And why should we drag everybody, including
> Your poor mother through a jury trial proceeding in if there's—
> It's clear to me beyond any co-eval, that your mom is- is well
> Within the range of people that seriously need a guardian?

The state court made full use of what it termed its "inherent powers" in a guardian

action at a point in time when the issue of the need for guardianship under the law

was yet to be decided, but it had been made abundantly that decision had already been

made, it was a done deal. The state court's notion of inherent powers allowed

it to step in the place of DOROTHY DIER, as if it was his right to waive and forgo a

Jury trial, not that of DOROTHY DIER.

The state court now occupied all roles at trial, he was the judge, he was the fact

finder, he was acting for the subject of the proceedings and for all practical purposes

he was also that persons attorney.

There is no quotation, citation or Rule of Law which this court can set forth, so as to

justify this conduct on the part of the state court. The state court had now

fully moved separate and apart from any known jurisprudence as regards the

reasonableness of his actions and/or words announcing for all to hear, that the

decision as regards guardianship was now his to make, and he had made that

decision- a trial at a later point in time had been rendered a mere formality.

.

**EXTRAJUDICIAL PERSONAL KNOWLEDGE OF STATE COURT**

9-During the February 2, 2006, hearing concerning in part the suitability of Summit

Park to meet the needs of DOROTHY DIER, Judge Sweeney stated the following as

regards his *extra-judicial personal knowledge* of Summit Park,

> THE COURT: Yeah, oh—I see. It's says—right—it's that one
> that right adjacent to Hillcrest Elementary?
>
> MR. DIER: Yes. It's behind the elementary school—
>
> THE COURT: Right. I know. Yeah, I know exactly—
>
> MR. DIER: If the Court please, Your Honor—
>
> THE COURT: I know exactly where it is.

THE COURT: . …...And I have no—I mean I have no preconceived notions about it. I
know the place. I think I've actually been in there. My sister lives about three houses
away from it. So, I know the area. I know the place a little bit. I've heard some things.

On September 22, 2006, the state court at the guardian of property hearing,
stated,"I've never been in Summit Park at all."

Furthermore, placing another twist on the state court's *acknowledged personal extra*

*judicial knowledge*, the state court in a signed Court Memorandum and Order, dated

September 27, 2006, stated that it did not select the nursing home for Ms. Dier, and

had only the most general knowledge of the facility as placed on the record, although

earlier stated that DOROTHY DIER was placed at Summit Park

pursuant to Court order. The state court's initial statement at the February 2, 2006,

hearing must be found as controlling, in that it was Judge Sweeney's initial, without a

opportunity for reflection, response to Summit Park and the issue of its suitability.

The state court had made it crystal clear when it stated, I Think I've been in there, My

sister lives about three houses away from it. So, I know the area. I know the place a

little bit. I've heard some things. The subsequent attempts by the state court to

distance itself from its initial statements can only be reasonably viewed as an

acknowledgement by the state court of the *impropriety*, or at the very least the

*appearance of impropriety* of its words and conduct.

## OTHER ISSUES

**The teachings of the appellate opinion are of more than just some interest, as**

**regards,**

**Standing to file, Summit Park**

**1- its designation of Summit Park as an interested person fails to acknowledge that there was and could be no designation of Summit Park by the court as an interested person <u>prior</u> to the filing of its petition for guardianship of property, the operative period of time pertaining to the issue of *standing*,**

**Venue**

**2-DOROTHY DIER as a resident of Summit Park, Baltimore County, pursuant to court order and direction of the appointed guardian, by operation of law no longer had the ability to choose a residence of her own liking, her residence was where she was placed and she was placed at Summit Park, in Baltimore County, not Howard.**

**Sufficiency of Physician Certificates under law**

**3- is the timeliness of filed physician certificates pursuant to Maryland Law now to be deemed as controlled by a clerk's office acceptance of such a filing rather than the plain meaning of statutory construction, "within 21 days before the filing."**

**Sufficiency of Physician Certificates, Dr. Bobs Second Opinion**

**4-Dr. Bob's second opinion, and labeled as such-second opinions are not recognized under Maryland Law, Maryland Rule 10-202, and in addition the second opinion of interest predates the first opinion, a most unnatural occurrence and not one that should be deemed reasonably acceptable at law.**

## RIGHT TO BE PRESENT UNDER MARYLAND LAW

5-DOROTHY DIER'S absence at court proceedings, including trial, neither explained as mandated by Maryland law, Estates and Trusts, Sect. 13-705(e) by factual information supplied to the court <u>by counsel or a representative appointed by the court.</u> The opinion in the instant case by some reach has deemed that the would be creditor and would be interested person, Summit Park by and through its employees are now to be accepted to be either counsel for DOROTHY DIER or a representative appointed by the court.

FURTHERMORE, the Maryland cases cited in the opinion do not concern an <u>innocent</u> such as DOROTHY DIER, but rather pertain to a prisoner without reasonable means of transportation to move them to the situs of parental rights hearing, but the court makes clear, even a prisoner is still to be afforded "due process," such as giving them the means to know exactly what took place at such a hearing and submit comments and questions so as to give them a means of reasonable participation under their particular circumstances. The opinion as it presently stands affords a greater degree of protection for a prisoner than an elderly "innocent." Is this the teaching of the opinion?

This court in <u>Lee</u>, a 2000 guardian of the person case citing U.S. Supreme Court precedent held "[t]he right to be heard before being condemned to suffer grievous loss of any kind , even though it may not involved the stigma and hardship of a criminal conviction is a principle basic to our society" and "Due process demands nothing less, particularly, as here, when the alleged disabled person faces significant and usually permanent loss of his basic rights and liberties." The question before this court is also not just how soon we forget, and what do we do when we remember? --the Maryland Court of Appeals stated in 1993, <u>Mack v. Mack,</u>  the greater the right at risk the greater the protection to be afforded by the court.

Global incorporation of an earlier proceeding

6-global incorporation by merely referring to an earlier proceeding, so as to be able to cherry pick bits and pieces so as to reinforce factual requirements not sufficiently set forth in the trial at bar. This technique hardly instills confidence as regards evidentiary requirements and due process of law, under the Rule of Law.

Dr, Tansinda

7-Dr. Tansinda's physician certificate and his testimony at trial speak for itself.

**CONCLUSION**

The issues presented by the Appellant are neither new nor novel when taken separately, however, what is out of the ordinary is the totality of the state court's conduct and the manner in which the appellate court has bent, but not as of yet totally broken to the state court's will.

The nature and the fashion of the favoritism exercised in behalf of court appointed counsel to the detriment of DOROTHY DIER, the bias and prejudice demonstrated toward DOROTHY DIER, and the extra-judicial personal knowledge of the state court created an atmosphere where DOROTHY DIER, an innocent, was condemned by a state court without benefit of due process of law, in an environment hostile to the proprieties and impartiality that ordinarily are assumed to take place in any judicial proceeding leaving no doubt that commonly accepted notions of fairness and justice well recognized both at common law and in American jurisprudence were left at the doorstep in this courthouse during this action. The state court has left a bold and brazen trail to be followed, as if to dare this court to speak truth to power.

My Mother may mean nothing to You but My Mother means Everything to Me.

There is no legal rational for the appellate opinion.

In the interest of justice, humanity, and human dignity the Appellant requests that now, more rational heads, hearts and souls prevail.

Respectfully,

JERRY L. DIER, Interested Person
11448 Rowley Rd.
Clarksville, Md 21029
(202) 276-8716

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foreging Motion has been served upon Gina Shaffer, at 207 Fulford Avenue,  Bel Air, MD 21014, this 25th day of October, 2007, U.S. Mail, postage prepaid.

JERRY L. DIER

267

Page 1

IN THE CIRCUIT COURT FOR HOWARD COUNTY, MARYLAND

IN THE MATTER OF

DOROTHY DIER,



FOR THE GUARDIANSHIP

OF THE PERSON

CASE NO. 13-C-05-63324

_____/

REPORTER'S OFFICIAL TRANSCRIPT OF PROCEEDINGS

Ellicott City, Maryland

Tuesday, March 7, 2006

BEFORE:

THE HONORABLE DENNIS M. SWEENEY, JUDGE

For the Petitioner:

BEVERLY I. HEYDON, ESQ.

For the Respondent:

ANTHONY E. DOYLE, JR., ESQ.

For the Interested Person:

JERRY L. DIER, ESQ., Representing Himself

Mary S. Rogers,
Frank Quinn
Official Court Reporters
Christine E. Rebbert
Court Reporter/Typist
Court House
Ellicott City, Maryland 21043

Page 75

MR. DIER: I don't have any further questions.   Thank you.

THE COURT: Okay; fine.   Thank you.   If that's all the questions for Dr. DeJonge...?

MS. HEYDON: Yes.

THE COURT: Okay.   All right, Doctor; thank you very much.   I appreciate your coming up and providing the testimony; I think it will be helpful in our decision-making here.   Thank you.

A.    I'm excused?

THE COURT: Yes, you're excused, and thank you, Doctor.

            (THE WITNESS WAS THEN EXCUSED)

THE   COURT:   All   right;   the--do   you   have   another physician?

MS. HEYDON: Yes; Dr. Bernhard.

THE COURT: And what is Dr. Bernhard's involvement?

MS.   HEYDON:   He's   a   wound   care   specialist   that's currently treating her.

THE COURT: All right; let's try to get him on before we take a luncheon break.

MS. HEYDON: Okay.

THE COURT: And so we don't hold him up, too.   Mr. Doyle, are you all right there?   I know you just got back--

MR. DOYLE: Yes, sir.

THE COURT:   --From vacation.   Okay; you're looking...

Page 76

MR. DOYLE: Trying to get used to the low altitude here.

THE COURT: Oh, I see; being back at work, huh?

DR. LARRY BERNHARD

witness produced on call of the Petitioner, having first been duly sworn, was examined and testified as follows:

THE CLERK: Please be seated.    State your name and address for the record, please.

THE WITNESS: Larry Bernhardt, B-E-R-N-H-A-R-D; 446 Colonial Ridge Lane, Arnold, A-R-N-O-L-D, Maryland 21012.

THE COURT: All right; go ahead, counsel.

DIRECT EXAMINATION

MS. HEYDON:

Q.   Dr. Bernhard, what's your educational background?

A.   Undergraduate, University of Maryland; a medical degree Temple; and training at--post-graduate Henry Ford Hospital.

Q.   In what year did you graduate with a medical degree?

A.   1981.

Q.   Where did you do your residency?

A.   Henry Ford Hospital in Detroit, Maryland--I mean, Detroit, Michigan.

Q.   And what type of residency program did you complete?

A.   Orthopedics with a specialty in foot, ankle, and lower surgery.

Q.   Okay.  Are you currently Board-certified?

65465

*

and the

erested

ecision

of the

t some

tter.

select

eneral

y was

The

r she

was

.

Mr.

r in

and

Jerry L. Dier

       **Appellant**

   vs.

**Summit Park Health and
Rehabilitation Center et al.**

       **Appellees**

\* In the

\*

\* **COURT OF SPECIAL APPEALS**

\*

\* No. 1595

\*

\* September Term, 2006

\*

\*

## ORDER

Upon consideration of Appellant's Request for Reconsideration of the unreported opinion filed on October 19, 2007 in the captioned appeal, it is this 30th day of November, 2007, by the Court of Special Appeals,

ORDERED that the Request for Reconsideration is denied.

For a Panel of the Court

CHIEF JUDGE'S SIGNATURE
APPEARS ON ORIGINAL ORDER

_____

**CHIEF JUDGE**

surveys.

**COMMENT:-** What will happen to the patients previously served by all these therapists?

## Atlanta nursing home chain to cut 7,300 jobs
The Atlanta Journal and Constitution May 18, 1999

Atlanta-based Mariner Post-Acute Network, citing deep Medicare reimbursement cuts, announced Monday that it was laying off about 7,300 employees --- nearly 300 in Georgia --- because it is closing its rehabilitation business and restructuring.

## Woman charged with disorderly conduct after nursing home incidents
## She is accused of interfering with staff members who were caring for her mother
Milwaukee Journal Sentinel June 2, 1999

A New Berlin woman recently sued by the city for allegedly harboring a vicious dog was charged Tuesday with disorderly conduct in connection with several disturbances at a Brookfield nursing home.

Betty J. Demshar, 62, insisted in court Tuesday that she was merely trying to protect her 98-year-old mother, who she alleged was being mistreated at Woodland Health Center, 18740 W. Blue Mound Road.

"Those people are not treating her right," said Demshar, who said she wanted to remove her mother from the nursing home.

---------------------------------------

Woodland Health Center was sued in March in connection with the death of an 86-year-old resident who allegedly was burned by hot coffee and received negligent care. Also, Woodland was recently cited for 21 federal violations after inspectors allegedly found residents with dirty hair and clothing and others calling out for food after waiting for meals.

**COMMENT:-** The next report is mainly about Manor Care but Mariners similar problems are reported

## REPORT CITES MANORCARE FOR HEALTH-CARE VIOLATIONS; MADISON NURSING HOME FACES DEADLINE TO FIX PROBLEMS
Wisconsin State Journal June 11, 1999

Sunny Hill Health Care Center, 4325 Nakoma Road, is also working toward fixing a smaller number of violations from a state visit this year, said Tschumper.

She said a number of problems at Sunny Hill had been identified in a lengthy report last year, and those problems had been fixed. A much smaller number of violations were found in a recent state visit, she said.

---------------------------------------

Sunny Hill is owned by **Mariner Post Acute Network** in Atlanta.

## Catonsville Home Shows Potential for Peril

The Washington Post June 19, 1999

If the records of a Mariner nursing home in Catonsville, Md., told an accurate story, the treatment of a 73-year-old woman connected to a feeding tube on Jan. 9 would have been a model of conscientious care.

The nursing staff administered seven medications at 9 a.m., and another five medications at 5 p.m., the records showed. The staff noted that the patient's feeding tube was checked four times, her feeding pump was run continuously during the day and evening shifts, and she was given 'water flushes' to clear the feeding tube every four hours.

But the home wasn't as thorough as it seemed.

Before any of that care was supposedly provided, inspectors found, the patient "had expired and her body had been removed from the facility."

Citing persistent deficiencies in patient care, regulators recently dropped the Mariner Health of Catonsville nursing home from Medicare and Medicaid, the government insurance programs for the elderly, poor and disabled.
--------------------------------------
Either way, Mariner Health of Catonsville provides a warning of what can go wrong in facilities entrusted with the care of sick, elderly, vulnerable people -- and the warning has taken on new urgency, because much of the nation's nursing home business is in financial distress.

Mariner Post-Acute Network Inc., the corporate parent of the Catonsville home -- lost $ 117.8 million on revenue of $ 1.3 billion during the six-month period that ended March 31, and its stock closed at 62 1/2 cents yesterday, down from a 52-week high of $ 17.12 1/2 last July. - - - - - , may not have enough money "to sustain operations" and pay its debts as they come due, the company said in its latest quarterly report to the Securities and Exchange Commission. Last week, the company's chief executive resigned.
--------------------------------------
The nursing home was threatened with disqualification from Medicare and Medicaid in November but failed follow-up inspections in January and April, prompting its termination and fines totaling $ 216,000.

## State recommends fining nursing home Northwest Health Care issued 16 citations, some linked to suffocation

Milwaukee Journal Sentinel September 24, 1999

A Milwaukee nursing home in which a 74-year-old confused resident suffocated after getting trapped in a side rail while trying to get out of bed has been cited for substandard care and recommended for more than $60,000 in fines.

The state Bureau of Quality Assurance issued 12 federal citations, one state Class A citation and three state Class B citations to Northwest Health Care Center, 7800 W. Fond du Lac Ave.

The recommended fines, which must be approved by the federal Health Care Financing Administration, have reached $61,000 to date and are accruing at the rate of $500 a day until state inspectors find the facility in substantial compliance.



# MemberoftheFamily.net

## Get the nursing home care your loved one deserves.

---

## MARYLAND NURSING HOME INFORMATION & REGISTRY

### NURSING HOME ANNUAL SURVEY RATING SYSTEM

| COLOR CODE | DEFINITION |
|---|---|
| Red<br>Yellow | Actual Harm and/or Immediate Jeopardy: Score = G,H,I,J,K,L |
| Blue | Potential for More than Minimal Harm: Score = D,E,F |
| Green | Potential for Minimal Harm: Score = A,B,C |
| | No Violations Reported |
| **REPEAT VIOLATIONS** | Same violation on two or more of the survey dates listed |

All results based on raw annual and complaint survey data obtained from CMS (HCFA) as of 06/15/07

**NOTE: Federal Regulations do not require State inspectors or the nursing home to notify patients and their families that a particular patient's care has been the subject of a survey violation. Even a finding of substandard care or actual harm does not require notification. Ask the nursing home administrator and your attending physician as to their policy regarding notification. In some cases you may need the assistance of your family attorney. Informed consent regarding continued care at a given facility is not possible without knowing the truth. More recent reports/corrections/complaint surveys may be available. Ask the nursing home administrator.**

Home Page     National Watch List     Contact Us     U.S. Nursing Home Registry

| ALICE BYRD TAWES NURSING HOME<br>Click For Quality Trends & Staffing | DATE:<br>ANNUAL<br>SURVEYS | 02/06/04 | 04/28/05 | 04/21/06 |
|---|---|---|---|---|
| CRISFIELD (COUNTY: Somerset) | RATING | | | |
| TOTAL CONFIRMED VIOLATIONS BY SURVEY DATE | | 2 | 3 | 3 |
| STATE AVERAGE VIOLATIONS BY SURVEY DATE | | 9 | 9 | 10 |

11/24/2007 10:41 AM


**COMPLAINTS: 2 VIOLATIONs SUBSTANTIATED:Click here. Use Back Button to Return to this Page**

| **SUBACUTE CARE CTR SOUTHERN MD** Click For Quality Trends & Staffing | DATE: ANNUAL SURVEYS | 09/10/04 | 09/09/05 | 10/03/06 |
|---|---|---|---|---|
| **CLINTON (COUNTY: Prince Georges)** | RATING | | | |
| **TOTAL CONFIRMED VIOLATIONS BY SURVEY DATE** | . | 5 | 2 | 3 |
| **STATE AVERAGE VIOLATIONS BY SURVEY DATE** | . | 9 | 9 | 10 |
| COMPLAINT INSPECTIONS: NONE ON FILE | | | | |

| **SUMMIT PARK HEALTH AND REHABILITATION** Click For Quality Trends & Staffing | DATE: ANNUAL SURVEYS | 11/20/03 | 01/18/05 | 12/19/05 |
|---|---|---|---|---|
| **CATONSVILLE (COUNTY: Baltimore)** | RATING | | | |
| **TOTAL CONFIRMED VIOLATIONS BY SURVEY DATE** | . | 12 | 11 | 14 |
| **STATE AVERAGE VIOLATIONS BY SURVEY DATE** | . | 9 | 9 | 10 |
| REPEAT VIOLATIONS: Give each resident care and services to get or keep the highest quality of life possible. Have drugs and other similar products available, which are needed every day and in emergencies, and give them out properly. Immediately tell the resident, doctor, and a family member if: the resident is injured, there is a major change in resident's physical/mental health, there is a need to alter treatment significantly, or the resident must be transferred or discharged. Keep accurate and appropriate medical records. Make sure each resident is being watched and has assistance devices when needed, to prevent accidents. Make sure that each resident who enters the nursing home without a catheter is not given a catheter, unless it is necessary. Make sure that the nursing home area is safe, easy to use, clean and comfortable. Provide services to meet the needs and preferences of each resident. Store, cook, and give out food in a safe and clean way.SUMMIT PARK HEALTH AND REHABILITATION is on the National Watch List: click here to find out why | | | | |
| COMPLAINTS: 24 VIOLATIONs SUBSTANTIATED:Click here. Use Back Button to Return to this Page | | | | |

| **SUNBRIDGE CARE & REHA FOR ELKT** Click For Quality Trends & Staffing | DATE: ANNUAL SURVEYS | 07/07/04 | 08/05/05 | 08/10/06 |
|---|---|---|---|---|
| **ELKTON (COUNTY: Cecil)** | RATING | | | |

National Nursing Home Watch List from beroftheFamily.net    Case 1:08-cv-00002-RMC    Document 1-5    Filed 01/02/2008    Page 25 of 38

http://www.memberofthefamily.net/usmap.h

# MemberoftheFamily.net
## Get the nursing home care your loved one deserves.

Home|Nursing Home Registry | Watch List | Danger Zone | Veterans | Quality
Indicators | Media|History

# National Nursing Home Watch List

**Nursing homes with recent survey violations or substantiated complaints for "actual harm" or immediate jeopardy." Click on a state to see homes cited for these problems.**



3

National Nursing Home Watch List from memberoftheFamily.net

http://www.memberofthefamily.net/usmap.h

## Definitions

The Centers for Medicare/Medicaid Services (CMS) has defined the following terms in its Survey Protocol for Long Term Care Facilities which is based on 42 CFR Part 483:

**Guidance on Severity Levels.** There are four severity levels. Level 1, no actual harm with potential for minimal harm; Level 2, no actual harm with potential for more than minimal harm that is not immediate jeopardy; Level 3, actual harm that is not immediate jeopardy; Level 4, immediate jeopardy to resident health or safety. These four levels are defined accordingly:

1. **Level 1** is a deficiency that has the potential for causing no more than a minor negative impact on the resident(s).

2. **Level 2** is noncompliance that results in minimal physical, mental and/or psychosocial discomfort to the resident and/or has the potential (not yet realized) to compromise the resident's ability to maintain and/or reach his/her highest practicable physical, mental and/or psychosocial well-being as defined by an accurate and comprehensive resident assessment, plan of care, and provision of services.

3. **Level 3** is noncompliance that results in a negative outcome that has compromised the resident's ability to maintain and/or reach his/her highest practicable physical, mental and psychosocial well-being as defined by an accurate and comprehensive resident assessment, plan of care, and provision of services. This does not include a deficient practice that only has limited consequence for the resident and would be included in level 2 or in level 1.

4. **Level 4** is immediate jeopardy, a situation in which immediate corrective action is necessary because the facility's noncompliance with one or more requirements of participation has caused, or is likely to cause, serious injury, harm, impairment, or death to a resident receiving care in a facility.

### Lists and Advice
Registry of U.S. Nursing Homes
Nursing Home Honor Roll
State Ombudsmen List
Alphabetical List of U.S. Nursing Homes

## Read Our New Book





As seen on NBC's Today Show

"Danger Zone will provide you with a plan and the tools to get the right care at the right time."
—Edward C. Watters III, M.D.,
coauthor of *Danger Zone*

### Danger Zone
**Unlock the Secrets of Nursing Home Medical Records and Protect Your Loved One**

With advice from a recognized expert and line-by-line translations of actual medical charts and reports, our new book, *Danger Zone*, will help you become a better advocate for your family member.

Here's what readers are saying about *Danger Zone*:

"Every person with a common interest of protecting a loved one in a nursing home situation needs this book! . . . It is a must have book!" —Reader review, Barnes & Noble.com

"Absolutely fabulous and should hereafter be referred to as the bible for families of nursing home residents." —Bob Bronaugh, Manor Care Chevy Chase (Maryland) Family Council

"There is no other book like it .... A must read for families, attorneys and even nursing home inspectors." —Violette King, Nursing Home Monitors (Illinois)

### Read More about Danger Zone
### Purchase Danger Zone

### Subscription Pages
VHA / VISN Information

### Forms
HIPAA Complaint Form
Maryland Deficiency Form

3

**About MemberoftheFamily.net**
History
Media Inquiries
Contact Us

MemberoftheFamily.net

Home|Nursing Home Registry |Watch List |Danger Zone I Veterans I Quality Indicators I Media I History
I Contact Us I Privacy
© 2004 Member of the Family LLC

SUMMIT PARK HEALTH AND REHABILITATION : Actual Har...

http://www.memberofthefamily.net/watch/215326.1

# MemberoftheFamily.net

## Get the nursing home care your loved one deserves.

**Home** | **Nursing Home Registry** | **Watch List** | **Danger Zone** | **Veterans** | **Quality Indicators** | **Media** | **History**

# NATIONAL NURSING HOME WATCH LIST

> **SUMMIT PARK HEALTH AND REHABILITATION: Actual Harm and/or Immediate Jeopardy**

**1502 FREDERICK ROAD**

**CATONSVILLE MD**

**TELEPHONE: 4107473287**

**TYPE OF OWNERSHIP: For profit - Corporation**

**NUMBER OF BEDS / PERCENT OCCUPIED: 143 / 92**

♀

Based on the annual and complaint survey data reported by CMS as of 06/15/07 , this home is listed because at least one area they caused actual harm to a patient and/or subjected the patients to immediate jeopardy. Mc recent reports/corrections may be available. Check with the nursing home administrator. Actual harm is indicated by a score of G, H, I, while J, K, L indicate immediate jeopardy. The color coding scheme is below:



'Danger Zone provides you with the plan and the tools to get the right care at the right time.'

Edward C. Watters III, M.D.

| RATING | DEFINITION |
|---|---|
| ■ | actual harm and/or immediate jeopardy: score= G,H,I,J,K,L |

Red



Yellow
Blue

| | potential for more than minimal harm: score= D, E, F |
| | potential for minimal harm: score= A, B, C |

## COMPLAINT SURVEY RESULTS: SUBSTANTIATED

| DATE | RATING | COMPLAINT VIOLATION CONFIRMED | SCOPE/SEVERITY CODE |
|------|--------|-------------------------------|---------------------|
| 09/14/2004 | | Make sure that the nursing home area is free of dangers that cause accidents. | D |
| 03/02/2005 | | Let the resident refuse treatment or refuse to take part in an experiment. | D |
| 03/02/2005 | | Keep accurate and appropriate medical records. | B |
| 03/10/2005 | | Give residents proper treatment to prevent new bed (pressure) sores or heal existing bed sores. | D |
| 03/10/2005 | | Make sure each resident is being watched and has assistance devices when needed, to prevent accidents. | D |
| 03/10/2005 | | Make sure that residents are well nourished. | D |
| 12/19/2005 | | Have a program to keep infection from spreading. | E |
| 03/08/2006 | | Provide needed housekeeping and maintenance. | E |
| 03/08/2006 | | Give professional services that meet a professional standard of quality. | G |
| 03/08/2006 | | Give residents proper treatment to prevent new bed (pressure) sores or heal existing bed sores. | E |

| | Date | | Description | | Code |
|---|---|---|---|---|---|
| | 03/08/2006 | | Make sure that residents are safe from serious medication errors. | | E |
| | 03/08/2006 | | Keep a resident apart from the others if the resident has an infection that can spread. | | E |
| | 04/25/2006 | | Let the appropriate people see and talk to each resident. | | B |
| | 05/23/2006 | | Let the resident refuse treatment or refuse to take part in an experiment. | | D |
| | 05/23/2006 | | Keep each resident free from drugs that restrain them, unless needed for medical treatment. | | D |
| | 05/23/2006 | | Provide social services for related medical problems to help each resident achieve the highest possible quality of life. | | D |
| | 08/31/2006 | | Make sure each resident is being watched and has assistance devices when needed, to prevent accidents. | | D |
| | 10/04/2006 | | 1) Hire only people who have no legal history of abusing, neglecting or mistreating residents; or 2) report and investigate any acts or reports of abuse, neglect or mistreatment of residents. | | D |
| | 10/04/2006 | | Give each resident care and services to get or keep the highest quality of life possible. | | D |
| | 02/02/2007 | | Give professional services that meet a professional standard of quality. | | E |
| | 02/02/2007 | | Make sure that each residents' abilities to take care of themselves does not lessen, unless a change cannot be avoided. | | D |
| | 02/02/2007 | | Prevent a loss in range of motion among residents who entered the nursing home with a full range of motion. | | E |

11/21/2007 11:...

| 02/02/2007 | | Have a program to keep infection from spreading. | D |
|---|---|---|---|
| 02/02/2007 | | Make sure that a working call system is available in each resident's room or bathroom and bathing area. | D |

**National Watch List: Select a State**   **Home Page**   **U.S. Nursing Home Registry: State Listings**   **Contact Us**   **Quality Indicators/Staffing**

## Lists and Advice

Alphabetical List of U.S. Nursing Homes
National Watch List
Nursing Home Honor Roll
State Ombudsmen List

**Subscription Pages**
VHA / VISN Information

**Forms**
HIPAA Complaint Form
Maryland Deficiency Form

## About MemberoftheFamily.net

History
Media Inquiries
Contact Us

## Read Our New Book



**TODAY**
As seen on NBC's
Today Show

'Danger Zone will
provide you with a plan
and the tools to get the
right care at the right
time.'
—Edward C. Watters III,
M.D.,
coauthor of *Danger Zone*

**Danger Zone**
**Unlock the Secrets of Nursing Home**
**Medical Records and Protect Your Loved**
**One**

**Read More about Danger Zone**
**Purchase Danger Zone**

MemberoftheFamily.net

**Home** I **Nursing Home Registry** I **Watch List** I **Danger Zone** I **Veterans** I **Quality Indicators** I **Media** I **History** I **Contact Us** I **Privacy**
© 2005 Member of the Family LLC

# MemberoftheFamily.net

## Get the nursing home care your loved one deserves.

## MARYLAND NURSING HOME WATCH LIST

### NURSING HOMES CITED FOR ACTUAL HARM / IMMEDIATE JEOPARDY

**BY CENTERS FOR MEDICARE & MEDICAID SERVICES: ANNUAL AND COMPLAINT SURVEY DATA**

All results based on data obtained from CMS 06/15/07. More recent reports and corrections may be available. Ask the nursing home administrator.

| WARNING | REASON |
|---------|--------|
| ▣ ▣ ▣ | ACTUAL HARM / IMMEDIATE JEOPARDY NOTED ON 3 OR MORE SURVEYS |
| ▣ ▣ | ACTUAL HARM / IMMEDIATE JEOPARDY NOTED ON 2 SURVEYS |
| ▣ | ACTUAL HARM / IMMEDIATE JEOPARDY NOTED ON 1 SURVEY |

| WARNING | FACILITY | CITY | ADDRESS |
|---------|----------|------|---------|
| ▣ | ARCOLA HEALTH AND REHABILITATION CENTE | SILVER SPRING | 901 ARCOLA AVENUE |
| ▣ | BRIGHTWOOD CENTER | LUTHERVILLE | 515 BRIGHTFIELD ROAD |
| ▣ ▣ | CALVERT COUNTY NURSING CTR. | PRINCE FREDERICK | 85 HOSPITAL ROAD |
| ▣ | CARRIAGE HILL BETHESDA | BETHESDA | 5215 CEDAR LANE |
| ▣ | CARROLL LUTHERAN VILLAGE | WESTMINSTER | 200 ST. LUKE'S CIRCLE |
| ▣ | CHERRY LANE | LAUREL | 9001 CHERRY LANE |
| ▣ ▣ | CHESAPEAKE WOODS CENTER | CAMBRIDGE | 525 GLENBURN AVENUE |

| | | | | |
|---|---|---|---|---|
| ■ ■ | | CHESTERTOWN NURSING & REHAB CT | CHESTERTOWN | 415 MORGNEC ROAD |
| ■ ■ | | CORSICA HILLS CENTER | CENTREVILLE | 205 ARMSTRONG AVENUE P.O. BOX 50 |
| ■ | | DEVLIN MANOR NURSING HOME | CUMBERLAND | 10301 NORTH EAST CHRISTIE ROAD |
| ■ | | EASTPOINT REHAB. & NURSING HOME | BALTIMORE | 1046 OLD NORTHPOINT ROAD |
| ■ | | FAIRFIELD NURSING CENTER | CROWNSVILLE | 1454 FAIRFIELD LOOP ROAD |
| ■ | | FAIRLAND NURSING AND REHABILITATION CE | SILVER SPRING | 2101 FAIRLAND ROAD |
| ■ | | FAYETTE HEALTH AND REHABILITATION CENT | BALTIMORE | 1217 W. FAYETTE STREET |
| ■ | | FROSTBURG VILLAGE | FROSTBURG | ONE KAYLOR CIRCLE RT36 & RT40 |
| ■ ■ | | FUTURE CARE PINEVIEW | CLINTON | 9106 PINEVIEW LANE |
| ■ | | FUTURE CARE SANDTOWN-WINCHESTER | BALTIMORE | 1000 N. GILMORE STREET |
| ■ | | GREATER LAUREL HEALTH AND REHABILITATI | LAUREL | 14200 LAUREL PARK DRIVE |
| ■ | | HAMILTON CENTER | BALTIMORE | 6040 HARFORD ROAD |
| ■ ■ | | HARBORSIDE HEALTHCARE HARFORD | BALTIMORE | 4700 HARFORD ROAD |
| ■ | | HAVEN NURSING HOME | BALTIMORE | 3939 PENHURST AVENUE |
| ■ ■ | | HEARTLAND HEALTH CARE HYATTSVILLE | HYATTSVILLE | 6500 RIGGS ROAD |
| ■ ■ | | HERITAGE HARBOUR HEALTH AND REHABILITA | ANNAPOLIS | 2700 SOUTH HAVEN ROAD |
| ■ | | HOMEWOOD AT CRUMLAND FARMS | FREDERICK | 7407 WILLOW ROAD |
| ■ | | JULIA MANOR HEALTH CARE CENTER | HAGERSTOWN | 333 MILL STREET |
| ■ ■ ■ | | LAPLATA CENTER | LAPLATA | 1 MAGNOLIA DRIVE |
| ■ | | LAURELWOOD CARE CTR AT ELKTON | ELKTON | 100 LAUREL DRIVE |
| ■ | | LOCH RAVEN CENTER | BALTIMORE | 8720 EMGE ROAD |
| ■ | | LOCHEARN NURSING HOME, LLC | BALTIMORE | 4800 SETON DRIVE |

| | | | |
|---|---|---|---|
| ▣ | LORIEN HEALTH SYSTEMS - RIVERSIDE | BELCAMP | 1123 BELCAMP RD |
| ▣ | MALLARD BAY CARE CTR CAMBRIDGE | CAMBRIDGE | 520 GLENBURN AVENUE |
| ▣ | MANOR CARE BETHESDA | BETHESDA | 6530 DEMOCRACY BOULEVARD |
| ▣ | MANOR CARE HEALTH SERV WHEATON | WHEATON | 11901 GEORGIA AVENUE |
| ▣ | MANOR CARE HEALTH SERV. TOWSON | TOWSON | 509 EAST JOPPA ROAD |
| ▣ | MARLEY NECK HEALTH AND REHABILITATION | GLEN BURNIE | 7575 E. HOWARD ROAD |
| ▣ | MILFORD MANOR NURSING HOME | BALTIMORE | 4204 OLD MILFORD MILL ROAD |
| ▣ ▣ | NMS HEALTHCARE OF HAGERSTOWN, LLC | HAGERSTOWN | 14014 MARSH PIKE |
| ▣ | NORTHAMPTON MANOR | FREDERICK | 200 EAST 16TH STREET |
| ▣ | RAVENWOOD NSG. & REHAB. CTR. | BALTIMORE | 501 W. FRANKLIN STREET |
| ▣ | SPA CREEK CENTER | ANNAPOLIS | 35 MILKSHAKE LANE |
| ▣ | ST. MARY'S NURSING CENTER INC | LEONARDTOWN | 21585 PEABODY STREET |
| ▣ | STELLA MARIS, INC. | TIMONIUM | 2300 DULANEY VALLEY RD |
| ▣ | SUMMIT PARK HEALTH AND REHABILITATION | CATONSVILLE | 1502 FREDERICK ROAD |
| ▣ | THE WESLEY HOME, INC. | BALTIMORE | 2211 W ROGERS AVENUE |
| ▣ | WESTERN MARYLAND HEALTH SYSTEM EXTENDE | CUMBERLAND | 900 SETON DRIVE |

**National Watch List: Select a State**    **Home Page**    **U.S. Nursing Home Registry: State Listings**    **Contact Us**    **Quality Indicators/Staffing**

## Lists and Advice

Alphabetical List of U.S. Nursing Homes
National Watch List
Nursing Home Honor Roll
State Ombudsmen List

**Read Our New Book**





As seen on NBC's

**Subscription Pages**
VHA / VISN Information

**Forms**
HIPAA Complaint Form
Maryland Deficiency Form

Today Show

'Danger Zone will provide you with a plan and the tools to get the right care at the right time.'
—Edward C. Watters III, M.D.,
coauthor of *Danger Zone*

## About MemberoftheFamily.net

History
Media Inquiries
Contact Us

**Danger Zone**
**Unlock the Secrets of Nursing Home Medical Records and Protect Your Loved One**

**Read More about Danger Zone**
**Purchase Danger Zone**

### MemberoftheFamily.net

**Home** I **Nursing Home Registry** I **Watch List** I **Danger Zone** I **Veterans** I **Quality Indicators** I **Media** I **History** I **Contact Us** I **Privacy**
© 2005 Member of the Family LLC

1    IN THE CIRCUIT COURT FOR HOWARD COUNTY,

2                    MARYLAND

3    IN THE MATTER OF:

4    DOROTHY DIER,              Civil Docket

5          Respondent.         Case No. 13-C-05-063324

6    - - - - - - - - - - /

7         OFFICIAL TRANSCRIPT OF PROCEEDINGS

8    (Motion to Request to Withhold and Withdraw Treatment)

9              VOLUME I OF I

10                        Ellicott City, Maryland

11   **ORIGINAL**         Wednesday, October 3, 2007

12

13   BEFORE:

14        THE HONORABLE DENNIS M. SWEENEY, JUDGE

15   APPEARANCES:

16        For the Petitioner:

17             BEVERLY HAYDON, ESQUIRE

18        For the Respondent:

19             (Attorney of record not present)

20   Transcribed from electronic recording by:

21     Clarence E. Williamson

22     Official Court Reporter

23     8360 Court Avenue

24     Ellicott City, Maryland 21043

25     410.313.2293

1          T A B L E   O F   C O N T E N T S
2
3                                                              Page
4     Petitioner States Motion                                  6
5
6     Discussion of Proposed Order                              9
7
8     Court's Decision
9                                                              35
10    Court Reporter's Transcription Certification             38
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

i

```
1                    P R O C E E D I N G S

2       THE CLERK:  All rise.

3       THE COURT:  Please be seated

4       THE CLERK:  For the record, Your Honor, calling case

5  13-C-05-063324, In the Matter of Dorothy Dier.

6       THE COURT:  Okay.

7       MR. DIER:  Good afternoon, Your Honor, Jerry Dier.

8  If the Court please, Your Honor, which side should I sit on?

9       THE COURT:  It doesn't make any, that's, that side's

10 fine.

11      MR. DIER:  Is that okay, Your Honor --

12      MS. HAYDON:  Good morning, Your Honor.  Beverly

13 Haydon on behalf of the Howard County Office on Aging.  Peggy

14 Rightnour is the agency's representative.

15      THE COURT:  Okay.

16      MR. DIER:  If I could just get my papers, Your

17 Honor?

18      THE COURT:  Sure.

19      MR. DIER:  I apologize to the Court.

20      THE COURT:  That's all right.

21      MS. HAYDON:  Also present, Your Honor, is Michelle

22 Lyons.

23      THE COURT:  Okay.

24      MR. DIER:  I ask for a rule on witnesses, Your

25 Honor, before we begin, if there are any.  Michele Lyons is, I
```

1    believe, an interested person so she would not --

2          THE COURT:  Yes.  All right.  Is there a, besides

3    the designated agency represented, is there anybody in the

4    courtroom that's going to be a witness in the case?

5          MS. HAYDON:  No, Your Honor.  The only witness is

6    Doctor Tansinda, and he stepped out.

7          THE COURT:  Okay.  Good.  Well, we'll have a rule on

8    witnesses here --

9          MR. DIER:  Thank you, Your Honor.  I also would like

10   to inquire, if the Court please, as to whether or not an

11   attorney has been appointed for Dorothy Dier in this matter.

12   I don't see anyone here on behalf of Dorothy Dier, other than

13   myself, and I'm here just as an interested person, --

14         THE COURT:  Right.

15         MR. DIER:  Not as her counsel.

16         THE COURT:  Well, I think the, I mean, we did have

17   an attorney appointed, Mr. Doyle, and he's not here, and I

18   think, you know he actually asked about whether he should be

19   here, and I told him I didn't think it was necessary because

20   his, because we now have a guardian appointed.  And, I don't

21   think it's required that there be a, appointment of somebody.

22   Let me, well let's figure out first of all what we're here on

23   here today.  If we could have the doctor, if you could step

24   outside until we call you in, okay?  Thank you.  I appreciate

25   it.

1    MR. DIER:  Your Honor, if I could just point out,
2  advise the Court that I filed a notice of appeal this morning,
3  and I tendered it to your courtroom clerk.
4    THE COURT:  Okay.  That's fine.  Good.  Yes, that's
5  fine.  The appeal in what, the, a Judge Leasure's order?
6    MR. DIER:  Exactly, Your Honor - under denial of my
7  request to a move to a county other than Howard County, under
8  twelve three o'one, and there is case law here, and I tendered
9  to Miss Haydon, and I'll give the book because --
10    THE COURT:  Well, okay.  I think it's, the order's
11 been denied, hadn't it?
12    MR. DIER:  No, no.  I'm not.  Yes.  My request to a
13 move --
14    THE COURT:  Has now been appealed, right? --
15    MR. DIER:  Was denied, and it's appealed under the
16 authority of Griffin versus Lesley, twenty Maryland fifteen
17 eighteen sixty-three.  That's what I was going to show the
18 Court, the annotation.  I haven't had a chance to see the
19 case.  Can I tender this to the Court?
20    THE COURT:  Okay.
21    MR. DIER:  It's the first one, Your Honor.
22    THE COURT:  Okay.  Here it is.
23    MR. DIER:  (Four words unintelligible) This is a
24 usual matter, and it's an old case that I haven't been able to
25 read, but I can clearly read the annotation.  And, the

1  annotation makes it clearly applicable in this case, right on
2  point.--

3      THE COURT:  Which one are you talking about?

4      MR. DIER:  Griffin versus Leslie, an order
5  overruling an application for removal of a cause from one
6  county to another for trial does finally settle a
7  constitutional right. --

8      THE COURT:  Okay. --

9      MR. DIER:  Griffin versus Leslie.

10     THE COURT:  Well, still, but that's up on appeal
11  now, right?

12     MR. DIER:  Yes. That's up on appeal, and due to the
13  fact that it's up on appeal, I would ask that all proceedings
14  in this matter be stayed under the Supreme Court authority of
15  Crusin as well as Mack versus Mack.  I'm sure the Court is
16  aware of both cases and they both stand, if they stand for
17  anything, they stand for this.  When there is an individual at
18  risk, you must afford them the most protection that the law
19  can in fact allow, and that's why in the Crusin case, back in
20  the late eighties, early nineteen nineties, the Supreme Court
21  moved from the preponderance of evidence standard to the clear
22  and convincing standard in these types of matters in order to
23  afford the individuals that greater degree of protection, and
24  that is also noted in Mack, which is the seminal case in this
25  jurisdiction on the type of matter that is here before the

1  Court.  And, the reasoning behind that is that if there is an

2  error in this type of case - it's different than an ordinary

3  civil case - if there's an error in this type of case and life

4  sustaining procedure and or procedures are in fact removed,

5  the error is fatal.  You can't go back and correct it like you

6  can in an ordinary civil case.

7        Now, what I'm respectfully asking the Court, due to

8  the matters that have in fact been raised, and the Court is

9  well aware of them, due to the fact that I have in fact filed

10  an appeal on behalf of my mother as regards to guardian of the

11  property action that was heard before this court on September

12  twenty-second --

13        THE COURT:  Is there still an appeal pending?

14        MR. DIER:  Yes, that's still pending.  I checked

15  yesterday, and that issue was for the recusal of this court in

16  that matter as well as other matters.

17        THE COURT:  Where's it pending?

18        MR. DIER:  It's pending in the Court of Special

19  Appeals.  I called yesterday to check on the status.

20        THE COURT:  Has it been argued?

21        MR. DIER:  No.  It was not set down for argument.

22        THE COURT:  Um hmm.

23        MR. DIER:  Papers were filed and submitted in, I

24  believe, June was the last filing of papers so it's been there

25  for a number of months.  It may have been there even longer.

1    THE COURT:  Are you all involved in that case?

2    MS. HAYDON:  No, Your Honor.

3    MR. DIER:  No, Your Honor.  That was, and I

4 apologize for interrupting, Your Honor.  That was Summit Park,

5 and (sounds like Jinna Schaeffer) is counsel for Summit Park.

6 So, that matter's still pending and that is really part and

7 parcel of the matter that is presently before the Court, and

8 here we have Dorothy Dier unrepresented, not present, and to

9 go forward under these circumstances, Your Honor, would not in

10 fact be appropriate --

11    THE COURT:  Okay.  Well, I'm going to a, I mean,

12 we're, I just want to, let me find out first kind of what the

13 State or the County Office on Aging here - what is it that

14 you're seeking to do here through this motion?

15    MS. HAYDON:  Your Honor, we filed a request to

16 withhold and withdraw treatment.  We would like the Court to

17 authorize the Office on Aging to give consent for do not

18 resuscitate order, which would be put on Dorothy Dier's chart

19 so that if she did go into cardiac arrest that they would not

20 break every bone in her body trying to resuscitate her.  We

21 are not asking that the feeding tube be removed.  It's the

22 intent.  Doctor Tansinda will tell you the feeding tube can

23 stay in place, but he'd like to chose the do not resuscitate

24 order and comfort measures to keep her comfortable.

25    THE COURT:  Okay.  And this, what you're basically

1  doing is, is seeking to — does the current guardianship order,

2  I'm at a little disadvantage here because I think all of the

3  records from the court are down in the Appellate Court now so,

4  because of the appeal.  I think that's what is happening here.

5  I see it went to the Court of Special Appeals.  In time, they

6  go back in o'six?

7          MS. HAYDON:  Right.  That mandate has issued.

8          THE COURT:  Oh, that mandate issued.

9          MS. HAYDON:  Yes.  In our case that mandate you

10  affirmed.

11          MR. DIER:  Your Honor, could I enquire of the State,

12  Your Honor, as regards their order, because part and partial

13  of their order is to withhold the feeding tube. --

14          THE COURT:  Right.  That's what I, yes --

15          MR. DIER:  That's part of their order --

16          THE COURT:  Are you not, you're not asking for that

17  now?

18          MS. HAYDON:  I think Doctor Tansinda will say

19  comfort measures will include keeping the feeding tube in, and

20  so we would not need that language in the order to draft

21  another order.

22          THE COURT:  Okay.  All right.

23          MR. DIER:  So, for the record, Your Honor, it's the

24  State's position that that part and portion of the order is

25  removed?

1    THE COURT:  I think that's exactly, I think that's
2    exactly what they're saying, right?

3        MS. HAYDON:  We're not asking to remove the feeding
4    tube.

5        THE COURT:  Right.  Well, I think you were at one
6    point.

7        MS. HAYDON:  Sometimes the physicians ask that that
8    language be in there just in case they go into cardiac arrest
9    and the feeding tube comes out, they're not going to re-
10    intubate.

11        THE COURT:  Yes.  Okay.

12        MR. DIER:  And, if you also look, Your Honor, on the
13    initial part of the order, where it says ordered, it says --

14        THE COURT:  Um, here, just one second here because --

15        MR. DIER:  I'm sorry.

16        THE COURT:  I'm at in a little bit of disadvantage
17    here.

18        MR. DIER:  I apologize.

19        THE COURT:  Um, do you have a copy?

20        MR. DIER:  I have a --

21        THE COURT:  No. I mean the order that you want.

22        MS. HAYDON:  The order that we'd like signed today?

23        THE COURT:  Yes.

24        MS. HAYDON:  There was that order that was attached
25    to our request, but it was, we had --

```
1    THE COURT:  Why, I don't seem to have that.  I don't
2  seem to have that.
3    MS. HAYDON:  Oh, I do then.
4    THE COURT:  Can, do I have a copy here?  Is this the
5  order?  Oh, here.  Let me see.  Let me see what they have
6  here.  Okay.  Show it to Mr. Dier.  Make sure it's, well here --
7    MR. DIER:  I'm sure it's the same one that I have
8  that I have that they sent me.
9    THE COURT:  All right.  Here, let me just read it
10  into the record here so we're all on the same wavelength.
11  This is the order that's been proposed:
12    "Upon consideration, Howard County's Office on Aging
13  request to withhold and withdraw treatment request for D and R
14  order, the court finds by clear and convincing evidence that
15  the withholding or withdrawal of life sustaining procedures is
16  in the best interest of Dorothy Dier pursuant to Maryland code
17  annotated states in class thirteen seven one three; therefore,
18  this blank day of blank 2007 hereby order that Phyllis
19  Madachy, Administrator of the Howard County Office on Aging or
20  her designee successor, shall be and hereby is granted the
21  authority to execute (coughing) delivered to Summit Park
22  Health Center or another licensed facility:  1) a do not
23  resuscitate order, 2) a directive instruction, which include
24  do not resuscitate and do not intubate directions, and 3) any
25  other document necessary to effectuate the same."
```

1    As further ordered, the guardian person shall be
2  hereby granted the authority to consent to withholding of the
3  feeding tube."

4    But, now, that paragraph you're not asking for.  Is
5  that right?

6    MS. HAYDON:  That's correct, Your Honor.  The feed,
7  Doctor Tansinda said that the feeding tube could remain in and
8  they'll provide comfort measures to her.

9    THE COURT:  Yes.  Okay.  So that paragraph would
10  come out. --

11    MR. DIER:  And they're also asking, if the Court
12  please, Your Honor, the part regarding "…and do not intube
13  (SIC), intubate come out."

14    THE COURT:  No.  Well, are you asking --

15    MR. DIER:  Because that's the same thing. (Speaking
16  at the same time as Ms. Haydon.)

17    MS. HAYDON:  I think that would be do not re-
18  intubate, if the, um --

19    THE COURT:  Is she intubated now?

20    MS. HAYDON:  Yes.

21    THE COURT:  Oh.  Okay.  And, then it says:  "Ordered
22  that the guardian person shall be and hereby is authorized to
23  consent to hospice services."  Okay.

24    MR. DIER:  We certainly (word unintelligible)
25  contest that, Your Honor.  It also notes that initial

1  paragraph:  "Withholding or Withdrawal of Life Sustaining Procedures,"
2  and are they, is the State at this point in time --
3          THE COURT:  Wait, where are you, here?
4          MR. DIER:  I'm sorry, Your Honor.  In the first
5  paragraph:  "Upon consideration of the Howard County Office on
6  Aging request to withhold and withdraw treatment."  It should
7  be just to withhold.  There shouldn't be any withdrawal
8  because withdrawal of treatment clearly infers the withdrawal
9  of the feeding tube.  Now, I would like to note to the Court
10  that back in February or early March of this year, I
11  discovered that my mother's feeding tube was blackened, but
12  apparently the people at Summit Park hadn't noticed and due to
13  that fact, my mother was taken to Saint Agnes Hospital on two
14  or three occasions before the feeding tube, the gastric tube,
15  was in fact taken out and replaced.  So, it was no big deal.
16  It was a procedure.  Miss (sounds like Ross) was present when
17  it was done.  She waited outside with me, and the procedure
18  probably didn't take any more than five or ten minutes.  So,
19  anything that goes to the fact that the feeding tube should in
20  fact be withdrawn or if it becomes blackened or discolored or
21  not usable that it shouldn't be placed in again would be
22  clearly inappropriate.
23          THE COURT:  Okay.  Well let's, that's a good point,
24  and will take that up here.  All right.  Well, here.  Get me
25  the State's and (word unintelligible).

1    MR. DIER:  Your Honor, can I also address the

2  Court's attention to paragraph number five, if the Court

3  please?

4    THE COURT:  Paragraph-number five of what?

5    MR. DIER:  Of the pleading, of the State.

6    THE COURT:  Of the request?  Okay.

7    MR. DIER:  Yes, Your Honor, and that matter is in

8  fact addressed in the seventeen motions that I filed before

9  this court.  It says the court order entered on June seventh,

10  two thousand and seven.  So, here we have a serious matter

11  where someone's life is placed at issue and the State is

12  noting that what they are requesting is grounded, premised

13  based on a June seventh, two thousand and seven order.  There

14  is no June seventh, two thousand and seven order.  There is no

15  June order.  There is no two thousand and seven order.  The

16  order that I am aware of, the only order as regard the

17  guardian of the person action was on March the seventh, two

18  thousand and six.  When we have this type of deficiency in the

19  State's pleading, when they are asking for the draconian

20  measures and now they are withdrawing in part due to my

21  representation most likely to Doctor Tansinda before the Court

22  took the bench for the second time, as well as speaking to Ms.

23  Haydon, I believe the Court has no other duty that it can

24  perform in this case other than to dismiss in its entirety

25  this request, because it's bounded, grounded, premised base on

1  an non-existent order.  This was put in the pleadings that

2  went out on September twenty-first.  I'm not sure of what date

3  it was in fact received by the State.  The State, according to

4  my understanding because I haven't received any response, has

5  not responded to any of them, not even to this basic objection

6  noted that it's the wrong month and it's the wrong year.

7        THE COURT:  Okay.  If we could, just, we'll let you

8  make every argument you wish to make here, but let me just -

9  I'm looking at something here for a second, if I could?

10  (lengthy pause)  All right.  Hmm.  What's this, Mr. Dier?

11        MR. DIER:  Your Honor, I want to show this also to

12  Ms. Haydon.  I want it marked, but I was assuming that Ms.

13  Haydon would know about this, and certainly Ms. Rightnour must

14  know about this --

15        THE COURT:  Well, I tell you what --

16        MR. DIER:  Summit Park was placed --

17        THE COURT:  No, no, no.  I tell you what, Mr. Dier,

18  here.  Now, we're getting into the facts of this so let's hold

19  off on this for a bit, okay?

20        MR. DIER:  Okay.  Just so the record is clear, that

21  I object to any form of this proceeding taking place without

22  my mother being represented and or present.

23        THE COURT:  What about the representation issue,

24  here?  You know, I'm the one that's called Mr. Doyle (word

25  unintelligible) so what about the representation issue here?

1  What's your thoughts on that?

2  MS. HAYDON:  Your Honor, I believe that once the

3  Court appoints a guardian of the person we are charged with

4  making decisions that are Ms. Dier's best interest, and under

5  current Maryland law, you are the ultimate guardian.  You make

6  those decisions.  We act as your agent.  There is a statute

7  that terminates the individual's right to have an attorney

8  present once the proceeding for guardianship of the person

9  have ended, and those were over a long time ago.  I don't know

10  of any other statute that requires the Court to appoint an

11  attorney for someone who's under a guardianship.

12  MR. DIER:  Your Honor, I don't believe the State

13  appointed any case, in this state or any state within the

14  United States, the state system or the federal system where an

15  individual has been subjected to a do not resuscitate order

16  and or do not intubate order, and the governmental authority

17  has taken the position that that person is not to be

18  represented.  It's (word unintelligible) that they are

19  represented by the government agency and or the court.  There

20  is no such case.  There is no such standard.  It makes

21  absolutely no sense.  It goes against the whole thrust and

22  basis of the protections guaranteed under the United States

23  Constitution.

24  THE COURT:  Well, let me jump over a few things here

25  and just think about this here for a second.  Now, is it your

1 position, Mr. Dier, when you get down to the merits of it, is

2 it your position that you do want all methods used to, you

3 know, if your mother's at hmm --

4          MR. DIER:  Absolutely, beyond any question, and

5 I'm --

6          THE COURT:  I didn't finish my statement so I'm not

7 sure you are responding to the question I have in my mind, but

8 let me just for the record's clear here.  You're saying that

9 if your mother is, let's say has a cardiac arrest, you want

10 her brought back as, the crash cart, the whole nine yards to

11 resuscitate her, to bring her back, and to intubate her, if

12 necessary?

13          MR. DIER:  Absolutely!

14          THE COURT:  Well, she is, she is intubated right

15 now.

16          MR. DIER:  Yes, she is.

17          THE COURT:  Yes.  But, to continue the intubation

18 and, that's your bottom line --

19          MR. DIER:  That's the thrust, Your Honor.  I don't

20 believe the Court recalls, and there's a good reason because

21 it's been so long ago.  In the initial pleadings that I placed

22 before the Court, it noted, and Michelle Lyons was present for

23 a goodly part of this, my mother was taken to Sibley Hospital,

24 and she was severely dehydrated.  But, they were treating that

25 with intravenous fluids, and there was a Doctor (sounds like

1  Koch), I believe that's his name.  He was in the emergency
2  room, and my mother was coming back just fine.  And, he
3  indicated that she may have to stay overnight, or just a
4  little bit longer, but everything was stable for a number of
5  hours.
6        Unfortunately, and to my mother's lasting detriment,
7  Doctor Koch's hours at the hospital ended at three forty-five.
8  Doctor Fitzgerald came in, looked at my mother, looked at her
9  age, looked at her face, looked at the numbers up on the
10  telemetry board, which were stable and improving, but slowly,
11  didn't bother to look to see what Doctor Koch had written, and
12  immediately pushed and punched me in the chest!  I didn't know
13  what this gentleman was trying to do, and he said you wouldn't
14  want that done to your mother, if her heart gave out, and I
15  said my mother's strong and healthy.  Her heart's not going to
16  give out.  She wants every chance to in fact live.
17        Doctor Fitzgerald got red in the face, his neck
18  expanded to twice its size.  His eyes blew up, and my mother
19  was being given a hundred milliliters of intravenous fluid an
20  hour, and she was improving.  Doctor Koch increased it to two
21  hundred and fifty milliliters an hours, two hundred and fifty
22  milliliters an hours.  At that time, I didn't know what that
23  meant.  For the first fifteen or twenty minutes, my mother got
24  better, slowly but surely, and her numbers rose even quicker
25  than before, but then they went all the way down, and they

1  plummeted down and she was on death's door because of Doctor

2  Fitzgerald pushing and punching me in the chest and my

3  response to him. They brought in Doctor Peter Hamm, and this --

4        THE COURT:  And, how long ago was this?

5        MR. DIER:  This is in September.  This is how all of

6  this started.  This is in September, two thousand five.

7  Doctor Peter Hamm --

8        THE COURT:  Two thousand five?

9        MR. DIER:  Yes.  From intensive care--

10        THE COURT:  Right.

11        MR. DIER:  Doctor Peter Hamm was not satisfied that

12  my mother's condition now had leveled and stabled because the

13  nurse there, on her own, changed it from two hundred and fifty

14  to fifty because she wasn't going to be part of this murderous

15  action.  As to my mother, Doctor Peter Hamm changed it from

16  fifty to five hundred, fifty to five hundred; ten times.  My

17  mother's numbers went down to seventy over forty.

18        I stayed with my mother to about three o'clock that

19  evening.  I was on the phone constantly with Michelle Lyons

20  because Michelle Lyons had left at about two thirty or three,

21  before Doctor Fitzgerald came on, and she thought everything

22  was fine, just like I did.  At around two thirty or three in

23  the morning, I left and Michelle kept on saying stay there.

24  Stay there with your mother until her numbers are stable for

25  at least an hour, hour and a half.  And, I stayed there to two

1  thirty or three o'clock, and I returned early the next morning
2  until my mother's number had stabled.

3       My mother was in the intensive care unit for a
4  number of weeks there as the result of these words: "Do not
5  resuscitate," and me saying no to that request.

6       THE COURT: Okay. Well, that's helpful background.
7  Let me, just in terms of the, is there, Mrs. Dier is now
8  ninety, is that right?

9       MR. DIER: She's ninety years young.--

10      THE COURT: Yea.

11      MR. DIER: Extremely healthy, if allowed to be
12  herself.

13      THE COURT: Yea. Well, that's, I think, up to some
14  debate --

15      MR. DIER: I understand.

16      THE COURT: Is there, has there been any crisis in
17  the recent times that, sometimes these do not resuscitate
18  orders come about because there's been something that has, you
19  know, happened that causes the Department of Aging to
20  correctly, generally, to (two words unintelligible). They
21  need to have this clarified. Is that, or is this prophylactic
22  in the sense that you want to have it in place, when the time
23  may come? --

24      MS. HAYDON: She, it's my understanding she has been
25  stable, but the facility and Doctor Tansinda, he's the

primary, have suggested that we have the do not resuscitate order in place.

THE COURT:  Yea.  Okay. --

MR. DIER:  Your Honor, if the Court pleases, I have to amplify that.  That's not correct.

THE COURT:  Okay.  What's it --

MR. DIER:  There has been a crisis.

THE COURT:  A crisis where --

MR. DIER:  A crisis regarding my mother's health.

THE COURT:  Well, okay, but I, you'll understand in a second why I'm cutting you off here, I think.

MR. DIER:  I do.

THE COURT:  I'm thinking that, and I realize I the one that called off Mr. Doyle from coming to this hearing, but I'm rethinking this now that we're in here, and thinking that there should be counsel.  My understanding is Mr. Doyle does not want to do this anymore, and there's probably multiple reasons for that, and I see he's still being characterized in pleadings and I think he does not want to do this.

Ms. Rochvarg, I note, is the counsel for Miss Dier at the Guardianship Review Board.  What I'm suggesting is this.  Maybe what we should do is take up, not take up the merits of this today.  I'll ask Ms. Rochvarg if she would come in to be counsel for Mrs. Dier and on the merits, reset it and take up today the motions that are here today.  What's your

1    thought on that?

2        MS. HAYDON:  I differ just a (two words
3    unintelligible), Your Honor.  We're prepared to go forward and
4    Doctor Tansinda is here.

5        THE COURT:  I understand.  I think I understand.  I
6    think the law's unclear on it, but I can see Mr. Dier's point
7    that, and the statute seems to say that this is, you know, we
8    have interested, at least one interested person here who's
9    contesting it.  The argument is that since you're the
10   guardian, I mean, you're the court appointed guardian that
11   there's, you're seeking to do this, that doesn't necessarily
12   mean that there can't be some need to have the person
13   separately represented for at least that limited purpose.

14       And, I think it's at least discretionary (two words
15   unintelligible), and I think it may be best here, particularly
16   where we have an interested person so strongly arguing against
17   the resuscitation, the do not resuscitate order.  So, but,
18   maybe what we could do, so that's what I'm going to do.  I'm
19   not, we're not going to hear it today.  I'm going to ask Ms.
20   Rochvarg.  We'll get it back in shortly, but we will then do
21   that.

22       MR. DIER:  Your Honor, there's a crisis.  Can I
23   (word unintelligible) that?  That I believe we need the
24   Court's intervention immediately.

25       THE COURT:  All right.  Well, let's hold up here.

1  Well, what's the crisis?

2        MR. DIER:  Well the, Michelle Lyons, if she can

3  address the Court --

4        MS. LYONS:  Can I speak a moment please? (Speaking

5  at the same time as Mr. Dier.)

6        THE COURT:  All right, Ms. Lyons.

7        MS. HAYDON:  Can I release Doctor Tansinda?

8        THE COURT:  Yes.  I don't think we're going to need

9  a doctor.  Let's find out what the crisis is --

10        MR. DIER:  I think we should find out what the

11  crisis is.

12        THE COURT:  Let's find out what the crisis is

13  because maybe the doctor will --

14        MR. DIER:  Exactly!

15        THE COURT:  Shed some light on this or not.  What's

16  the crisis Ms. Lyons?

17        MR. DIER:  She doesn't know the crisis.

18        MS. LYONS:  I don't know the crisis, but I know with

19  all respect to you that our family has always believed in the

20  right to life and the D and R and the taking away the feeding

21  tube is something we cannot accept.

22        THE COURT:  Well, we're going to, that's, we're not

23  going to take that up today.

24        MS. LYONS:  Okay.

25        THE COURT:  What's crisis are you talking about?

1        MR. DIER:  Okay.  Thank you, Your Honor.  This has

2   evolved in the past few weeks.  What's taking place is this,

3   Your Honor.  When I come to visit my mother and the Court

4   notes I'm there frequent and I observe what is in fact taking

5   place.  I have found on one occasion, her back uncovered,

6   facing the window, which is only two to two and a-half feet

7   away as well as the air conditioning blower.  The air

8   conditioning blower is blowing cold air on her unprotected

9   back.  The window is open.  It's cool at night, and I checked

10  the temperature gauge.  It reads forty degrees.  I'd like to

11  ask the State or anyone here, when was the last time they set

12  the temperature gauge to forty degrees?  On other occasions, I

13  have found my mother facing that window and that blower, and

14  again blowing cold air, blowing cold air and the window

15  opened.

16        As recently as Sunday, the same thing, except the

17  resident next to my mother complained:  "Close the window.

18  Close the window."  I couldn't see that the window was in fact

19  opened because it was covered by the curtain as well as the

20  blinds were drawn so I thought she meant she was just cold.

21  The temperature gauge was again set at fifty degrees.  The

22  nurse came in, excuse me, Monique came in and then the nurse.

23  Monique is a nurse's assistant and at my request changed the

24  temperature to a approximately seventy-five degrees.  About

25  forty-five minutes later, I thought maybe this woman, Gloria

1  is correct.  I'd better check the window.  I looked behind the

2  drawn blind and the window was open approximately eighteen

3  inches, again right on my mother.

4       This has happened on a number of occasions.  I told

5  the people there what's going on.  They do little or nothing.

6  This happened again as recently as my last visit on Monday.

7       THE COURT:  Did you tell the Guardian?

8       MR. DIER:  Now, what's happened as the result of all

9  of this?

10      THE COURT:  Did you tell the Guardian about this?

11      MR. DIER:  No.  No.  I've not told the Guardian.

12      THE COURT:  Well, why wouldn't you tell the Guardian

13  about this?

14      MR. DIER:  Because I told the people there.  Your

15  Honor, if I, it would take an extraordinary long period of

16  time, but in all candor, every time that I've related

17  information to the Office of the Howard County Guardian, my

18  mother's condition is worsened.  They take my complaints as a

19  reason by and through Summit Park to hurt and harm my mother,

20  incident after incident after incident, including this writ

21  now and including Ms. Ross.  That's why I haven't informed the

22  Office of Aging.  If the Court wants, I can go into the

23  instances, but I'd like to complete what's happened to my

24  mother as a result of this.

25      Approximately a week and a half, maybe it's almost

1   two weeks ago, now, a nurse, who I would describe as a

2   friendly nurse, and I hope she's not fired as a result of me

3   saying her name, Tyler, I believe it's T-Y-L-E-R, a lady as I

4   know she's been working here for some time.  She's always been

5   very helpful.  She told me, and I could almost tell myself

6   cause my mother had been coughing very deeply and I complained

7   to the nurses.  This is a deep cough.  It's coming right from

8   within her chest and it's constant.  It's constant.  You can

9   just see it on her face and on her body.

10          Tyler told me that my mother had contracted

11  pneumonia.  Pneumonia, I wonder if the Office of Aging knew

12  that my mother has contracted pneumonia.  I must say in the

13  past week or week and a half, my mother has not been coughing

14  as much and hasn't shown the same symptoms, but I am gravely

15  concerned about this window and this blower, and I must say

16  that on Sunday when I was there, other than the window being

17  open and Gloria directing my attention to that the blower was

18  on high.

19          Generally, the blower gets cold, but this time it

20  was on high.  That's, it's hard to believe how this in fact

21  take place.  I wouldn't believe it unless I had observed it

22  myself that any human being could do this to another human

23  being.  It cannot be by accident.  It can't be by chance.

24  It's by mischief, a crafted plan and design to make the

25  matters moot, to make the matters moot, and we all know what I

1   am talking about by making the matters moot.   That's what's

2   taking place.

3           The Court may very well know that I was in Federal

4   Court yesterday.

5           THE COURT:  No.  I didn't know.

6           MR. DIER:  Okay.  Arguing a habeas, ex parte before

7   Judge Robertson.

8           THE COURT:  Where?

9           MR. DIER:  In the District of Columbia --

10          THE COURT:  Oh, okay.

11          MR. DIER:  Judge Robertson denied jurisdiction.

12  That matter may very well be revisited, but what he said and

13  what I'm doing right now, I'm following his direct.  He

14  said take it back to the State of Maryland.  That's where it

15  belongs, and that's why I'm letting this court know.  I'm

16  taking it back to the State of Maryland.

17          THE COURT:  Right.  Well, I think --

18          MR. DIER:  And that's a crisis.

19          THE COURT:  I understand.  Well, the Guardian, I

20  think it would be most productive to make sure the Guardian

21  knows about these things and you can put it in writing to the

22  Guardian if you're concerned about actually talking to him.

23  You can, and I'm sure the Guardian will respond to those

24  concerns.

25          MR. DIER:  Well, Your Honor, then I should also let

1  the Court know what's happened regarding the Guardian in the

2  past six weeks concerning myself.

3       MS. HAYDON:  Your Honor, I object.  Is this a review

4  hearing?  (Five or so words unintelligible, talking at the

5  same time as Mr. Dier and the Court.)

6       MR. DIER:  Well, the Court has raised the issue --

7       THE COURT:  -- Okay.  I tell you what to do.  Why

8  don't you go out, and take a second.  And, counsel, if I can

9  see you on the other case up here, while you do that.

10       (This case is momentarily interrupted, the Judge

11  addressing another case.)

12       THE COURT:  Did you release the doctor?

13       MS. HAYDON:  Yes, I did, Your Honor.

14       THE COURT:  Okay.  Good.  Now, do you want to spend

15  some time today just going through these motions and requests

16  and dealing with those, get those, underbrush taken care of?

17       MS. HAYDON:  Yes, please.

18       MR. DIER:  Could we just, one, Your Honor, that

19  without my mother being here or represented by counsel or a

20  good reason for her not being here being placed on the record

21  by her counsel, there is only one motion, Your Honor, that I

22  would be prepared to go forward on, and that's to request

23  subpoena power.  I need subpoena power, Your Honor, to

24  effectively bring (word unintelligible) from the different

25  agencies and or individuals involved before the Court, before

1   the Court can make any reasoned meaningful decision as regards

2   to my mother's condition and status.   I do not have that power

3   at this time.   I can only move by way of the discovery rules,

4   which I am allowed to under the Maryland Rules, title ten, as

5   an interested person, but that's different from having

6   subpoena power.

7          I would respectfully request that I be granted

8   subpoena power and that that be made known to the Clerk's

9   Office so they can issue me subpoenas in blank so I can get as

10  to the truth as to what is going on as regards my mother.   I

11  could spend hours, and I'm sure the Court's role there

12  detailing what has in fact been taking place, but I should

13  note to the Court because the Court noted to me on that March

14  seventh date, two thousand and six, that although the Court

15  noted that I was the best son, the most caring and interested

16  son, and that I was though overly optimistic, it was of great

17  importance to the Court and to my mother that I be there for

18  her and with her so I could observe and give suggestions, not

19  make orders, demands and or commands as what would be in her

20  best interest.

21          I've done the best I could under the restrictions

22  that have been placed on me by Aging as well as Summit Park,

23  but it reached a point of not quite no return, but moving in

24  that direction in a most disturbing pace on August the

25  seventeenth of this year.   I had complained during that week

1  to Doctor (name sounds like Batsperand), who is the head of

2  the medical facility about the positioning of my mother's legs

3  being locked under her body.

4       It's hard to believe that.  I tried to close my eyes

5  sometimes, but it's scary.  You have an individual with her

6  arms, her right and left arm and hands encapsulated under a

7  gown locked into her body.  We have an individual turned to

8  one side and the other and we have both legs, her right leg

9  and her left leg locked under her body so we have an

10  individual who's, I know it hurts Michelle, but we have an

11  individual who's five five to five seven, and now we have an

12  individual lying in that bed from the tip of her head to where

13  her legs are locked in under her body, locked in by pillows,

14  locked in by her upper torso, twenty-two to twenty-four inches

15  from the tip of her head to her legs, like a half a person,

16  like half a person.

17       I complained time and time and time again, and every

18  time I complain to Miss Ross, every time I complain to the

19  people at Summit Park, Miss Dorsey, who's the designated agent

20  of the director, my mother's treatment gets worse to have

21  reached the point that her left leg, and I don't even know how

22  this is possible, but again, physically my mother's always

23  been a very healthy person; her left leg, when she's placed in

24  bed, and it's hard to imagine even this, because it's beyond

25  barbaric, the knee of her left leg is between four and six

1  inches, and sometimes two to four inches from her nose.

2  That's how it's placed.  Her knee is in a raised position,

3  almost right into her face.  Her left leg, and her right leg

4  is locked into her body covering her left foot, causing bed

5  sores to develop where there was no need.

6        Without going into much greater detail, on or about

7  November fifth, two thousand and six, and he's seen this and

8  he's done nothing! Callous indifference! On or about November

9  fifth, my mother was on the first floor, the gateway floor,

10 Summit Park, and with my help and assistance there constantly,

11 three to four, five times a day, to do two things:  I love my

12 mother and to protect her from the staff.

13        What happened was, Doctor Bernhardt saw that as a

14 result of what I had done to help and assist her, as well as

15 she was receiving physical therapy and occupational therapy at

16 the time, all her bed sores, even the one on her hip that

17 (three words unintelligible) at Howard County General on

18 January fourth, two thousand and six, had healed.  She had no

19 wounds at all!  And, the people from physical therapy, and

20 they all seemed to disappear, once they seemed to be favorable

21 to me and say things favorable and do things favorable, they

22 disappeared.

23        Mr. William Moore, the physical therapist, told me

24 that my mother's legs, and he said he placed an order in her

25 chart, were not to be locked into her body and he saw what

they were doing.  They were not to be locked into her body and he found through physical therapy, her legs could be placed without any difficulty at a ninety-degree angle.  We all know what that means.  That's the angle we have when we're sitting. That's what Ms. Rightnour's legs are, that's what Ms. Haydon's, that's what the Court, and the Clerk.  When people sit or drive a motor vehicle or operate a computer, that's it. There's no need for her legs to have been locked over her body within days of her receiving this most favorable prognosis by Doctor Bernhardt, and he said I won't even have to see Ms. Dier anymore.  I said we'll be sorry to see it leave, but we're glad under the circumstances, and he said, well I'll come by intermittently just to see how she's doing.

My mother was transferred to the second floor, to the B wing under the care of Mr. Richards, who had somehow disappeared in August upon my continued complaints.  He had been there, according to my understanding, for years, no longer to be seen, Mr. Richards.  He's the nurse.  So, Mr. Richards insisted on locking my mother's legs under her body, insisted, and they were locked in by pillows, and she developed sores all over her feet where she had none.  And, Doctor Bernhardt, who wasn't even going to see her except just to come by and say hi, or something, now was there again, back each and every week.  And, without going into what Doctor Bernhardt did or didn't, and other members of the staff, the

1  bedsores got worse, but I was there.  I insisted and I tried

2  to make them do the right thing as best I could under the

3  restrictions that I had placed upon (word unintelligible).

4         What happened in August, again I complained of it.

5  This year, within weeks, only weeks ago, I called in and

6  required to attend a meeting with Peggy Rightnour, Ophelia

7  Ross, Robby Dorsey, the unit manager and designated person by

8  Jacquelyn Harding, the director of Summit Park, as well as

9  another lady from Social Services at the Summit Park.  I don't

10 know her name.  And apparently, there's been a complaint, or

11 complaints lodged against me.  And, what am I doing that's

12 wrong going to see my mother three to five times a day because

13 I love her, to protect her, and give her comfort?  They say

14 that I'm lifting up the sheets and looking under to see what

15 they're doing to her!

16        They say that on the bandage on her elbow somehow,

17 now when they say they, these are unsubstantiated allegations.

18 Someone was making these allegations.  The bandage, somehow,

19 they don't know who did it, but it was at a tilt and it wasn't

20 that way before.  So, here I'm coming to see her from more

21 than twenty times a week.  That's essentially my life.  Going

22 to see and help my mother and she deserves that and more.

23 And, I'm limited now to three times a week.  Three times a

24 week for two hours on each visit.  That's what's taking place

25 now because I've seen too much.  I've heard too much.  I've

1  made too many complaints to Aging. I've made too many

2  complaints to Summit Park, and I've made too many complaints

3  to the medical staff, and I'm too vocal when I get before the

4  Court. So, that's the way to essentially shut me up by

5  telling me, and I know I'm taking a chance because I don't

6  know what they're going to do to my mother now (two words

7  unintelligible) that I'm going to do what Judge Robertson

8  said.

9          I'm going to take it back to the State of Maryland

10  Court and pray, and pray, now and tonight that this court will

11  do the right thing to help my mother - an innocent. She's an

12  innocent! She's not deserving of this! I told Doctor

13  Tansinda. Doctor Tansinda, in all due respect to Doctor

14  Tansinda, the last time I saw him with my mother was about a

15  week to two weeks ago, he was in my mother's room for less

16  than a minute, and it was less than a minute. In all due

17  respect, I know he's busy, but less than a minute, but I told

18  him, and he didn't know, and he was taken back and he told Ms.

19  Haydon, and there was no reason for him not to tell Ms. Haydon

20  because I was going to detail this to the Court, that my

21  mother in two instances, separate and apart from speaking to

22  me, which they may or may not believe, two instances where the

23  nurses there had gave Doctor Tansinda and there was nothing

24  that he had read in the reports that signified that such had

25  taken place.

1    Within the last two weeks, a nurse by the name of
2    Clara, I hope she's not fired or somehow disappears, when she
3    was in to do the tube feeding with my mother I said, because I
4    know that they generally want me to leave, so I said I'll step
5    out now, and my mother was looking at me and looking at the
6    nurse Clara and her hair and eyes were going back and forth,
7    and the nurse sensed that my mother fully understood and
8    comprehended what was taking place, and the nurse said to my
9    mother, don't worry Ms. Dier, I'm going to tell your son to
10   wait outside and he's going to come back.  He's going to come
11   back, after the tube feeding.  The nurse clearly understood
12   that my mother understood and I did come back.
13       Within the past week to week and a half, Rick!  He's
14   easily distinguishable because his hair is braided in the
15   back.  He's very, very nice.  I go in nights.  I speak to Rick
16   and Rick speaks to me, and he tells me something unusual
17   happened.  He said, "I thought I heard your mother speak, but
18   she's never spoken to me before so I must be wrong, but I
19   thought I heard her speak."  And, I said, "Rick, my mother's
20   spoken to me many, many, many times," and Rick said, "Yes, she
21   was speaking."  I said, "When was she speaking?"  She was
22   complaining when I was moving her about and changing her
23   bandages.  This doesn't appear in any of her reports!  Doesn't
24   appear anywhere that my mother is cognizant and talks and does
25   when she feels like doing what she wants to do at her

1 particular time of choosing because the Court may well recall,

2 I've indicated to the Court.

3        The Court may very well recall that I indicated to

4 the Court how all of this came about.  My mother, when she

5 hears about family illnesses and so forth, ever since my

6 father had his second bypass operation in 1992, and she was

7 seventy-five, never had any psychiatric history.  My father

8 had difficulties, his chest opened up three times within

9 twenty-four hours --

10        THE COURT:  I remember all of that history here.

11        MR. DIER:  Okay. Without going into that, without,

12 okay, okay.  Without going into all that, my mother needs help

13 to deal with her depression!  There was a nurse's, I'm not

14 sure if it's called a nurse's physician or a psychiatric

15 nurse.  I think it was psychiatric nurse.  I believe her name

16 is Zetner or Zetter, but I'm not sure, came by Summit Park

17 when my mother had only been there for about a month to

18 evaluate my mother.  And, I explained to her in detail my

19 mother's condition.  I know the Court doesn't want to hear

20 this, and in detail, and she said, we heard this, we heard

21 this before.  This is someone who can be helped.  What

22 medications has she been on before?  And, we'll see if we can

23 help her again.

24        Well, I never heard from this doctor again, but I

25 did hear from a member of the staff, but I don't remember the

1  number of the staff, and I was told that a representative from

2  Aging, and I believe it was Ms. Rightnour at that time, in

3  March two thousand and six had said no to my mother receiving

4  medications to treat her depression. This is what my mother

5  has been dealing with and facing isolation, darkness, torture,

6  and torment. It's only her inner physical strength, and I've

7  never met anyone at any age anywhere, or heard of anyone,

8  who's as physically strong and healthy as my mother. It's

9  only that in my presence and my love for her and her love for

10 me, and I told her that help is on the way, help is on the

11 way.

12         I'm asking this court to make more than that help

13 being on the way to give her the help that as an innocent and

14 as a human being she's deserving of, Your Honor.

15         THE COURT: All right. Well, we're going to, I'm

16 going to, as I indicated, appoint somebody to, maybe Ms.

17 Rightnour, to represent Ms. Dier in this proceeding and then

18 reset it. I'll, we will, I'll talk, we'll talk to Ms.

19 Rightnour, and then we'll set a date. I'll try to do it

20 sooner rather than later because --

21         MR. DIER: The subpoena power, Your Honor? Can I be

22 granted that?

23         THE COURT: No. I'm not going to grant the subpoena

24 power at this point. We'll get Ms. Rightnour on board and

25 then we can see where things go.

1    MR. DIER:  Okay.  Can we revisit it then after we
2  get her on board?
3    THE COURT:  Possibly. Yea.  I mean it's, but, I
4  mean, we're not.  The State has the burden of the, office has
5  the burden of proving by clear and convincing evidence this is
6  required under the statute, I think.  Do you agree with that?
7    MS. HAYDON:  Yes.
8    THE COURT:  Yes.  All right, and so they're going to
9  have to come in and present evidence that this is in the best
10  interest of Ms. Dier, and the attorney appointed will have an
11  opportunity and you'll have an opportunity.  You know, we're
12  not going to relive everything that we've already been
13  through.  It's not a, looking at the entire years and years of
14  care, it's directed to this issue, and I think we're going to
15  keep it at that, but we'll let people present what they feel
16  is appropriate.
17    So, okay, well, we'll be in touch with you about
18  resetting this and my law clerk will be the contact person for
19  this.  All right?  Thanks folks.
20    MR. DIER:  I thank you so much for hearing me out
21  again, Your Honor.  Thank you.
22    THE COURT:  Okay, Mr. Dier.
23    MR. DIER:  Your Honor, can I, can the Court order,
24  Your Honor, that I can see my mother on an unlimited basis?
25    THE COURT:  I am not going to take that up today.

1    I'm not going to take that up today.  Nope.

2              MR. DIER:  Okay.  Thank you.

3              THE COURT:  All right.

4              THE CLERK:  All rise, please.

5              (Case ends at 10:55am.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## COURT REPORTER'S CERTIFICATE

I hereby certify that I reported verbatim by audio recording the proceedings attached hereto in the Matter of Dorothy Dier, Case No. 13-C-05-063324, held in the Circuit Court for Howard County on October 3rd, 2007, before the Honorable Dennis M. Sweeney.

I further certify that the proceedings were transcribed by me to the best of my ability in a complete and accurate manner, and page numbers one through thirty-seven constitute the official transcript of the proceedings.

In Witness Whereof, I have affixed my signature on this 8th day of November, 2007.

ORIGINAL

Clarence E. Williamson
Contingent Court Reporter

JS-44
(Rev.1/05 DC)

# CIVIL COVER SHEET

**I (a) PLAINTIFFS** Dorothy Dier

**(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF** 88888
(EXCEPT IN U.S. PLAINTIFF CASES)

Baltimore County

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
Jerry L. Dierson, in behalf of pro se Dorothy Dier

**DEFENDANTS** Phyllis Madagy, ETAL
Howard County

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

AT

Case: 1:08-cv-00002
Assigned To : Collyer, Rosemary M.
Assign. Date : 1/2/2008
Description: Habeas Corpus-2255

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff
☒ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant
☐ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP
FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☒ 2 | ☒ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

**☐ A. Antitrust**

☐ 410 Antitrust

**☐ B. Personal Injury/ Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

**☐ C. Administrative Agency Review**

☐ 151 Medicare Act

**Social Security:**
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)

**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

**☐ D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

**☐ E. General Civil (Other) OR ☐ F. Pro Se General Civil**

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ☐ G. Habeas Corpus/ 2255 | ☐ H. Employment Discrimination | ☐ I. FOIA/PRIVACY ACT | ☐ J. Student Loan |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment<br>(criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ☐ K. Labor/ERISA (non-employment) | ☐ L. Other Civil Rights (non-employment) | ☐ M. Contract | ☐ N. Three-Judge Court |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

☒ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify)   ☐ Multi district Litigation   ☐ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

28 USC 2254

**VII. REQUESTED IN COMPLAINT**   CHECK IF THIS IS A CLASS ☐ ACTION UNDER F.R.C.P. 23   **DEMAND $** _____   Check YES only if demanded in complaint JURY DEMAND: ☐ YES  ☒ NO

**VIII. RELATED CASE(S) IF ANY**   (See instruction)   ☐ YES  ☐ NO   If yes, please complete related case form.

**DATE** 1/2/08   **SIGNATURE OF ATTORNEY OF RECORD** _X_ ___ per pro se, in behalf of his mother, Dorothy Dye,

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.   COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.   CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.   CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.   CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.   RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

JAN - 2 2008

RECEIVED